**EXHIBIT #2**

**2006 SUBSEQUENT PAROLE CONSIDERATION HEARING**

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of: )            CDC Number D-30420
                         )
LESLIE BYRDE             )
                         )
_____)

INMATE COPY

R.J. DONOVAN CORRECTIONAL FACILITY

SAN DIEGO, CALIFORNIA

JULY 19, 2006


PANEL PRESENT:

Mr. James Davis, Presiding Commissioner
Mr. Alejandro Armenta, Deputy Commissioner


OTHERS PRESENT:

Mr. Leslie Byrde, Inmate
Mr. Daniel Coryn, Attorney for Inmate
Ms. Katherine Mitchell, Deputy District Attorney
Mrs. Linda Engstrom, Victim's Next of Kin
Mr. Scott Engstrom, Victim's Next of Kin
Mr. William Engstrom, Victim's Next of Kin
Ms. Maryann Diaz, Correctional Counselor
Correctional Officers Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No        See Review of Hearing
_____ Yes       Transcript Memorandum


**Stacy Wegner, Peters Shorthand Reporting**

Exhibit #2 Page 1

ii

## INDEX

PAGE

Proceedings..........................................  1

Case Factors......................................... 10

Pre-Commitment Factors............................... 15

Post-Commitment Factors.............................. 45

Parole Plans......................................... 28

Closing Statements................................... 70

Recess............................................... 90

Decision............................................. 91

Adjournment.......................................... 98

Transcriber Certification............................ 99

--oOo--

Exhibit #2 Page  2

1

PROCEEDINGS

1
2    PRESIDING COMMISSIONER DAVIS:  This is a
3    subsequent parole consideration hearing for
4    Leslie Byrde, CDC number D-30420.  Today's date
5    is July 19th, 2006.  We're located at R.J.
6    Donovan Correctional Facility.  The inmate was
7    received on May 23rd, 1986, from Marin County.
8    The life term began on May 23rd, 1986, with a
9    minimum eligible parole date of January 5th,
10   1995.  The controlling offense for which the
11   inmate was committed is murder second, case
12   number MAR-9635, count one, Penal Code Section
13   187 second.  The inmate received a term of 15
14   years to life.  This hearing is being tape
15   recorded, and for the purposes of voice
16   identification, we'll each state our first and
17   last name, spelling the last name.  And when it
18   reaches you, Mr. Byrde, if you'll also give us
19   your CDC number, please?
20       INMATE BYRDE:  Yes.
21       PRESIDING COMMISSIONER DAVIS:  I'll start
22   and move to my left.  I'm James Davis, D-A-V-I-
23   S, Commissioner.
24       DEPUTY COMMISSIONER ARMENTA:  My name is
25   Alejandro Armenta, A-R-M-E-N-T-A, Deputy
26   Commissioner.
27       INMATE BYRDE:  Leslie Byrde, B-Y-R-D-E, D-

Exhibit #2 Page   3

2

1   30420.

2      **ATTORNEY CORYN:**  Daniel Coryn, C-O-R-Y-N,

3   attorney for Mr. Byrde.

4      **DEPUTY DISTRICT ATTORNEY MITCHELL:**

5   Katherine Mitchell, M-I-T-C-H-E-L-L.

6      **MRS. ENGSTROM:**  Linda Engstrom, E-N-G-S-T-

7   R-O-M, mother of Cindy.

8      **PRESIDING COMMISSIONER DAVIS:**  Thank you.

9      **MR. SCOTT ENGSTROM:**  Scott Engstrom, E-N-G-

10  S-T-R-O-M, brother of the victim.

11     **MS. DIAZ:**  Maryann Diaz, D-I-A-Z,

12  Correctional Counselor II.

13     **MR. WILLIAM ENGSTROM:**  William Engstrom, E-

14  N-G-S-T-R-O-M, father of the deceased.

15     **PRESIDING COMMISSIONER DAVIS:**  Thank you.

16  Let the record also reflect that we're joined by

17  a correctional officer who is here for security

18  purposes only and will not be actively

19  participating in the hearing.  Mr. Byrde, in

20  front of you in the laminated piece of paper is

21  the American's with Disabilities Act statement.

22  Would you please read that aloud, sir?

23     **INMATE BYRDE:**  In front of me.  I can't see

24  out this eye, so --

25          The American's with Disabilities Act is

26          a law to help people with disabilities.

27          Disabilities are problems that make it

Exhibit #2 Page  4

1    harder for some people to see, hear,
2    breathe, talk, walk, learn, think,
3    work, or take care of themselves than
4    it is for others.  No one can be kept
5    out of public places or activities
6    because of a disability.  If you have a
7    disability, you have the right to ask
8    for help to get ready for your BPT
9    hearing, get to the hearing, talk, read
10   forms and papers and understand the
11   hearing process.  BPT will look at what
12   you ask for to make sure that you have
13   a disability that is covered by the ADA
14   and that you have asked for the right
15   kind of help.  If you do not get help,
16   or if you don't think you got the kind
17   of help you need, ask for BPT 1074
18   Grievance Form.  You can also get help
19   to fill it out.
20   **PRESIDING COMMISSIONER DAVIS:**  Thank you.
21   Our records indicate that in cooperation with
22   the staff in the institution on March 28th,
23   2006, you reviewed and signed a BPT Form 1073
24   indicating that you have multiple sclerosis.  Is
25   that the reason for the wheelchair?
26   **INMATE BYRDE:**  Yes, sir.
27   **PRESIDING COMMISSIONER DAVIS:**  And the

Exhibit #2 Page  5

1  wheelchair is something that you have all the
2  time?
3       INMATE BYRDE:  Yes, sir.
4       PRESIDING COMMISSIONER DAVIS:  And that you
5  had it available to you to make your way to the
6  hearing today?
7       INMATE BYRDE:  Yes, sir.
8       PRESIDING COMMISSIONER DAVIS:  All right.
9  And I see that you wear glasses.  And they are
10 sufficient for you to read?
11      INMATE BYRDE:  Yes.
12      PRESIDING COMMISSIONER DAVIS:  And you've
13 had those -- you've had the ability to -- or
14 you've had those available to you in reviewing
15 your Central File and all the other documents in
16 preparation for this hearing?
17      INMATE BYRDE:  Yes.
18      PRESIDING COMMISSIONER DAVIS:  All right.
19 You're able to hear me all right?
20      INMATE BYRDE:  Yes.
21      PRESIDING COMMISSIONER DAVIS:  And of
22 course, you made your way by way of the
23 wheelchair.  Is there any reason that you can
24 think of that you would not be able to actively
25 participate in this hearing?
26      INMATE BYRDE:  No, sir.
27      PRESIDING COMMISSIONER DAVIS:  All right.

Exhibit #2 Page  6

1  Now, you indicated that you were -- had

2  difficulty seeing out of your right eye?

3      **INMATE BYRDE:**  Yes, sir.

4      **PRESIDING COMMISSIONER DAVIS:**  And is that

5  something that's been longstanding?

6      **INMATE BYRDE:**  Yes, sir.  It's part of the

7  multiple sclerosis.  It gradually makes you go

8  blind.

9      **PRESIDING COMMISSIONER DAVIS:**  Okay.

10     **INMATE BYRDE:**  My left is still, knock on

11 wood, halfway decent shape.  My right eye is

12 maybe 50 percent.  I can't read with the right

13 eye.

14     **PRESIDING COMMISSIONER DAVIS:**  All right.

15 And everything else -- we're all squared away

16 otherwise, correct?

17     **INMATE BYRDE:**  Yes, sir.

18     **PRESIDING COMMISSIONER DAVIS:**  And Counsel,

19 you're satisfied with that as well?

20     **ATTORNEY CORYN:**  Yes.

21     **PRESIDING COMMISSIONER DAVIS:**  Thank you.

22 This hearing is being conducted pursuant to

23 Penal Code Sections 3041 and 3042 and the rules

24 and regulations of the Board of Prison Terms

25 governing parole consideration hearings for life

26 inmates.  The purpose of today's hearing is to

27 once again consider the number and nature of the

Exhibit #2 Page  7

1  crimes for which you were committed, your prior

2  criminal and social history, and your behavior

3  and programming since your commitment.  Now,

4  we've had the opportunity to review your Central

5  File and your prior transcripts, and you'll be

6  given an opportunity to correct or clarify the

7  record as we proceed.  We will reach a decision

8  today and inform of whether or not we find you

9  suitable for parole and the reasons for that

10  decision.  If you are found suitable for parole,

11  the length of your confinement will be explained

12  to you.  Nothing that happens in today's hearing

13  will change the findings of the Court.  The

14  Panel is not here for the purpose of retrying

15  your case.  We're here for the sole purpose of

16  determining your suitability for parole.  Do you

17  understand that, sir?

18      **INMATE BYRDE:**  Yes, sir.

19      **PRESIDING COMMISSIONER DAVIS:**  All right.

20  Your hearing will be conducted in two phases.

21  First, I will discuss with you the crime for

22  which you were committed, as well as your prior

23  criminal and social history.  Commissioner

24  Armenta will then discuss with you your progress

25  since your commitment, your counselor's report,

26  your psychological evaluation, parole plans, and

27  any letters of support or opposition as they may

Exhibit #2 Page  8

1  exist.  Once that's concluded, the

2  Commissioners, the District Attorney then your

3  attorney will have an opportunity to ask you

4  questions.  Questions that come from the

5  District Attorney will be asked through the

6  Chair then you will respond back to the Panel

7  with your answer.  Next, the District Attorney

8  and then your attorney will have an opportunity

9  to make a final closing statement, followed by

10  your statement, which should be focused on why

11  you believe that you are suitable for parole,

12  followed by statements from the victim's next of

13  kin.  California Code of Regulations states that

14  regardless of time served a life inmate shall be

15  found unsuitable for and denied parole, if in

16  the judgment of the Panel the inmate would pose

17  an unreasonable risk of danger to society if

18  released from prison.  Now, you have certain

19  rights.  Those rights include the right to a

20  timely notice of this hearing, the right to

21  review your Central File, and the right to

22  present relevant documents.  Now, Counsel, are

23  you satisfied that your client's rights have

24  been met to date?

25      **ATTORNEY CORYN:**  Yes, I am.

26      **PRESIDING COMMISSIONER DAVIS:**  Thank you.

27  You have an additional right, and that is to be

Exhibit #2 Page  9

1  heard by an impartial Panel.  Now, you've heard

2  Commissioner Armenta and I introduce ourselves

3  today.  Do you have any reason to believe that

4  we would not be impartial?

5      **INMATE BYRDE:**  No, I don't.

6      **PRESIDING COMMISSIONER DAVIS:**  Thank you.

7  You will receive a written copy of your decision

8  today.  That decision becomes effective within

9  120 days.  A copy of the decision and a copy of

10 the transcript will be sent to you, and you will

11 have 90 days from that date to appeal if you so

12 desire.  You are not required to admit to your

13 offense or discuss your offense.  However, this

14 Panel does accept the findings of the Court to

15 be true.  In fact, the Board has eliminated its

16 appeal process.  If you disagree with anything

17 in today's hearing, you have the right to go

18 directly to court with your complaint.

19 Commissioner Armenta, are we going to be dealing

20 with anything from a confidential file today?

21     **DEPUTY COMMISSIONER ARMENTA:**  No, we are

22 not.

23     **PRESIDING COMMISSIONER DAVIS:**  All right.

24 Thank you.  I'm going to pass a checklist of

25 documents to both counsel.  If you would please

26 review that to make sure that we're both --

27 we're all operating off the same list of

Exhibit #2 Page 10

1   documents.

2       **DEPUTY DISTRICT ATTORNEY MITCHELL:**  I have

3   these.  Thank you.

4       **PRESIDING COMMISSIONER DAVIS:**  Thank you.

5       **ATTORNEY CORYN:**  Yes, I have these

6   documents.  Additionally, I have some chronos --

7       **INMATE BYRDE:**  Those are duplicates.

8   Basically, the things that should be -- the

9   chronos are not duplicates, but the tops of all

10  these are letters just in case they were lost.

11      **ATTORNEY CORYN:**  Yeah.

12      **PRESIDING COMMISSIONER DAVIS:**  All right.

13  Is that all the additional documents that you

14  have for us today?

15      **ATTORNEY CORYN:**  Yes.  Mr. Byrde said it

16  might be duplicative, but we just want to make

17  sure that --

18      **DEPUTY COMMISSIONER ARMENTA:**  That's fine.

19      **PRESIDING COMMISSIONER DAVIS:**  We'll take a

20  look at that compared to what we have and review

21  it at the appropriate time.  And I'm sure Mr.

22  Armenta will cover this as well, but if for some

23  reason we miss something, please let us know.

24  I'm going to go ahead and mark that checklist of

25  documents as Exhibit One.  Any preliminary

26  objections, Counsel?

27      **ATTORNEY CORYN:**  None.

Exhibit #2 Page 11

1     **PRESIDING COMMISSIONER DAVIS:**  All right.

2  Will your client be speaking with us today?

3     **ATTORNEY CORYN:**  Yes.

4     **PRESIDING COMMISSIONER DAVIS:**  All right.

5  Then would you raise your right hand then, sir?

6  Do you solemnly swear or affirm that the

7  testimony you are about to give at this hearing

8  will be the truth, the whole truth, and nothing

9  but the truth?

10     **INMATE BYRDE:**  I do.

11     **PRESIDING COMMISSIONER DAVIS:**  Thank you.

12  All right.  Absence objection I want to

13  incorporate by reference the probation officer's

14  report, pages two through six, and refer to the

15  July 2006 calendar board report for the crime

16  summary.  Starting on page one, paragraph one,

17  it's a summary of crime.

18          On 6/18/85 at approximately 8:45 a.m.

19          Marin County Sheriff's Department was

20          contacted regarding the discovery of a

21          nude female body.  The detective noted

22          that the body had been placed at the

23          location of discovery.  The body showed

24          signs of violence.  Further

25          investigation disclosed the identity of

26          the victim to be Cindy Engstrom, E-N-G-

27          S-T-R-O-M, and the cause of death to be

Exhibit #2 Page 12

1    asphyxia.  On the afternoon of 6/18/85

2    in the Casino Lake area some articles

3    of clothing belonging to the victim

4    were located.  Information collected

5    during the investigation identified

6    Byrde as the primary suspect in the

7    murder case.  During investigation

8    Byrde stated to detectives, "I am

9    responsible for what happened.  I

10    deserve to be punished."

11  There's your version here as well, but I

12  think, Mr. Byrde, since you have chosen to speak

13  with us today, I'll let you go ahead and tell us

14  your version rather than read it into the

15  record.  Why don't you tell us what happened on

16  that a day.  First of all, did you commit this

17  crime?

18    **INMATE BYRDE:**  Yes, sir, I did.

19    **PRESIDING COMMISSIONER DAVIS:**  And tell us

20  what happened.

21    **INMATE BYRDE:**  It's been a long time.  They

22  didn't make me do this last time, or that I can

23  recollect.  Ms. Engstrom and I were at my home

24  for purposes of sexual liaison.  I suggested

25  that we try bondage situation in the bathtub.

26  She agreed.  She actually had known that, about

27  the bondage, before she went to the house.  I

Exhibit #2 Page 13

1   talked to her the night before.  When we were in

2   the bathtub having sex I think she panicked.

3   She started yelling and struggling.  I panicked.

4       **PRESIDING COMMISSIONER DAVIS:**  Was that

5   because her mouth and nose were beginning to go

6   under water?

7       **INMATE BYRDE:**  No, sir, I don't think so.

8   I think she might of gotten water in her mouth

9   and nose from the splashing around, and that

10  might of caused what happened, but I mean, I

11  wasn't holding her down.  But anyway, she did

12  panic.  She started yelling, and I was -- my

13  windows were wide open.  We were close to

14  neighbors.  I mean, I wasn't like -- I mean, I

15  just freaked.  I didn't -- I pushed her under

16  the water.  Apparently, I hit her because she

17  was bruised.  I have no specific memory of

18  holding her under water or anything like that,

19  but obviously it went by in a flash for me.  It

20  just went by in a flash.  I'm obviously

21  responsible.  She was in a helpless situation.

22  Whether she panicked or not, it was my fault.

23      **PRESIDING COMMISSIONER DAVIS:**  So her hands

24  -- now, her hands and feet were tied?

25      **INMATE BYRDE:**  They were initially.  She

26  pulled them loose while she was struggling.

27  They weren't tied that tight, but they were in -

Exhibit #2 Page 14

1   - they had I guess, football tape, I guess you

2   could call it, white football type, and she

3   pulled them all loose.  Police found the tape

4   with the rest of the stuff and it was unbroken.

5       **PRESIDING COMMISSIONER DAVIS:**  If her hands

6   had been loose, she would of been able to lift

7   herself out of the bathtub.

8       **INMATE BYRDE:**  I mean, during the struggle

9   she pulled herself loose, but I obviously had

10  hit her and knocked her out or done something or

11  pushed her under water.  I mean, whatever

12  happened to her happened because I did it.  I

13  mean, there's no question about that.  It's just

14  that I don't -- I didn't -- I didn't do it

15  intentionally.  I mean, I'm responsible.  I

16  didn't set out to injure her, but when she

17  panicked, I think I panicked, and all I wanted

18  her to do was shut up.

19      **PRESIDING COMMISSIONER DAVIS:**  The

20  probation officer's report on page two, second

21  paragraph, indicates signs of violence were

22  noted on the body, including bruises from her

23  forehead, the backs of her hands, and swelling

24  over her left eye, markings of her left ankle

25  and wrist indicating some kind of tying or

26  constriction having been placed around her

27  ankles and wrists.  Dr. Jindrich, J-I-N-D-R-I-C-

Exhibit #2 Page 15

1  H, found the cause of death to be asphyxia.

2  Also observed varying types of trauma to the

3  body including bruising over the victim's right

4  eye, her forehead, her left eye, inside her

5  upper lip, a large area of bruising on top of

6  her head and behind her left ear.  On top of the

7  victim's right hand and wrist was observed

8  recent bruising and also depression of the skin

9  suggesting some kind of binding having been

10  wrapped around her wrist.  The doctor also

11  observed bruising on the victim's right and left

12  ankles.  Also observed evidence of forcible

13  compression on the victim's neck but was unable

14  to definitely state what actually caused the

15  strangulation resulting in the victim's death as

16  there was also evidence of drowning.  Sounds to

17  me like there was a lot of -- there was a lot of

18  force being exerted here?

19       **INMATE BYRDE:**  Well, her wrists were tied

20  to her ankles.  That's exactly how those bruises

21  took place.  In other words, her right wrist was

22  taped to her right ankle.  Her left wrist was

23  taped to her left ankle, so her wrist and ankles

24  would of been bruised as she pulled out.  We

25  also inside the bathtub, and it wasn't a round

26  tub, it's a rectangular square tub, thrashed in

27  there, and I'm quite she got some bruises there

Exhibit #2 Page 16

1  too, but also I'm quite sure I hit her in the

2  head or shoved her head.  I mean, I don't have a

3  specific memory of punching or anything like

4  that, but I do have a memory of shoving her

5  underwater and telling her to be quiet or trying

6  to get her to be quiet.

7    **PRESIDING COMMISSIONER DAVIS:**  All right.

8  In terms of arrests, there are no -- there's no

9  prior juvenile history and no adults arrest

10  prior to the instant offense.  In terms of a

11  social history, you were born in Los Angeles.

12  Your father was a career naval officer.  You

13  believed your father to be a remote person,

14  reserved, quiet, non-emotional, and controlling.

15  You describe your mother as an alcoholic.  A

16  very bright woman who was -- you described as a

17  housewife and someone who taught school while

18  you were in Hawaii.  By the way, if I say that

19  doesn't strike you as accurate or you want to

20  make a clarification, please let me know.  Are

21  we correct so far?

22    **INMATE BYRDE:**  Pretty much.  I've softened

23  my opinion of my father in the last 20 years.

24    **PRESIDING COMMISSIONER DAVIS:**  Why do you

25  think you reflected on him this way at this

26  particular time?

27    **INMATE BYRDE:**  Well, I think maybe he

Exhibit #2 Page 17

1  softened and I softened, and we've come together

2  a little bit.

3      **PRESIDING COMMISSIONER DAVIS:**  Do you keep

4  in contact now?

5      **INMATE BYRDE:**  Yes, sir.  He lives in

6  Carlsbad, and he visits regularly.

7      **PRESIDING COMMISSIONER DAVIS:**  Okay.

8      **INMATE BYRDE:**  He's 88 years old, and so he

9  comes down.

10     **PRESIDING COMMISSIONER DAVIS:**  You indicate

11 that your mother was an insomniac who slept

12 until noon, also an alcoholic and drank -- went

13 to bed a about 5:00 a.m., slept until noon, and

14 then started drinking at 5:00 p.m. and would

15 drink a full bottle of gin in one evening?

16     **INMATE BYRDE:**  Every day.

17     **PRESIDING COMMISSIONER DAVIS:**  And let your

18 sister and you to take care of yourselves -- or

19 you and your sisters pretty much take care of

20 yourselves?

21     **INMATE BYRDE:**  Yes, sir.

22     **PRESIDING COMMISSIONER DAVIS:**  Do you still

23 keep in contact with your sisters?

24     **INMATE BYRDE:**  Yes, sir.

25     **PRESIDING COMMISSIONER DAVIS:**  And where do

26 they live?

27     **INMATE BYRDE:**  One of them lives in Orange

Exhibit #2 Page 18

1  County.  One of them lives in Scottsdale,

2  Arizona.

3      PRESIDING COMMISSIONER DAVIS:  Okay.  And

4  you keep in contact by letters?

5      INMATE BYRDE:  By letters.  The one from

6  Orange County visited a couple months ago, and

7  we write.

8      PRESIDING COMMISSIONER DAVIS:  Okay.  You

9  had a fairly good relationship with both of your

10 sisters growing up, particularly your younger

11 sister.  Is that still the case?

12     INMATE BYRDE:  Yes, sir, that's the one in

13 Orange County.

14     PRESIDING COMMISSIONER DAVIS:  Your mother

15 died in 1977 by drowning in the family swimming

16 pool.  There was some assumption that perhaps

17 she blacked out and just drown?

18     INMATE BYRDE:  She had -- in addition the

19 her alcoholism, she smoked at least two packs of

20 cigarettes every day, and she used to go

21 swimming in her pool by herself, which was not

22 the smartest thing to do.  That's probably what

23 happened.  That's what the doctor said.  She

24 probably had a little stroke and blacked out or

25 something.

26     PRESIDING COMMISSIONER DAVIS:  The father

27 is now living -- you said he's now living in

Exhibit #2 Page 19

1  Oceanside?

2      INMATE BYRDE:  La Costa.

3      PRESIDING COMMISSIONER DAVIS:  La Costa.

4  He remarried?

5      INMATE BYRDE:  Yes, sir.

6      PRESIDING COMMISSIONER DAVIS:  You

7  graduated from Arcadia High School in Arizona in

8  1963, went to the University of Arizona where

9  you have a BS in business administration.  And

10  you took some graduate courses, including a two-

11  year course in banking?

12      INMATE BYRDE:  Yes, sir.

13      PRESIDING COMMISSIONER DAVIS:  You were

14  employed by the Arizona Bank in Phoenix, Arizona

15  in 1971 through '83 and left there to take a

16  better job with the West America Bank?

17      INMATE BYRDE:  Correct.

18      PRESIDING COMMISSIONER DAVIS:  As a senior

19  vice president?

20      INMATE BYRDE:  Correct.

21      PRESIDING COMMISSIONER DAVIS:  Where you

22  managed a portfolio of about seven million

23  dollars --

24      INMATE BYRDE:  700 million.

25      PRESIDING COMMISSIONER DAVIS:  700 million.

26  Okay.  They left out a few zeros in this

27  process.

Exhibit #2 Page 20

1   **INMATE BYRDE:** I was in charge of all the
2   loans for the entire bank.
3   **PRESIDING COMMISSIONER DAVIS:** Okay.
4   Including also some teaching at Pema Junior
5   College (phonetic)?
6   **INMATE BYRDE:** Yes, sir.
7   **PRESIDING COMMISSIONER DAVIS:** And you're
8   active in the community during this time. You
9   were treasurer of the National Cystic Fibrosis
10  Foundation?
11  **INMATE BYRDE:** Just the Arizona chapter.
12  **PRESIDING COMMISSIONER DAVIS:** The Arizona
13  chapter. Why the cystic fibrosis? What was the
14  interest in that?
15  **INMATE BYRDE:** Actually, I had a friend who
16  had a child with cystic fibrosis and asked me if
17  I could get involved.
18  **PRESIDING COMMISSIONER DAVIS:** The director
19  of the American Red Cross for the Southern
20  Arizona Chapter for '81 to '82, and you were
21  involved in the Kiwanis Club in raising money
22  for Boy Scouts, Big Brothers, Heart Association
23  and so on?
24  **INMATE BYRDE:** Yes, sir.
25  **PRESIDING COMMISSIONER DAVIS:** It's
26  interesting to juxtapose all of against what the
27  District Attorney and some of the information at

Exhibit #2 Page 21

1  trial that came up about your other association

2  with prostitutes and some of the information

3  that was, I'm sure you're familiar with, from

4  the probation officer's report that he quote

5  from the District Attorney.  Were you leading

6  kind of a double life at that time?

7      **INMATE BYRDE:**  I was going through a period

8  of -- I like to think of it as a very isolated

9  period of extreme stress.  Actually, in that

10  information that you have, I didn't intend to

11  submit that, but there was some recent

12  information that one of the doctors gave me that

13  said people with MS suddenly do this, they go

14  off the deep end for unexplained reasons from

15  time to time.  But I had a -- I was in charge of

16  lending, as I stated.  My boss at the time,

17  although I didn't know it then, was a crook.  I

18  would turn down major multi-million dollar

19  loans, and he would approve them over my head

20  and tell me I didn't know what I was doing.

21  Turned out -- subsequently I found out a couple

22  years later he was in bed with these developers.

23  He ended up going to prison for it.  He ended up

24  doing federal time for it, but at the time I had

25  no idea.  I just knew I was being criticized in

26  my job.  I had my first major attack of MS,

27  which at that time affected one of my hands, and

Exhibit #2 Page 22

1  I was basically in fear of my job and in fear of

2  what was going to happen, in fear of this, what

3  you see now.  That's not an excuse, but I was

4  under a lot of pressure and a lot of stress, and

5  I didn't handle it appropriately.  I handled it

6  by, basically driving around trying to escape my

7  reality, and I got involved in these activities.

8      PRESIDING COMMISSIONER DAVIS:  And so your

9  activity with prostitutes was something that was

10  done after your diagnosis?  Is that what you're

11  saying?

12      INMATE BYRDE:  Yes, after I had my first

13  attack.

14      PRESIDING COMMISSIONER DAVIS:  So you did

15  nothing prior to that?

16      INMATE BYRDE:  No, I had no prior

17  involvement.  I think the first prostitute I

18  ever encountered in my life was around maybe

19  December of '84, somewhere in there.  It was a

20  short period of maybe five or six months.

21      PRESIDING COMMISSIONER DAVIS:  The

22  information is described again on -- I

23  referenced -- included my reference in the year

24  -- I don't think I included page seven by

25  reference, actually, but on page seven of the

26  probation officer's report really describes some

27  rather graphic fantasies that apparently you

Exhibit #2 Page 23

1   admitted to at this time.  Was this you think

2   all part of your MS as well?

3       **INMATE BYRDE:**  No, I can't blame it on the

4   MS.  I think I blame it on just trying to escape

5   my own reality.  The world of -- the first

6   prostitute I ever met or had a relationship with

7   was something that was alien to me.  You

8   discussed my past activity and all the civic

9   stuff and all this.  It was just something that

10  was completely alien, and I spent most of the

11  time asking questions about what your life like

12  and they would describe to me.  I said what's

13  the craziest thing you ever heard, and they

14  would describe wild and crazy things.  You know,

15  it was just something completely different.  It

16  allowed me to escape my own reality and to say

17  wow, you know, and get into that, but it wasn't

18  -- it wasn't any kind of longstanding fantasy I

19  had or anything like that.  In fact, a lot of

20  times one person would tell me one thing, and I

21  would pass it on to the next one just to see for

22  reaction and all this stuff.  It's basically

23  escapism.  I was trying the get away from my own

24  reality into another reality.

25      **PRESIDING COMMISSIONER DAVIS:**  Well, you

26  have to admit sitting on this side that's quite

27  a quantum leap for someone who's involved in Red

Exhibit #2 Page 24

1   Cross and Kiwanis and so forth to be involved in
2   these kinds of activities that are described in
3   here?
4       INMATE BYRDE:  I don't know what activities
5   are described.  I probably dated about half a
6   dozen prostitutes.  There's no excuse for it.  I
7   mean, I can't justify it.  I wouldn't attempt
8   to.  It's so alien to my own upbringing and my
9   own experience.  If you go back 20 years ago or
10  so, I guarantee anybody looking at me would say
11  I'm at least conservative as either one of you
12  two gentleman, you know, just as you've pointed
13  out.
14      PRESIDING COMMISSIONER DAVIS:  Okay.
15  Anyway, also included in my earlier
16  incorporation by reference to include that page
17  seven into the record as well.  Commissioner, do
18  you have any questions?
19      DEPUTY COMMISSIONER ARMENTA:  Yes, I do.
20  Prior to that incident, had you hurt any of the
21  other ladies?
22      INMATE BYRDE:  No.
23      DEPUTY COMMISSIONER ARMENTA:  No?
24      INMATE BYRDE:  No.
25      DEPUTY COMMISSIONER ARMENTA:  Did you have
26  any disagreements with them?
27      INMATE BYRDE:  Disagreements, no.

Exhibit #2 Page 25

1    **DEPUTY COMMISSIONER ARMENTA:**

2    Disagreements?

3         **INMATE BYRDE:** Not that I'm aware of.

4         **DEPUTY COMMISSIONER ARMENTA:** No?

5         **INMATE BYRDE:** That I can recall.

6         **DEPUTY COMMISSIONER ARMENTA:** So why would

7    you have it here?

8         **INMATE BYRDE:** The only --

9         **DEPUTY COMMISSIONER ARMENTA:** This

10   incident?

11        **INMATE BYRDE:** The only reason in my mind

12   that anything happened was the fact that Ms.

13   Engstrom panicked in the situation and started

14   screaming, and I freaked out because I was

15   afraid that my neighbors were going to hear the

16   screaming and yelling.

17        **DEPUTY COMMISSIONER ARMENTA:** Did you live

18   in a house?

19        **INMATE BYRDE:** Yes, sir, right next door --

20        **DEPUTY COMMISSIONER ARMENTA:** In an

21   apartment?

22        **INMATE BYRDE:** No, a house.

23        **DEPUTY COMMISSIONER ARMENTA:** A house?

24        **INMATE BYRDE:** But it's maybe ten or 12

25   feet to the next house. They're close together.

26        **DEPUTY COMMISSIONER ARMENTA:** What time was

27   it?

Exhibit #2 Page 26

1    **INMATE BYRDE:**  It was 10:00 o'clock at
2    night maybe.
3    **DEPUTY COMMISSIONER ARMENTA:**  At night?
4    **INMATE BYRDE:**  Maybe 10:30, yeah.
5    **DEPUTY COMMISSIONER ARMENTA:**  During the
6    week or weekend or what?
7    **INMATE BYRDE:**  You know, I can't recall.
8    It may of been a Sunday night, Monday night.
9    **DEPUTY COMMISSIONER ARMENTA:**  Where was
10   your wife?
11   **INMATE BYRDE:**  She was at a Girl Scout camp
12   with my two daughters.
13   **DEPUTY COMMISSIONER ARMENTA:**  And you say
14   that you can't remember what happened.  Were you
15   under drugs?
16   **INMATE BYRDE:**  No, sir, I've never used
17   drugs.
18   **DEPUTY COMMISSIONER ARMENTA:**  No, alcohol?
19   **INMATE BYRDE:**  No, I'm a very light
20   drinker.
21   **DEPUTY COMMISSIONER ARMENTA:**  And the only
22   thing you recollect is that you did hold her
23   down?
24   **INMATE BYRDE:**  Oh, no, I hit her -- held
25   her down, and I probably hit her too or fighting
26   with her as she was struggling and yelling.  I
27   wanted her to be quiet, and she didn't want to

Exhibit #2 Page 27

26

1   be quiet.

2      **DEPUTY COMMISSIONER ARMENTA:**  Did you hit

3   her, or are you still saying probably?  Did you

4   hit her?

5      **INMATE BYRDE:**  I'm sure I did.  I mean, I

6   don't have a memory of hitting her.

7      **DEPUTY COMMISSIONER ARMENTA:**  Okay.

8      **INMATE BYRDE:**  But just from looking at the

9   bruises, I can't account for them any other way.

10  I must have hit her.

11     **DEPUTY COMMISSIONER ARMENTA:**  And why do

12  you think you can't remember?

13     **INMATE BYRDE:**  Well, because I was think I

14  was not intending to strike her as much as I was

15  trying to shove her down and keep her quiet.  I

16  was actually quite panicked because of the

17  window right above my right ear was wide open,

18  and I was afraid that the neighbors were going

19  hear, and I wanted to jump up and close the

20  window.

21     **DEPUTY COMMISSIONER ARMENTA:**  Yeah.

22     **INMATE BYRDE:**  That was the biggest thing -

23  -

24     **DEPUTY COMMISSIONER ARMENTA:**  How long did

25  you hold her down?

26     **INMATE BYRDE:**  It seemed like a few

27  seconds.

Exhibit #2 Page 28

1    **DEPUTY COMMISSIONER ARMENTA:** A few

2  seconds?

3    **INMATE BYRDE:** It seemed like to me.

4    **DEPUTY COMMISSIONER ARMENTA:** Did you ask

5  her to be quiet?

6    **INMATE BYRDE:** Yes, of course.

7    **DEPUTY COMMISSIONER ARMENTA:** And she would

8  not?

9    **INMATE BYRDE:** No, I think she was choking

10  or had water or something, like I said, and she

11  was yelling and struggling, and we both

12  panicked.

13    **DEPUTY COMMISSIONER ARMENTA:** Okay. So you

14  -- so she's at fault too?

15    **INMATE BYRDE:** No, not at all.

16    **DEPUTY COMMISSIONER ARMENTA:** Because she

17  panicked?

18    **INMATE BYRDE:** That's obviously my fault.

19    **DEPUTY COMMISSIONER ARMENTA:** Yeah.

20    **INMATE BYRDE:** She was in a helpless

21  situation.

22    **DEPUTY COMMISSIONER ARMENTA:** Okay. I

23  don't have any other questions.

24    **PRESIDING COMMISSIONER DAVIS:** All right.

25  Mr. Byrde, is there anything that I haven't

26  asked you about your prior history, about your

27  social history, your -- obviously, you don't

Exhibit #2 Page 29

28

1   have an arrest record, so we don't have anything

2   to cover there, about the crime itself that you

3   believe is important for this Panel to

4   understand this afternoon that we haven't

5   already gone over?

6       **INMATE BYRDE:**  No, sir, not really because

7   to me -- I mean, like I said, I probably was

8   more conservative than either one of you

9   gentleman, and to me whether I meant to do this

10  or didn't mean to do that, it's been all along

11  irrelevant to me.  I'm responsible.  Whatever

12  happened, I did it.  I'm responsible and I

13  understand that to be the case and I accept that

14  responsibility.  So the details of it are -- are

15  not as relevant to me as they might be to

16  someone else.  I've carried an awful lot of

17  guilt about this for a very long time.

18      **PRESIDING COMMISSIONER DAVIS:**  All right.

19  I'll ask you to turn your attention please to

20  Commissioner Armenta.

21      **DEPUTY COMMISSIONER ARMENTA:**  Let's go over

22  several things.  Let's go over the letters, and

23  we do have a number of letters.  We have a total

24  of 31 letters of opposition to you being getting

25  a date.  With that, I mean 37 letters from

26  different people, members of the family, as well

27  as friends and neighbors.  We also -- we did

Exhibit #2 Page 30

1  receive a letter -- we did send out some

2  notices. We got a letter from the Marin County

3  Sheriff's Office, the last letter being dated

4  May 10th, 2005, and they oppose your release, as

5  well as from the courts. The judge sent a

6  letter, and as well as the office from the DA

7  office. However, we have a member of the DA's

8  office in the hearing, and we'll be hearing from

9  that individual. We have letters from the

10  father of the victim, Mr. William Engstrom, and

11  he's here. Right, you're here, sir?

12     **MR. WILLIAM ENGSTROM:** Yes, sir.

13     **DEPUTY COMMISSIONER ARMENTA:** Okay. I want

14  to ask you, do you want me to read the letter,

15  or when it comes to your time do you want me to

16  -- do you want to read it yourself or what?

17     **MR. WILLIAM ENGSTROM:** I would like to have

18  you read my wife's letter.

19     **DEPUTY COMMISSIONER ARMENTA:** That is --

20     **MR. WILLIAM ENGSTROM:** Linda.

21     **DEPUTY COMMISSIONER ARMENTA:** Okay. I'll

22  do that.

23     **MRS. ENGSTROM:** Is that the one from 2006,

24  this year?

25     **DEPUTY COMMISSIONER ARMENTA:** We'll look

26  for it.

27     **MRS. ENGSTROM:** I think Katherine has --

Exhibit #2 Page 31

1    **DEPUTY COMMISSIONER ARMENTA:** Okay. Yeah,

2    it's right here.

3    **MRS. ENGSTROM:** Okay.

4    **DEPUTY COMMISSIONER ARMENTA:** June 13,

5    2006?

6    **MRS. ENGSTROM:** Yes.

7    **DEPUTY COMMISSIONER ARMENTA:**

8         Members of the Board, Cynthia Lynn

9         Engstrom is my daughter and murder

10        victim of Leslie Arthur Byrde,

11        convicted of second-degree murder,

12        sentenced 15 years to life in prison.

13        I am writing to you with the hope that

14        you will not release Leslie Arthur

15        Byrde from prison for the murder of my

16        daughter Cynthia Lynn Engstrom. Leslie

17        Arthur Byrde committed a heinous crime.

18        He so cold heartedly ended Cindy's

19        life. The pain that he has caused to

20        our family is unimaginable. Cindy

21        would be 40 years old now. She would

22        be a aunt, a sister-in-law, a loving

23        sister, and a precious daughter. It is

24        my belief that sexual predators and

25        violent murderers are beyond

26        redemption. It is shown that the

27        recidivism rate is greatly in excess of

Exhibit #2 Page 32

1   50 percent.  We can never bring Cindy
2   back to us, but it is my belief that
3   society would be protected from this
4   cold hearted -- should be protected
5   from this cold hearted murderer.  I
6   urge the Board please deny parole to
7   Leslie Arthur Byrde.
8   Signed Linda J. Engstrom, mother.  We also
9   have a letter dated June 13, 2006, from Sylvia
10  Ann Engstrom.  Is she a sister?
11      MR. SCOTT ENGSTROM:  It's my wife.
12      DEPUTY COMMISSIONER ARMENTA:  Sister-in-
13  law?
14      MR. SCOTT ENGSTROM:  Correct.
15      DEPUTY COMMISSIONER ARMENTA:  Okay.  And
16  June 13th, 2006, from the father.  I did mention
17  that letter already.  We got a letter on June
18  11, 2006, from Walter Gene (indiscernible).
19      DEPUTY DISTRICT ATTORNEY MITCHELL:
20  Something like that.  it's a Japanese name.
21      DEPUTY COMMISSIONER ARMENTA:  Northridge,
22  California, and it's basically a letter in
23  support of the pleas made by the family and asks
24  that you not be given a date.  June 7th, 2006,
25  letter from sandy Nelson.  And that's the --
26      MR. WILLIAM ENGSTROM:  Sister.
27      DEPUTY COMMISSIONER ARMENTA:  That's the

Exhibit #2 Page 33

1  sister?

2      MR. WILLIAM ENGSTROM:  Yes.

3      DEPUTY COMMISSIONER ARMENTA:  And letter

4  from June 6, 2006, from Roy O'Sherum (phonetic),

5  June 5th, 2006, letter from Robert Whitaker

6  (phonetic), Northridge, California.  June 5th,

7  2006, letter from Kelly Clark.  Is she a friend

8  of the family?

9      MR. WILLIAM ENGSTROM:  I'm sorry, from a

10  coworker.

11      DEPUTY COMMISSIONER ARMENTA:  Okay.  June

12  4th, 2006, letter from Chris Berry (phonetic).

13  June 2nd, 2006, letter from Fred Pruvica

14  (phonetic).

15      DEPUTY DISTRICT ATTORNEY MITCHELL:

16  Pruvechey (phonetic).

17      DEPUTY COMMISSIONER ARMENTA:  Pruvechey?

18      DEPUTY DISTRICT ATTORNEY MITCHELL:  Yeah.

19      DEPUTY COMMISSIONER ARMENTA:  Okay.  June

20  2nd, 2006, letter from Jim Thomas (phonetic),

21  Huntington Beach, also they urge that you be

22  kept.  June 1st, 2006, letter from Stephanie

23  Nguyen.  And a letter June 1st, 2006, from a

24  Michael Williams.  He opposes your release.

25  Also, a letter from Jay Thobe, T-H-O-B-E.

26  Letter dated June 1st, 2006, from a Marvin

27  Gibler (phonetic), lives in Lake Forest.  Letter

Exhibit #2 Page 34

1  dated May thirty-first, 2006, also from a Tracy

2  Tobin (phonetic) writing as a concerned citizen

3  and also believes that you should not be

4  released.  May 31st, 2006, letter from Shanelle

5  Branenburg (phonetic), also opposes your

6  release.  May 31st, 2006, letter from William

7  and Deborah Whitaker.  And another letter from

8  Richard and Cheryl Pyle (phonetic), dated May

9  30th, 2006.  David Karl also wrote a letter

10  dated 5/30/2006.  His letter is very brief and

11  to the point, and he says, "I believe that

12  people can change and do deserve a second

13  chance; however, the despicable crime that this

14  inmate committed is one of the few crimes that I

15  feel do not deserve any leniency.  I also have a

16  letter with no date from Lynn Moss, and Jason

17  Shsu S-H-S-U, also wrote a letter and no date,

18  but also he opposes your parole.  And Joshua

19  Emmons (phonetic) wrote a letter and also

20  opposes.  Dena Dernick (phonetic) also wrote us

21  a letter and she opposes.  And Yun Hutchinson

22  (phonetic), Robby Reese (phonetic), Mark Schultz

23  (phonetic) also wrote a letter.  Most of these

24  letters don't have a date, but they did sign the

25  letters.  Letter from Jorge Norvada (phonetic)

26  and opposes.  Again, a letter from the DA's

27  office May 26th, 2006, from the Chief Deputy

Exhibit #2 Page 35

1  District Attorney Mitchell, and we have that

2  person present.  And I'm sorry there is a more

3  current letter from the sheriff's office.  That

4  is May 25th, 2006.  That one I will read into

5  the record.

6            In June, 1985, I was the chief

7            investigator into the murder of Cynthia

8            Engstrom.  Ms. Engstrom was murdered a

9            the hands of Leslie Arthur Byrde, a

10           vice president of a local bank.  Leslie

11           Arthur Byrde offered Cynthia Engstrom a

12           ride.  Byrde took Engstrom to his home

13           that day.  Byrde's wife and two

14           children were out of town attending a

15           church camp.  Once at the residence,

16           Mr. Byrde fulfilled a fantasy that he

17           had and engaged Cynthia in a sexual act

18           with him while in a bathtub.  During

19           this act Leslie Arthur Byrde watched as

20           the water rose over Cynthia's face.

21           During my extensive interview with him,

22           I asked Byrde what he had planned to do

23           with her body after she was dead.

24           Leslie Arthur Byrde replied, 'I was

25           planning to prop her up on a park

26           bench.'  What did he do with her --

27           what he did with her body was dump her

Exhibit #2 Page 36

1           on a rural dirt driveway, a driveway

2           that belonged to a rancher who was

3           defaulting on a loan from the very bank

4           that Mr. Byrde was employed.  This was

5           a callous self gratifying murder.  An

6           educated man, married, gainfully

7           employed, Mr. Byrde acted as if nothing

8           had happened and displayed a total lack

9           of remorse.  I urge the parole Board to

10          deny parole to Leslie Arthur Byrde.

11    Signed Richard A. Keaton (phonetic),

12  retired sergeant, Marin County Sheriff's Office.

13  Also I'll read the letter from the courts dated

14  May 23rd, 2005.

15          On May 20th, 1986, I sentenced Leslie

16          Arthur Byrde to serve 15 years to life

17          with the second-degree murder of

18          teenage girl Cynthia Engstrom.  Mr.

19          Byrde was first eligible for parole in

20          1993.  At that time I wrote a letter

21          objecting to a early parole for him.  I

22          have attached a copy of my letter dated

23          November 12th, 1993, for use of

24          reference as well as the incorporation

25          of this letter.  I believed then, I

26          still believe today, that Mr. Byrde is

27          too dangerous to release into society.

Exhibit #2 Page 37