1        Once again I urge you to deny him
2        parole.
3    And that's retired Judge Beverly Savitt, S-
4    A-V-I-T-T.  In fact, as I recall reading that
5    letter and talking that she stated in that
6    letter that if she was able to give you more
7    time at that time that you would of gotten more
8    time.  I'm going to ask the next of kin, is
9    there anything other than the letters that I
10   mentioned that you would like me to read into
11   the record or would you just -- when it comes to
12   your time, you just going to take care of it?
13       **DEPUTY DISTRICT ATTORNEY MITCHELL:**  I think
14   we've read enough letters.  I think -- maybe,
15   did you want to say something?
16       **DEPUTY COMMISSIONER ARMENTA:**  No, not yet.
17       **DEPUTY DISTRICT ATTORNEY MITCHELL:**  Right.
18   Right.
19       **DEPUTY COMMISSIONER ARMENTA:**  Okay.  Let's
20   keep on going then.  Okay.  We did cover the
21   letters, and I said there's a letter from the
22   Deputy DA, but she is here.  We covered the
23   letter from the Court and the Sheriff.  And we
24   have letters from your family.  We have a letter
25   from a Carol Sullivan and dated February 21st,
26   2006.  Also a May 6th, 2006, letter from your
27   brother?

Exhibit #2 Page 38

1     **INMATE BYRDE:**  I don't have a brother.

2     **DEPUTY COMMISSIONER ARMENTA:**  He says, "I'm

3  writing on behalf of my brother Arthur Byrde."

4     **INMATE BYRDE:**  Who signed it?

5     **DEPUTY COMMISSIONER ARMENTA:**  That's a she?

6     **INMATE BYRDE:**  That's a she.

7     **DEPUTY COMMISSIONER ARMENTA:**  I'm sorry.

8     **INMATE BYRDE:**  Okay.

9     **DEPUTY COMMISSIONER ARMENTA:**  I need

10  glasses.

11     **INMATE BYRDE:**  You scared me with that one

12  there.

13     **DEPUTY COMMISSIONER ARMENTA:**  I'm sorry, I

14  apologize.  And there's a letter from Samantha

15  Byrde.

16     **INMATE BYRDE:**  One of my daughters.

17     **DEPUTY COMMISSIONER ARMENTA:**  Okay.  And

18  Nancy?

19     **INMATE BYRDE:**  That's my wife.

20     **DEPUTY COMMISSIONER ARMENTA:**  The wife.

21  Want me to read that letter?

22     **INMATE BYRDE:**  Sure.

23     **DEPUTY COMMISSIONER ARMENTA:**  Okay.  March

24  18th, 2006, Tucson.

25          My husband of 38 years, Leslie Arthur

26          Byrde, has spent the majority of our

27          married years in prison.  I've missed

Exhibit #2 Page 39

1   him greatly, and after the shock of

2   having him gone and losing his support,

3   the support of my best friend, I

4   continue to love the man he was and the

5   man he is today.  Art has missed his

6   two daughters grow up.  When he was

7   sent to prison our youngest daughter

8   was third grade and our oldest in

9   fifth.  Now, they are living their own

10  lives and -- but he has missed out on

11  so much.  He has been gone for dance

12  recitals, (indiscernible), graduations

13  and weddings.  He has missed out on the

14  good night kisses, checking out prom

15  nights, and walking down the wedding

16  aisles.  His daughters have been

17  without fatherly advise, monetary

18  backing, vacations together and so much

19  more.  Beyond the fact that we have

20  suffered without him, is the fact that

21  he caused the death of a fellow human

22  being.  He deeply regrets this.  We'll

23  probably never forgive or understand

24  his doing this.  Arthur is and always

25  was a person who respected life.  One

26  of my fondest memories was with when we

27  were at Sea World looking at the tidal

Exhibit #2 Page 40

1   pools.  A small child was being

2   careless with a sea --

3 And what -- that is anatomy?

4 **INMATE BYRDE:**  Anatomy?

5 **DEPUTY COMMISSIONER ARMENTA:**  Yeah.

6   And Art took the time to tell the boy

7   and our daughters that this was a

8   living creature and needed to be

9   treated with respect.  In prison Art

10   has tried not to waste his mind and

11   talents.  He took classes in computers

12   when they were available.  He's always

13   enjoyed working as a clerk, and has

14   been a respected helper in Hands on

15   Peace.  I am proud of him for his

16   efforts.  Art's health has become much

17   worse the last 21 years.  He was

18   diagnosed with MS 32 years ago and has

19   had flare ups on and off since that

20   time.  It was shortly after a

21   particularly bad flare up that he went

22   to prison.  Now, without the steady use

23   of his legs, he is unable to walk.  At

24   60 he is slower to recover from

25   setbacks and needs to be home where he

26   can get the care he needs.  I feel my

27   husband has served his time in

Exhibit #2 Page 41

1    punishment.  Although nothing can truly
2    make up for his crime, he can be better
3    service to his family and humanity at
4    home.  I am a teacher, fully vested in
5    requirement who can support him if he
6    needs to be.  I love him and want to
7    spend my remaining years with him.
8    Please grant him a parole date.  Nancy
9    G. Byrde.
10   That's your wife?
11   **INMATE BYRDE:**  Yes, sir.
12   **DEPUTY COMMISSIONER ARMENTA:**  Do you have a
13   letter of where you're going to live in
14   California?
15   **INMATE BYRDE:**  Well, I wanted to speak with
16   you gentlemen about that because that's an issue
17   that needs to be addressed because of my
18   disability.  If we're at that point in time --
19   **DEPUTY COMMISSIONER ARMENTA:**  Well, that's
20   something that we're doing right now.
21   **INMATE BYRDE:**  Okay.
22   **DEPUTY COMMISSIONER ARMENTA:**  Because one
23   of the questions that I would have is where do
24   you plan to live?
25   **INMATE BYRDE:**  Okay.  Obviously, I know
26   that the law is that you should attempt to
27   parole to your county of commitment.  I can do

Exhibit #2 Page 42

1    that.  I have financial resources to do that,

2    but I would prefer if you would allow me to

3    parole -- if you were to grant parole to my

4    sister's house, for example, in Orange County.

5    She's a licensed social worker and has plenty of

6    room for me.  Obviously, ultimately, I want to

7    try to transfer my parole to Arizona and live

8    with my wife, as she indicates in the letter.  I

9    realize that takes a little bit of time to do.

10   But that's -- I don't plan to live in California

11   any longer than I have to.  I can parole to my

12   sister's house.  I have a daughter who's an

13   architect who lives in San Diego.  I can parole

14   to my daughter's house, whatever the Board feels

15   appropriate.  If I'm required to go to Marin

16   County, I can afford to do that, but I don't

17   think the people in Marin County -- in fact, Ms.

18   Mitchell said in one of the previous hearings

19   people in Marin County don't want me back, and I

20   understand that.

21        **DEPUTY COMMISSIONER ARMENTA:**  Do you want

22   to talk about that or --

23        **INMATE BYRDE:**  That's --

24        **ATTORNEY CORYN:**  Go ahead.  You can address

25   that.

26        **DEPUTY COMMISSIONER ARMENTA:**  Okay.  I

27   don't believe you would be -- I'm sorry, I don't

Exhibit #2 Page 43

1  believe you would be or could be required to go

2  back to the county of commitment.  I believe the

3  law in that area has been changed.

4      **INMATE BYRDE:**  Right.

5      **DEPUTY COMMISSIONER ARMENTA:**  I think we

6  would be looking at, as a parole Board, is for

7  an area in California --

8      **INMATE BYRDE:**  Right.

9      **DEPUTY COMMISSIONER ARMENTA:**  -- where you

10  would have the less -- the best chance to

11  succeed.

12      **INMATE BYRDE:**  Right.

13      **DEPUTY COMMISSIONER ARMENTA:**  It doesn't

14  necessarily have to be wherever the commitment

15  offense did occur.

16      **INMATE BYRDE:**  Right.  That's what I wanted

17  to hear because the reality of it is I'm

18  disabled.  It's not like I'm going to be out on

19  the streets looking for a job.  I'll basically

20  be confined to a house, wherever it is, and so I

21  would prefer to parole to my sister's house who

22  is the social worker who has --

23      **DEPUTY COMMISSIONER ARMENTA:**  Do we have a

24  letter from her?

25      **INMATE BYRDE:**  There's a letter from her.

26  It doesn't specifically to my living because I

27  didn't know what you would actually want.

Exhibit #2 Page 44

1     **DEPUTY COMMISSIONER ARMENTA:**  Well, I'll

2  tell you in the future, if you don't get a date

3  today, and you feel that you can live with her

4  and she wants you to live with her.  Be certain

5  that a letter does say that.

6     **INMATE BYRDE:**  I'll do that, sir.

7     **DEPUTY COMMISSIONER ARMENTA:**  Yeah.

8     **PRESIDING COMMISSIONER DAVIS:**  Other

9  options include, and I don't know if Arizona is

10  a signer to the interstate compact or not, but

11  would be to have your incarceration; should you

12  not get a date today, and we're certainly a long

13  away from making that decision; however, if you

14  don't get a date today, work on getting your

15  incarceration transferred to the state of

16  Arizona, if they're signed to the compact.  I

17  don't know if they are.

18     **INMATE BYRDE:**  I don't believe that they

19  are, sir.

20     **PRESIDING COMMISSIONER DAVIS:**  That's

21  something you should investigate with your

22  counselor.

23     **INMATE BYRDE:**  Yeah.

24     **MS. DIAZ:**  Actually, may I say something?

25  Arizona is part of it.

26     **INMATE BYRDE:**  Arizona is?

27     **PRESIDING COMMISSIONER DAVIS:**  Arizona is.

Exhibit #2 Page 45

1     **INMATE BYRDE:**  Okay.

2     **MS. DIAZ:**  Yes, I've processed inmates

3  before.

4     **INMATE BYRDE:**  Oh, good.  Okay.

5     **PRESIDING COMMISSIONER DAVIS:**  So that's

6  something you should investigate.  All right?

7     **DEPUTY COMMISSIONER ARMENTA:**  Okay.  All

8  right.  Let's get into what you've been doing

9  since your last hearing.  Mr. Byrde, your last

10 hearing was on 1/22 -- January 22nd, 2002.  At

11 that time you were denied for three years.  You

12 came in last May 31st, 2005.  At that time you

13 signed a one-year stip for a psych report?

14    **INMATE BYRDE:**  Yes, sir.  I was told it was

15 out of date.

16    **DEPUTY COMMISSIONER ARMENTA:**  Yeah, I think

17 it was six years old.

18    **INMATE BYRDE:**  It was only three years old.

19    **DEPUTY COMMISSIONER ARMENTA:**  Was it only

20 three?

21    **INMATE BYRDE:**  It was slightly over three

22 years old, and they said it had to be within

23 three years.

24    **DEPUTY COMMISSIONER ARMENTA:**  Okay.  And

25 even that's changed now with the rules on that,

26 but that was then.  Now is now.  Okay.  Now, you

27 got a five-year denial -- was that in 1996?

Exhibit #2 Page 46

1      **INMATE BYRDE:**  Sounds right.

2      **DEPUTY COMMISSIONER ARMENTA:**  9/24, and

3    prior to that on 12/93 you did a two-year stip?

4      **INMATE BYRDE:**  Right.

5      **DEPUTY COMMISSIONER ARMENTA:**  Okay.  And I

6    did go over your C file and went over the

7    reports prepared by Correctional Counselor York,

8    prepared what is known as the life prisoner's

9    report, and also the post-conviction progress

10   report, which covers the period from your last

11   hearing to the present time.  I can also report

12   that at this time your points, your scores are

13   at 28, which is the least you can be at.

14     **INMATE BYRDE:**  Yeah.

15     **DEPUTY COMMISSIONER ARMENTA:**  Minimum that

16   you can be at, which is 28.  And -- let me turn

17   it around.

18                        **R E C E S S**

19     **DEPUTY COMMISSIONER ARMENTA:**  Okay.  We are

20   on side two of the tape in the hearing of Leslie

21   Byrde, CDC number D-30420.  Okay.  And as far as

22   any problems in the prison, you have none.

23   Those are what are known as 115s.  No

24   disciplinaries.  You do have a 128, which is a

25   counseling chrono, only one.  That's dated

26   November 14th, 1991, supposedly for quarters,

27   whatever that is.

Exhibit #2 Page 47

1    **INMATE BYRDE:**  I had a vent cover that we

2    forgot to take down during inspection.

3    **DEPUTY COMMISSIONER ARMENTA:**  Okay.  Let me

4    ask you, how is it that you've been able to

5    function all these years inside the prison

6    without one 115?

7    **INMATE BYRDE:**  That's a hard question --

8    **DEPUTY COMMISSIONER ARMENTA:**  I mean,

9    that's not easy.

10   **INMATE BYRDE:**  Yeah, that's a hard question

11   to answer.  I mean, I'm not involved in the

12   activities that people are normally are in

13   prison that tend to get them 115s.  I don't make

14   Pruno.  I don't gamble.  I'm not gang

15   affiliated.  I don't try to use any other

16   inmates that I don't, you know, I spend most of

17   my time in my cell studying and reading and --

18   or involved in activities in the chapel or self-

19   help groups or whatever.  So I've try to do keep

20   myself as far away as I can from the problems

21   that would lead to 115s.

22   **DEPUTY COMMISSIONER ARMENTA:**  Have you ever

23   been -- while in prison, have you ever been

24   pressured to take part?

25   **INMATE BYRDE:**  Well, I got beat up about a

26   year and a half ago and went to the hole because

27   I refused to lose some disciplinary

Exhibit #2 Page 48

1  documentation for some gangsters who thought I

2  should.

3      DEPUTY COMMISSIONER ARMENTA:  Okay.

4      INMATE BYRDE:  I said I don't do that, and

5  I got assaulted and was in the hole for a week

6  and a half until that all got sorted out, and it

7  was explained to them that they shouldn't do

8  that.

9      DEPUTY COMMISSIONER ARMENTA:  Okay.  Now,

10  we did get from you a lot of your certificates,

11  and I'm going to go over the information that I

12  found in the C file.  If there's something that

13  I miss, go ahead just let me know, okay.  I did

14  find that you have been a participant of Hands

15  of Peace.  Is that correct?

16      INMATE BYRDE:  A participant, and also I'm

17  actually the --

18      DEPUTY COMMISSIONER ARMENTA:  Facilitator?

19      INMATE BYRDE:  Facilitator, and I teach the

20  other facilitators now.  Actually, I have people

21  coming in from the street and I teach them how

22  to do it.

23      DEPUTY COMMISSIONER ARMENTA:  Why don't you

24  tell us about it.

25      INMATE BYRDE:  About Hands of Peace?

26      DEPUTY COMMISSIONER ARMENTA:  Uh-huh.

27      INMATE BYRDE:  Hands of Peace is an

Exhibit #2 Page 49

1  alternatives to violence program, which focuses

2  basically on effective communications and

3  listening techniques and violence avoidance

4  techniques.  We train people to basically

5  utilize these techniques to avoid conflict

6  situations.  We used to be called Creative

7  Conflict Resolution.

8      **DEPUTY COMMISSIONER ARMENTA:**  What have you

9  learned about yourself since taking part in

10  this?

11      **INMATE BYRDE:**  Every time I go one of these

12  things you learn something because they're

13  always different, you know.  We all think that

14  we're great listeners or great communicators or

15  whatever, but everybody in there can teach you

16  something about, you know, how you can become

17  better, what it is to avoid conflict, to avoid

18  violence, to avoid all of that stuff.

19      **DEPUTY COMMISSIONER ARMENTA:**  So what did

20  you learn about yourself?

21      **INMATE BYRDE:**  I learned that I was not

22  nearly as smart as I thought I was.  I tended to

23  be from my job, for lack of a better

24  description, arrogant.  I thought I was a real

25  hot shot kind of guy and that people maybe had

26  less education than me, you know, were not quite

27  as sharp, and I found out that's not the case,

Exhibit #2 Page 50

1  you know.  Intelligence hasn't really got

2  anything to do with education, and there's some

3  really smart and valuable people out there, you

4  know.  We see people come into the alternatives

5  to violence things, and a lot of then are just

6  there for the chrono or whatever, but a lot of

7  them are there because they really want to

8  change, you know, and you can learn a lot from

9  them, and they learn a lot from us we think.

10        **DEPUTY COMMISSIONER ARMENTA:**  You also took

11  part in a program called Views (phonetic)?

12        **INMATE BYRDE:**  That's at the --

13        **DEPUTY COMMISSIONER ARMENTA:**  Victims?

14        **INMATE BYRDE:**  Yes.  That was way, way --

15        **DEPUTY COMMISSIONER ARMENTA:**  In the '90s?

16        **INMATE BYRDE:**  Way back, yeah.

17        **DEPUTY COMMISSIONER ARMENTA:**  Like, well,

18  you know what I do, sir, I go over your whole C

19  file.

20        **INMATE BYRDE:**  I forgotten all about that.

21        **DEPUTY COMMISSIONER ARMENTA:**  Yeah, I know.

22  I go over the whole thing.  We're kind of told

23  just cover the period from your last hearing.

24        **INMATE BYRDE:**  Right.

25        **DEPUTY COMMISSIONER ARMENTA:**  And we do,

26  but in all fairness, but we also like to go back

27  --

Exhibit #2 Page 51

1    INMATE BYRDE:  I appreciate it.  That's

2  right.

3    DEPUTY COMMISSIONER ARMENTA:  Like when you

4  first came in you were, I think I believe you

5  were -- you went to Mule Creek, and immediately

6  they made you a clerk?

7    INMATE BYRDE:  Well, actually, I had been

8  at Folsom for awhile before there.  I didn't

9  immediately go to Mule Creek.

10    DEPUTY COMMISSIONER ARMENTA:  Oh, you

11  didn't, okay.

12    INMATE BYRDE:  I was at Folsom for about a

13  year and a half before I went to Mule Creek.

14    DEPUTY COMMISSIONER ARMENTA:  Well, when

15  you get a term like you did, a year and a half

16  is not that long.

17    INMATE BYRDE:  Yeah, I was lucky.

18    DEPUTY COMMISSIONER ARMENTA:  So that's

19  almost immediately.

20    INMATE BYRDE:  Yeah, okay.

21    DEPUTY COMMISSIONER ARMENTA:  Anyway,

22  that's where you went, and the point is that

23  you've been a clerk for many years, and your

24  ratings have been exceptional for all your

25  efforts.  And you also have been a housing clerk

26  and been very involved in -- like I said, you've

27  been a facilitator.  Now, you also teach them?

Exhibit #2 Page 52

1    **INMATE BYRDE:**  Yes, sir.

2    **DEPUTY COMMISSIONER ARMENTA:**  The Creative

3    Conflict Resolution.  You've got certificates of

4    completion.  You also participated in a

5    Vocational Computer Tech?

6    **INMATE BYRDE:**  Yes.

7    **DEPUTY COMMISSIONER ARMENTA:**  Did you ever

8    complete that?

9    **INMATE BYRDE:**  Well --

10   **DEPUTY COMMISSIONER ARMENTA:**  I know you

11   were close?

12   **INMATE BYRDE:**  Well, the guys that were in

13   the course deliberately never completed it

14   because if you actually got the final

15   certificate they kicked you out of the class.

16   And with computer technical and computer

17   programming, once you're away from it for a

18   couple of years, you're dead in the water.  I

19   mean, it's been 11 and a half years since I was

20   in it, and even though I was pretty qualified

21   computer programmer 11 and a half years ago,

22   today probably the average ten year-old could

23   run rings around me.  The technology goes so

24   fast, so we would deliberately -- we would learn

25   one language, become very competent in it, and

26   then we would learn another language, and then

27   another language.  So we have stage

Exhibit #2 Page 53

1  certificates, and I think the certificates in

2  that say job ready and eligible and all of that

3  sort of thing, but we very deliberately tried

4  not to graduate because once we did we'd be out

5  of it and we couldn't ever -- we'd lose our

6  vocation immediately.

7      **DEPUTY COMMISSIONER ARMENTA:** Okay. We

8  have your certificates here, most recently 2006

9  from Hands of Peace Alternatives to Violence

10  Project. Workshop for training in nonviolent

11  conflict resolution, and it says you

12  satisfactorily completed 22 hours training for

13  facilitator's course?

14      **INMATE BYRDE:** Right, I was a training

15  facilitator.

16      **DEPUTY COMMISSIONER ARMENTA:** Again,

17  another one 2004 for Conflict Resolutions,

18  Friends Outside?

19      **INMATE BYRDE:** Right.

20      **DEPUTY COMMISSIONER ARMENTA:** And

21  certificate in 2003, and then another one for

22  serving in the facilitator team. That seems to

23  be what your -- your main --

24      **INMATE BYRDE:** Yes, sir, it is.

25      **DEPUTY COMMISSIONER ARMENTA:** -- function

26  is at this point?

27      **INMATE BYRDE:** Right.

Exhibit #2 Page 54

1    DEPUTY COMMISSIONER ARMENTA:  Well, your

2  main project?

3    INMATE BYRDE:  It is.  Yeah, I'm very

4  involved in that project and have been for the

5  last ten years or more.

6    DEPUTY COMMISSIONER ARMENTA:  Yeah, there's

7  a lot of --

8    INMATE BYRDE:  I think there's like 16 of

9  them, in fact.

10    DEPUTY COMMISSIONER ARMENTA:  --

11  certificates.

12    INMATE BYRDE:  There's a lot more that we

13  didn't get certificates for.  It seems sort of

14  overkill after a certain point.

15    DEPUTY COMMISSIONER ARMENTA:  Well, if you

16  earn them, you should get them.  You also have a

17  certificate for Breaking Barriers?

18    INMATE BYRDE:  Yes, sir.

19    DEPUTY COMMISSIONER ARMENTA:  1996, and for

20  Karos (phonetic).

21    INMATE BYRDE:  Kiros (phonetic).

22    DEPUTY COMMISSIONER ARMENTA:  Kiros?

23    INMATE BYRDE:  Right.

24    DEPUTY COMMISSIONER ARMENTA:  Okay.  And

25  you also completed a morals and values course.

26  Is that correct?

27    INMATE BYRDE:  Yes, sir.

Exhibit #2 Page 55

1    **DEPUTY COMMISSIONER ARMENTA:**  What did you
2    learn the there?
3        **INMATE BYRDE:**  It was taught by a an old
4    rabbi from New York.  Basically, his number one
5    moral and number one value amounted to the same
6    thing, which was that life was devoted to work.
7    I've always been kind of a work alcoholic
8    anyway, so I'm not sure I learned anything new,
9    but he was a very interesting guy, and it was
10   that people needed to be busy and needed to be
11   working.  You didn't need to be watching
12   television and playing pinochle out in the day
13   room.  You needed to be actually doing something
14   positive with your life, and I agreed with him
15   completely.
16       **DEPUTY COMMISSIONER ARMENTA:**  We got a
17   number of chronos, most of them have to do with
18   your participation in Hands of Peace.  We also
19   got a positive chrono from J.W. Dresbach.
20       **INMATE BYRDE:**  Yes, sir.  He's a captain.
21       **DEPUTY COMMISSIONER ARMENTA:**  D-R-E-S-B-A-
22   C-H, facility captain, facility one.  And it
23   talks very highly of you and your work.  And he
24   himself has been with the department for 31
25   years.  And he says, "I do not feel that inmate
26   Byrde would reoffend if released from prison.
27   This is not a statement I make lightly.  Inmate

Exhibit #2 Page 56

1  Byrde is only the second inmate for which I have

2  made such evaluation.  I am aware of the inmate

3  Byrde's commitment offense, but based on my day-

4  to-day observations with him and his

5  interactions with staff, I feel comfortable with

6  my evaluation.  My opinion is further supported

7  by inmate Byrde's deteriorating physical

8  condition.  The increasing cost of maintaining

9  inmate Byrde in prison represents, in my

10  opinion, both an unwarranted and unnecessary

11  cost to the state.  I mentioned letters from

12  Carol, but here's a letter from a Dr. Rod Stern

13  (phonetic)?

14        INMATE BYRDE:  Yes.

15        DEPUTY COMMISSIONER ARMENTA:  Is he is --

16        INMATE BYRDE:  He's a friend.

17        DEPUTY COMMISSIONER ARMENTA:  Oh, a friend,

18  but he's also been in prison?

19        INMATE BYRDE:  He was.  He was in prison

20  here.  He's been out for a number of years, and

21  he's been very successful in business, and he

22  just keeps in touch with some of us that's still

23  here in prison.

24        DEPUTY COMMISSIONER ARMENTA:  It's a letter

25  of support.

26        INMATE BYRDE:  Right.

27        DEPUTY COMMISSIONER ARMENTA:  Dated

Exhibit #2 Page 57

1  February 25th, 2006.  As I mentioned letters

2  from Sherry, your sister?

3      INMATE BYRDE:  One of my sisters.

4      DEPUTY COMMISSIONER ARMENTA:  Okay.  We

5  read your wife's letter, and also a letter here

6  from your daughter?

7      INMATE BYRDE:  Which?

8      DEPUTY COMMISSIONER ARMENTA:  Is that your

9  daughter?

10     INMATE BYRDE:  Which one?

11     DEPUTY COMMISSIONER ARMENTA:  Samantha?

12     INMATE BYRDE:  Samantha is one of my

13  daughters, yes.

14     DEPUTY COMMISSIONER ARMENTA:  Okay.

15         My father Leslie Arthur has been a

16         prisoner in the California Department

17         of Corrections for 28 years.  During

18         the time he has missed seeing my sister

19         and me grow up.  We've been punished

20         for not having him near us in these

21         years.  I've missed him greatly, and

22         due to the location of my job, have not

23         been able to ever even visit him on a

24         regular basis.  I feel that he has

25         served his punishment.  I would

26         respectfully request his release from

27         prison in the near future.  He is

Exhibit #2 Page 58

1            needed at home and in our lives, and we

2            want him back.

3       And it's signed Samantha Byrde in Chicago,

4    dated March 17th, 2006.  Okay.  Let's go into

5    one more area, which is the psychological.

6    There was a report that was prepared for this

7    hearing by Dr. Louisa Fijman, F-I-J-M-A-N.

8    She's a staff psychiatrist.  I'll cover a couple

9    of areas.  Under diagnosis -- or diagnostic

10   impression, Axis I:  There's No Diagnosis.  Axis

11   II:  There's No Diagnosis.  Under Axis III:  It

12   says you have Multiple Sclerosis and cataracts.

13       **INMATE BYRDE:**  Cataracts.

14       **DEPUTY COMMISSIONER ARMENTA:**  As well as

15   asthma.  Under Axis IV:  Which is the area of

16   your stress, it says consists of Legal Issues,

17   Incarceration, Deterioration of Health and

18   Separation from your Family Members is what is

19   causing you your stress, and gives you a

20   functional score between 75 to 80.  In the area

21   of whether she considers you a threat to the

22   community, I will read this into the record.

23   "Mr. Byrde's violence potential outside a

24   controlled setting in the past was considered to

25   have been less than average, and at the present

26   it is estimated to be reduced from that level.

27   If released to the community, he in all

Exhibit #2 Page 59

1  probability be likely to continue improvement

2  given his defined set of expectations and goals,

3  along with family support.  He further appears

4  to have internal resources necessary, along with

5  the motivation, to be productive and contribute

6  to helping others."  Basically, one other area

7  that I should point out in the psychological

8  report, she writes on section six, it says no

9  one in the family, with the exception of his

10  wife, knew about his illness for the previous

11  ten years.  Multiple sclerosis is known to be

12  aggravated by any type of stress.  Mr. Byrde was

13  at that time experiencing a great deal of stress

14  produced by conflicts of work, (indiscernible)

15  or being overruled by his superiors and that

16  were questioning his judgment.  A combination of

17  his declining health, his conflicts at work, and

18  his personal approach to dealing with stress

19  produced some type of emotional (indiscernible).

20  She basically felt that you were leaving your

21  office to unwind, trying to unwind.  It was at

22  this time that he became engaged in soliciting

23  prostitutes.  The contacts occurred for

24  approximately six or seven months.  It was a

25  period where several banks merged, and he was

26  part of the design team in charge of

27  reorganizing the work force.  This involved

Exhibit #2 Page 60

1  letting go of a number of people, which created

2  enumerable conflicts and lawsuits. He remembers

3  working seven days a week for a period of five

4  months. Now, that's what you told her?

5      INMATE BYRDE: Yes, largely. I guess she

6  got some of that from reading my file, but

7  mostly.

8      DEPUTY COMMISSIONER ARMENTA: All right.

9      INMATE BYRDE: She asked me questions about

10  it.

11      DEPUTY COMMISSIONER ARMENTA: Okay. All

12  right. Is there anything that I haven't

13  covered?

14      INMATE BYRDE: No, sir. I guess not.

15      DEPUTY COMMISSIONER ARMENTA: Okay. I'll

16  turn it over for questions.

17      PRESIDING COMMISSIONER DAVIS: Did we talk

18  about what you're going to do for a living when

19  you're released?

20      INMATE BYRDE: We haven't specifically.

21      DEPUTY COMMISSIONER ARMENTA: Tell me.

22      INMATE BYRDE: A lot of it is going to

23  depend on my physical condition. I'm totally

24  disabled. We can talk about, you know, my

25  finances or where I'm going get money, but I

26  have sufficient resources outside to -- that I

27  wouldn't be a burden to the state. I have been

Exhibit #2 Page 61

1  offered in the past -- I have members of my

2  family that are in the computer business and

3  it's possible that I could be able to work from

4  the home.

5      **DEPUTY COMMISSIONER ARMENTA:**  Okay.

6      **INMATE BYRDE:**  To do some work from there,

7  but it's very unlikely that I'll ever be able to

8  go to an office.  I'll never be able to drive a

9  car, for example, or anything like that.  It's

10  just too far gone.  So unless I can find a job

11  that I can actually do out of the house, I'm

12  going to have to be retired.  I have a pension

13  from the Arizona Bank that you talked about.

14  I'll eligible -- I'm fully paid up in Social

15  Security.  I paid the maximum benefit for a lot

16  of years.  My wife, of course, has indicated

17  that her retirement -- we own a home in Arizona,

18  and I have other letters of support from people

19  that has offered money, so it's not a question

20  of having enough money to live on.  I want to

21  work.  I'm kind a work alcoholic, as I've said,

22  but whether I'm going to be able to find gainful

23  employment that's meaningful is open to question

24  depending on exactly where I parole and when I

25  parole.  I actually foresee -- I have in the

26  back of my mind an idea to spend my time

27  actually trying to help, hate to say it, ex-

Exhibit #2 Page 62

1  convicts, in gaining approval and setting small

2  business loans and doing the planning and the

3  research and doing the submissions for banks.

4  I'm an expert in that field, and I can actually

5  get loans for people to help them stay out of

6  prison, stay on the street, and just do that on

7  a volunteer basis and support myself kind of

8  putting loan package together.  I know what

9  questions the banks are going to ask, and I can

10 do the projections.  I can help people get

11 loans.  I've actually done that already a couple

12 times for people, but that's not gainful

13 employment, but it is how I plan to spend my

14 life.

15     **PRESIDING COMMISSIONER DAVIS:**  Do you have

16 questions, Commissioner?

17     **DEPUTY COMMISSIONER ARMENTA:**  I was going

18 to tell you that even that area has changed a

19 lot, the last 15, 20 years.

20     **INMATE BYRDE:**  Yeah, I know it's --

21     **DEPUTY COMMISSIONER ARMENTA:**  Okay.  Now,

22 you can go on line and you get loans.

23     **INMATE BYRDE:**  In fact, one of my nephews -

24 - if you ever got a credit card, he is probably

25 the one that processed it.

26     **PRESIDING COMMISSIONER DAVIS:**  Nice.

27     **INMATE BYRDE:**  Yes.

Exhibit #2 Page 63

1    **PRESIDING COMMISSIONER DAVIS:**  Okay.  When

2  you were with the Red Cross.

3    **INMATE BYRDE:**  Sir.

4    **PRESIDING COMMISSIONER DAVIS:**  So you were

5  a treasurer for them for a year?

6    **INMATE BYRDE:**  No, sir.  I was the -- I was

7  treasurer with cystic fibrosis.  I was the

8  regional board member with the Red Cross.

9    **PRESIDING COMMISSIONER DAVIS:**  All right.

10 How did you become associated with the Red

11 Cross?

12    **INMATE BYRDE:**  It wasn't through any greet

13 goodness of my own.  I was with the Arizona Bank

14 in Tucson.  All of the major banks participate

15 in assigning some of their more senior officers

16 to serve on the Board of the charities just so

17 that we'd be representing for a public

18 relations.

19    **PRESIDING COMMISSIONER DAVIS:**  Were you

20 active with them at all?

21    **INMATE BYRDE:**  Oh, yeah, we went to

22 meetings, and what we would do is I would be

23 assigned to -- for example, when we had our

24 fundraising things, I would be the one that

25 would be raising the money from all the various

26 banks from the state.

27    **PRESIDING COMMISSIONER DAVIS:**  Did you gain

Exhibit #2 Page 64

1   any practical knowledge from your association

2   with the American Red Cross?

3       INMATE BYRDE:  In what --

4       PRESIDING COMMISSIONER DAVIS:  Did you ever

5   learn first aid, those kinds of basic sorts of

6   things that the Red Cross tends to want to make

7   sure all their people know?

8       INMATE BYRDE:  I didn't learn first aid

9   from Red Cross.  I was a certified life guard

10  from a previous experience, but --

11      PRESIDING COMMISSIONER DAVIS:  When were

12  you a certified life guard?

13      INMATE BYRDE:  I grew up in Hawaii, and

14  everybody out there swims like a fish, and I

15  took the Red Cross life guard training.

16      PRESIDING COMMISSIONER DAVIS:  So was CPR a

17  part of your training?

18      INMATE BYRDE:  The old way.

19      PRESIDING COMMISSIONER DAVIS:  What's the

20  old way?

21      INMATE BYRDE:  We're talking 1950s, was the

22  on the back and pull the arm.  With the person

23  on their stomach you're pulling up on their arm

24  and you're pushing down on their back.  It's

25  completely different than what they teach today.

26      PRESIDING COMMISSIONER DAVIS:  Right.  So

27  you're familiar with what they were at the time

Exhibit #2 Page 65

1  of the crime.  Were you familiar with what

2  they're currently teaching?

3      INMATE BYRDE:  I had a vague idea, and in

4  fact, I think I mentioned to one of the

5  investigating officers that I tried to revive

6  the victim, which I did unsuccessfully.

7      PRESIDING COMMISSIONER DAVIS:  All right.

8  Do you have any other questions, Commissioner?

9      DEPUTY COMMISSIONER ARMENTA:  No.

10      PRESIDING COMMISSIONER DAVIS:  All right.

11  Ms. Mitchell?

12      DEPUTY DISTRICT ATTORNEY MITCHELL:  May I

13  address some questions to him through the Board?

14      PRESIDING COMMISSIONER DAVIS:  Yes.

15      DEPUTY DISTRICT ATTORNEY MITCHELL:  If you

16  could ask Mr. Byrde if he remembers the first

17  version of the events of the murder that he told

18  to Sergeant Keaton as to statements from the

19  second version of events?

20      PRESIDING COMMISSIONER DAVIS:  Do you

21  remember, sir?

22      INMATE BYRDE:  Yes, I do, and would you

23  like me to address that?

24      PRESIDING COMMISSIONER DAVIS:  Certainly.

25  I assume that would be your next question?

26      DEPUTY DISTRICT ATTORNEY MITCHELL:  Yes, if

27  he could tell the Board what his first version

Exhibit #2 Page 66

1  of events.

2      PRESIDING COMMISSIONER DAVIS:  All right.

3      INMATE BYRDE:  Yes, when I was first

4  interviewed by the -- Sergeant Keaton, I had no

5  memory of committing this crime, and what I mean

6  is, I mean, I knew that the victim was did, that

7  I knew that I disposed of the body, but I

8  believed in my heart that she must of died as a

9  drug overdose or something that was unrelated to

10  me.  I just didn't have the memory of holding

11  her under water or pushing her or hitting her or

12  anything long enough that would of caused

13  anyone's death.  I remember jumping up and going

14  downstairs, turning off water, closing windows,

15  and coming back up and finding her to my

16  surprise.  I really think that I blanked or did

17  something and disassociated, and maybe I

18  couldn't believe what I'd did.  But when I first

19  interviewed with the police, I was adamant that

20  I had not done this, that I was not responsible,

21  that something else must have happened to her.

22      PRESIDING COMMISSIONER DAVIS:  Okay.

23      DEPUTY DISTRICT ATTORNEY MITCHELL:  If you

24  could ask Mr. Byrde, how many months after the

25  murder of Cindy Engstrom was it that he suddenly

26  remembered this second version of events?

27      PRESIDING COMMISSIONER DAVIS:  Do you

Exhibit #2 Page 67

1  understand the question, sir?

2     **INMATE BYRDE:** Yes.

3     **PRESIDING COMMISSIONER DAVIS:** Okay.

4     **INMATE BYRDE:** I was -- I'm not sure of the

5  exact number of months. It was probably about,

6  I'm guessing, three or four. I was under the

7  care -- I had been seeing a psychiatrist who had

8  been talking to me about what had gone on, and

9  through seeing that psychiatrist, I was brought

10  to understand what had happened, and at that

11  point told my attorney what I remembered. And

12  I'm not sure what he said to the District

13  Attorney or anyone else, but in terms of my own

14  attorney when I found out.

15     **DEPUTY DISTRICT ATTORNEY MITCHELL:** If you

16  could ask Mr. Byrde if that psychiatrist was not

17  a psychiatrist that had been retained by his

18  attorney?

19     **INMATE BYRDE:** He was retained by my

20  attorney, yes.

21     **PRESIDING COMMISSIONER DAVIS:** Okay.

22     **DEPUTY DISTRICT ATTORNEY MITCHELL:** And if

23  could you ask Mr. Byrde if it wasn't when he was

24  in jail and they were preparing for the trial of

25  this case that he suddenly remembered the second

26  version of events?

27     **INMATE BYRDE:** I was in jail. It was many

Exhibit #2 Page 68

1   months before the trial, but I was in jail, yes.

2   **DEPUTY DISTRICT ATTORNEY MITCHELL:**  Okay.

3   If you could ask Mr. Byrde why he placed Cindy

4   Engstrom's body where he placed it.

5   **INMATE BYRDE:**  I was driving out in the

6   remote areas of Marin County.  It was a turn in,

7   and I just -- it seems like a good spot.  I know

8   there was a lot made of the fact that apparently

9   the person that owned that ranch was a doctor,

10  if I recall, that owed the bank some money and

11  was in default.  I would like to point out that

12  if you know anything about banking, his loan was

13  completely stock secured, and I'd never met the

14  man.  I mean, his -- the loan officer's boss's

15  boss's boss would of been me.  I mean, it was

16  irrelevant to me.  I had no idea where I was at,

17  but I was out driving around in the countryside,

18  and I left it, and I did -- go ahead.

19  **PRESIDING COMMISSIONER DAVIS:**  No, finish

20  your statement.

21  **INMATE BYRDE:**  No, and I did somewhat had

22  made an earlier statement to Sergeant Keaton who

23  -- Sergeant Keaton is a very honest individual I

24  had found when I was dealing with him.  I did

25  originally think -- because I thought that I was

26  wasn't responsible for the death, I did

27  originally have the idea of well maybe I'll just

Exhibit #2 Page 69

1    leave Ms. Engstrom in park or somewhere like

2    that.  She'll be found.  They'll figure out it

3    wasn't me.  It was -- whatever it was, drugs,

4    heart attack, whatever it was, I didn't know,

5    and that way people won't be looking for me.

6    And that was the genesis of that remark to him.

7    Once I realized later on what I had done, it

8    became kind of silly, so I think that's why I

9    said that to him in the first place.

10    **PRESIDING COMMISSIONER DAVIS:**  Okay.

11    **DEPUTY DISTRICT ATTORNEY MITCHELL:**  If you

12    could ask Mr. Byrde sometime after he was

13    convicted and sentenced to prison, did he

14    discuss this case with a reporter and talk about

15    why he placed the body where he did, if he

16    remember that conversation.

17    **INMATE BYRDE:**  A reporter.  I'm not sure

18    what -- I don't remember the conversation

19    specifically, no.

20    **PRESIDING COMMISSIONER DAVIS:**  Would it be

21    with someone other than a reporter?  We don't

22    have to focus on whether it was specifically a

23    reporter or not.  Did you discuss with someone a

24    different version of perhaps why you left the

25    body where you did?

26    **INMATE BYRDE:**  I don't remember discussing

27    anything different from what I've said to you.

Exhibit #2 Page 70

1   I was interviewed by a reporter while I was at
2   Folsom that was allegedly at that time going to
3   possibly write a book or something, but I don't
4   have any specific memories.  It's been a long
5   time.  It's been 20 years.  I don't know exactly
6   what I might of said to her.
7       **DEPUTY DISTRICT ATTORNEY MITCHELL:**  Okay.
8   If you can ask Mr. Byrde why he bought the
9   boning knife, the knife that Cindy was murdered?
10      **INMATE BYRDE:**  I bought the knife the day
11  before I think, but maybe it was -- I'm not
12  sure.  A boning knife is a knife with a blade
13  about that long.  I bought it because I was knew
14  -- we were going to use the tape that I
15  discovered -- the tape when it's wet -- I knew
16  from -- I use the tape on my ankles all the
17  time, and it's hard to get off, and I was going
18  to cut the tape off of with it.  I might point
19  out too there were no knife wounds or anything
20  like that on Ms. Engstrom.
21      **DEPUTY DISTRICT ATTORNEY MITCHELL:**  I don't
22  have any other questions.
23      **PRESIDING COMMISSIONER DAVIS:**  All right.
24  Counsel?
25      **ATTORNEY CORYN:**  I have none.
26      **PRESIDING COMMISSIONER DAVIS:**  All right.
27  Closing?

Exhibit #2 Page 71

1    **DEPUTY DISTRICT ATTORNEY MITCHELL:**  Yes.

2    I'd like to thank the Commissioners for giving

3    me the opportunity to correct the record, which

4    I know always happens in these lifer hearings

5    because many years ago something will get put

6    into the record from some correctional counselor

7    or psychologist or something, and then it

8    becomes part of the record.  Even though it's

9    wrong, it just kept -- gets repeated over and

10   over again.  For example, the report of the

11   correctional counselor that appears at the top

12   of your lifer packet where the summary of the

13   crime is a restatement of a summary that was

14   made many years earlier, and it just gets

15   repeated and repeated.  And then the prisoner's

16   version, which was given years ago, gets

17   repeated verbatim, and all kinds of

18   misinformation then just gets repeated over the

19   years, and I would like to correct that with you

20   gentlemen.  The first paragraph, the summary of

21   the crime where it talks about the body being

22   placed at the location of discovery, and this

23   one sentence, "The body showed signs of

24   violence."  Now, that is the most sanitized

25   misrepresentation of the condition of Cindy

26   Engstrom's body.  As Commissioner Davis has

27   noted, in the probation officer's report that

Exhibit #2 Page 72

1    was prepared at the time that Mr. Byrde was

2    sentenced, Cindy Engstrom was battered and

3    bruised.  The photographs of her body were

4    appalling.  She was bruised all over her body,

5    her face, her head, her hands, her arms.  It was

6    very clear from the photographs and the

7    coroner's report that Cindy Engstrom did not die

8    an immediate death, that there was a violent

9    struggle, and that this young woman had to try

10   to fight for her life unsuccessfully.  The

11   coroner, as you have noted, determined that the

12   cause of death was asphyxiation, although the

13   actual mechanism of the asphyxiation could not

14   be determined by the coroner.  However, there

15   was evidence of trauma to her neck, evidence

16   that she had been strangled.  There was damage

17   to the hyoid bone.  There was petechial

18   hemorrhaging, which would be evidence of

19   strangulation, but also the coroner was not able

20   to say whether she died as a result of the

21   manual strangulation or the drowning or a

22   combination of both, but signs of violence

23   indeed.  The prisoner's version of events, which

24   I would like to point out is the second version

25   of events that, as Mr. Byrde has stated,

26   suddenly came to him some months after the crime

27   while he was sitting in jail and he was in

Exhibit #2 Page 73

1  consultation with a defense retained

2  psychiatrist, and that is the version that you

3  have heard today, which is that they were having

4  bondage sex, Cindy became panicked, he panicked,

5  and then there was this violent struggle, but

6  then he still doesn't really know what happened,

7  and he must of hit her.  This is sort of his, I

8  guess, I'm guilty.  I'm sort of guilty, but I

9  wasn't -- I don't remember being as bad as it

10 clearly was.  The original version of events

11 that he told Sergeant Keaton just a couple of

12 days after the murder was that they were having

13 consensual bondage sex.  They had sex.  He got

14 up to go down and feed the cat.  He was gone

15 about ten or 15 minutes and when he came back,

16 sure enough here was this young woman dead in

17 his bathtub, making it appear that her death was

18 accidental.  You know, she's a prostitute, so

19 there was probably some untoward drug abuse

20 going on in her life or some unknown medical

21 condition, and this was the -- his original

22 version of events.  Then, of course, came the

23 coroner's report, and the photographs that were

24 developed from the crime scene and the autopsy,

25 which of course, gave lie to the whole it was

26 just an apparent accidental event that occurred

27 while I was out feeding the cat.  What really

Exhibit #2 Page 74

1  happened here was that Cindy Engstrom's death
2  was the culmination of Mr. Byrde's homicidal
3  hateful fantasies involving women, fantasies
4  that he discussed over several months with some
5  of the various prostitutes that he retained,
6  that he spoke to freely, as he would in the
7  belief that their conversations were private.
8  These fantasies included mutilation, scavenger
9  hunts where women's breasts were going to be
10  some of the objects of the scavenger hunts,
11  raping his co-workers, killing them, his female
12  co-workers, by blowing them up, their cars up.
13  But the most graphic fantasy that he shared with
14  one of his actual favorite prostitutes was this
15  fantasy of watching a woman drown and seeing the
16  fear in her eyes as the water rose up over her
17  face, and sure enough, this is how Cindy
18  Engstrom met her death at the hands of the
19  defendant, Mr. Byrde.  The absence of my
20  reference to all of these fantasies, which are
21  articulated very thoroughly in the probation
22  report, and also discussed by Judge Savitt in
23  her sentencing of Mr. Byrde, are for some reason
24  completely ignored by the psychiatrist who did
25  this, what I consider to be a very worthless
26  report for the Board.  I'm sorry to say that the
27  only thing that the psychiatrist seems to

Exhibit #2 Page 75

1  properly link together with Mr. Byrde is it's
2  clear that he really hates and hated his mother.
3  She was a missing in action mother.  She was a
4  hopeless alcoholic, and there is probably -- and
5  you probably don't need to be a psychiatrist to
6  understand that there's probably a link between
7  his attitude towards his mother and his
8  attitudes towards women that he voiced to the
9  psychiatrist, which also explains also some of
10  the things that were going on at the bank.  The
11  doctor, the psychiatrist, seems to relate the
12  events of this crime just to the stress that he
13  was having at his place of work, in that the
14  only way he could relieve the stress was through
15  "sexual release."  Now, sexual release is one
16  thing, carving up women, fantasizing about
17  blowing them up and drowning them, cutting off
18  their breasts, that I -- it's pretty hard to
19  really lump that into your garden variety sexual
20  release.  And the stress that was going on with
21  Mr. Byrde at the bank had to do with his
22  harassment of his women, co-employees and
23  subordinates, that led apparently in the fall of
24  1984 to a sexual harassment suit being filed
25  against him --
26      **ATTORNEY CORYN:**  I object.  We're getting
27  off the topic of suitability for the instant

Exhibit #2 Page 76

1  hearing.

2      **PRESIDING COMMISSIONER DAVIS:**  I think what

3  the District Attorney is trying to describe now

4  is the nature of the crime itself, and certainly

5  in closing there is a latitude in terms of that,

6  so I'll allow her to continue.  Please do.

7      **DEPUTY DISTRICT ATTORNEY MITCHELL:**  Thank

8  you.  The women employees at the bank got very

9  tired of his obscene comments, the sexual toys

10  placed in their desks, cartoons involving rape

11  and murder that would show up in a top drawer of

12  their desk.  That was the stress that was going

13  on at the bank.  It had to do with his

14  disgusting behavior toward his women co-

15  employees.  It didn't have anything to do with

16  the number one man at the bank Mr. Mayno

17  (phonetic), who was one of his supporters.  His

18  statement is included in the probation report

19  when Mr. Mayno said what a wonderful employee

20  Mr. Byrde was at the bank.  Well, of course, Mr.

21  Mayno himself a few years later went off to

22  Federal prison for his misdeeds, but what you

23  had here was a man who is living a secret life.

24  All of this, these letters that have been

25  directed his way by people who are going to be

26  his support on the outside, Mr. Byrde had a

27  tremendous support system going on at the time

Exhibit #2 Page 77

1  he was leading this horrible, ugly double life.

2  He had a wife who stuck by him through thick and

3  thin, who was at church camp with his two young

4  daughters while he was going back and forth on

5  multiple trips to San Francisco to pick up

6  prostitutes to bring them back to his house in

7  her absence to engage in bondage sex and to

8  share his thoughts of these sadistic practices.

9  He had an excellent job at the bank.  It was

10  very curious that the place where he placed

11  Cindy Engstrom's body on her back totally naked

12  in a spread eagle position was the driveway of a

13  client of the bank who was in default on his

14  loan.  Cindy Engstrom was not placed somewhere

15  with a blanket over her, even though he brought

16  her out of his house and put her in a blanket in

17  the trunk of his car.  He placed her body on the

18  driveway, nude, spread eagle, bruised, battered,

19  as it was, and then took her meager little

20  positions, drove many miles away on the rural

21  roads of West Marin to a location where there is

22  a bridge that is over a creek, had to get out of

23  his vehicle to throw her meager positions and

24  the boning knife that he had purchased into the

25  creek bed, and as it just so happens, that's the

26  creek where a fisherman happened to be.  Well,

27  the good news was that that fisherman was also a

Exhibit #2 Page 78

1    police officer and realized immediately that

2    women's undergarments, a boning knife and a

3    purse, that's a crime scene.  And so it was

4    through fortuitous circumstances that Cindy

5    Engstrom was identified.  That led to the police

6    to the Tenderloin area of San Francisco and all

7    the prostitutes with whom Mr. Byrde was

8    fraternizing over these many months and led to

9    his eventually being contacted by the police

10   when he made his initial statement that would

11   seem to suggest that Cindy Engstrom had just

12   accidentally died after bondage sex, and there

13   was nothing violent about it on his part, which

14   of course, was totally a lie and untrue.  On his

15   parole plans, the fact of the matter is Mr.

16   Byrde detests his wife.  This unfortunate woman

17   who sat by his -- behind him through the course

18   of the trial was the object of some of his

19   homicidal fantasies that he shared apparently

20   with some of his women co-employees that got

21   communicated apparently to his -- the

22   psychiatrist that was working with him on his

23   criminal defense, and that came out at the trial

24   to the shock of everybody.  But his thoughts

25   about his wife was that he hated her and wanted

26   to blow her up in her car, as he did with some

27   of his other co-employees, so the idea of -- he

Exhibit #2 Page 79

1  had a support system, and yet it didn't prevent

2  him from committing this horrible crime.

3  Running off to his wife is not the answer

4  because the fact of the matter is, his true

5  thoughts about his wife are extremely hateful

6  and violent. That came out at the trial. The -

7  - I do want to say one thing about Cindy

8  Engstrom. She was 19 years old. Somehow or

9  other within the months prior to this she had

10 gotten involved in prostitution. She was very

11 naive. She was from a very loving family who --

12 her parents and her siblings attended her trial.

13 Her parents were present every day throughout

14 the course of the trial. They have vowed to

15 attend every lifer hearing that they have to to

16 make sure that Mr. Byrde stays in custody so

17 that this never happens to anybody else's child.

18 And as Judge Savitt pointed out so insightfully

19 at the time he was sentenced and in her previous

20 letter, this is a very dangerous man. The

21 psychiatrist who examined him -- it's such a

22 superficial shallow report with such lack of

23 insight, whereas Judge Savitt who sat through

24 this lengthy trial, heard everything, has

25 basically said he is and always will be

26 dangerous to women. He's broken and can't be

27 fixed. She points out that his apparent show of

Exhibit #2 Page 80

1  remorse at trial with tears were ingenuine.

2  Basically, he wasn't crying for the life that he

3  took, Cindy Engstrom, who never got to

4  participate in all of life's joys that when

5  you're 19, if you're 41, all those wonderful

6  things that happened during those 20 years, that

7  Mr. Byrde wasn't weeping for her, he was weeping

8  for himself because even though he's a very

9  intelligent man, whatever is wrong with him got

10  the better of him, and unfortunately Cindy

11  Engstrom was his victim and had to pay the price

12  for whatever it is that's wrong with Mr. Byrde,

13  and it can't be fixed.  And I would like to

14  thank you for your attention.

15      **PRESIDING COMMISSIONER DAVIS:**  All right,

16  thank you.  Counsel?

17      **ATTORNEY CORYN:**  Yes.  I also thank you for

18  listening to Mr. Byrde today.  As far as the

19  commitment offense, according to the Code of

20  Regulations, the statutory basis for parole

21  suitability should be noted for the record that

22  Mr. Byrde accepts full responsibility.  He does

23  not minimize his conduct, which is consistent

24  with the version that he gave to the Board and

25  that he answered in Ms. Mitchell's questions,

26  and the version that's the same as the one

27  submitted to the probation officer.  He was

Exhibit #2 Page 81

1   convicted of second-degree murder.  This crime

2   was not premeditated and deliberate, and the

3   jury found it second degree.  By way of

4   mitigation, Mr. Byrde had no prior criminal

5   record and no arrests prior to the commitment

6   offense.  He had a stable background and a

7   stable social history.  He was -- had a

8   bachelor's degree and a graduate degree in

9   banking.  He had a solid banking employment

10  history and had involved himself in Red Cross

11  and the Kiwanis Group.  This is really an

12  aberrational conduct.  You can talk about led a

13  double life, yes, and as Mr. Byrde explained,

14  this is seemingly out of character with his

15  previous background.  He was not young when he

16  committed the offense.  He was out and had

17  stability, and then he had the attack of -- and

18  the pressures of MS, but he realizes and he

19  articulated today that it's no excuse for what

20  he did.  And again, I think he expressed sincere

21  and genuine remorse as well.  As far as post-

22  conviction factors, Mr. Byrde programs well and

23  in a positive manner.  He's never received a

24  115.  I think that's remarkable.  As mentioned

25  by Mr. Armenta, how he's been able to be in

26  custody for so long without -- staying out of

27  trouble, which bodes well for his adjustment in

Exhibit #2 Page 82

1  prison.  He receives exceptional work reports.

2  He's participated in numerous self-help groups,

3  Hands of Peace, Kiros, Conflict Resolution, and

4  importantly, also, he's able to share the

5  insights into what he's learned in the groups.

6  The psych report is what has been at issue in

7  the past, and I know in '92 it was noted that

8  his last report -- I mean, in 2002, I'm sorry,

9  the last report Dr. Fijman of 2001 was not

10  negative, and it was supportive, and the Board

11  asked that a new report be prepared.  Well, for

12  this hearing that's what the CDC has done.

13      **PRESIDING COMMISSIONER DAVIS:**  Excuse me,

14  officer, can you move the paper from his

15  microphone there?  Go ahead, Counselor.

16      **ATTORNEY CORYN:**  I was talking about the

17  2006 psychiatric report by Fijman, F-I-J-M-A-N,

18  however you pronounce that.  It's noted that Mr.

19  Byrde has developed an understanding of the

20  factors.

21      **DEPUTY COMMISSIONER ARMENTA:**  Switch tapes.

22      **PRESIDING COMMISSIONER DAVIS:**  We need to

23  switch tapes.

24                    R E C E S S

25      **ATTORNEY CORYN:**  Continuation.  I was

26  talking about the 2006 psychiatric report by Dr.

27  Fijman that was ordered for this hearing because

Exhibit #2 Page 83

1   there hadn't been one in a while, and Mr. Byrde

2   complied with that.  The doctor noted that Mr.

3   Byrde has developed an understanding of the

4   factors that influenced the committing of his

5   crime.  He realizes now that he has other

6   options related to the reductions of stress in

7   his life.  It is noted that his violence

8   potential in a controlled setting is below

9   average.  Now it's even decreased than that, and

10  he's developed insight.  And if released to the

11  community, he would likely continue his

12  improvement and his gains.  His parole plans, he

13  should be commended for the fact that he's got

14  marketable skills and education.  He's got a

15  number of letters of support from his wife, his

16  daughters.  He has a home for him.  He has

17  funds.  He can parole to Orange County, San

18  Diego.  And that firm support, financial

19  support, is not going to be an issue.  Lastly,

20  as the Board can see and also in reviewing the

21  ADA rights, Mr. Byrde, he has multiple

22  sclerosis.  He's in a wheelchair.  Probably,

23  he'll be on disability.  I would submit due to

24  that and his increased age, the likelihood of

25  recidivism is decreased, and I would

26  respectfully ask that the Board consider all of

27  these factors in determining parole suitability.

Exhibit #2 Page 84

1    **PRESIDING COMMISSIONER DAVIS:**  All right.

2    Thank you, sir.  Mr. Byrde, now is your

3    opportunity to address the Panel directly and

4    tell us why you believe you are suitable for

5    parole.

6        **INMATE BYRDE:**  Thank you.  Before I do, I'd

7    like to say I always loved my wife.  Where that

8    came in, I don't want to go.  There's no excuse

9    for what I did.  I have no excuse.  I've spent

10   the last 21 years trying to atone for my

11   actions.  I'm not the same person I was in 1985.

12   I've spent a lot of time trying to exert a

13   positive influence on other people through Hands

14   of Peace.  It's been talked about.  I also do

15   tutoring to help people get a GED in education.

16   I've done a lot of that.  It's -- I don't feel

17   that I'm a threat to society in any way should I

18   be paroled.  This is supported by, you know, the

19   psychiatric reports, but not just this one, a

20   whole string of them going back ten years with

21   multiple psychiatrists and psychologists.  My

22   medical condition is obvious.  I'm the victim of

23   a debilitating, irreversible, incurable,

24   progressive neurological disease.  It's already

25   taken away my legs.  It's taken away have of my

26   right eye.  My sister, who also suffers from

27   multiple sclerosis, Shirley Rector (phonetic),

Exhibit #2 Page 85

1  is something on an expert.  Because of that, she

2  wrote the Board a couple hearings ago and said I

3  was probably no match for the average ten year-

4  old, and that's probably even more true today.

5  I'll never drive an automobile.  I'll, as we've

6  said, I'll probably never even leave my

7  residence without another person there to assist

8  me.  So the idea that I present a threat to

9  anyone to me is a little farfetched.  I mean,

10  I'm a totally disabled person at this point, and

11  it's not something that gets better.  We talked

12  about the fact that I do have financial support

13  from my family, friends.  I'm eligible for

14  Social Security.  I do have a small pension of a

15  few hundred dollars a month, so I'm not a

16  financial burden to the state if I'm paroled,

17  and I'm a consider financial to the burden -- to

18  the state in prison because my medical -- my

19  medication costs are kind of exorbitant.  That's

20  about it.  I mean, I think it's all been talked

21  about.  It's all been laid out, and I appreciate

22  you taking the time to listen to me.

23      **PRESIDING COMMISSIONER DAVIS:**  Just one

24  question I'd like to focus on also.

25      **INMATE BYRDE:**  Yes, sir.

26      **PRESIDING COMMISSIONER DAVIS:**  How is --

27  you said you're a different person now?

Exhibit #2 Page 86

1       **INMATE BYRDE:**  Yes.

2       **PRESIDING COMMISSIONER DAVIS:**  What kind of

3   assurance can you give the Panel?  I mean, we're

4   talking about a situation where you leading two

5   different lives at one time.  How is that

6   different today?

7       **INMATE BYRDE:**  Well, I think if you go back

8   20 years, I was an extremely type A aggressive

9   person.  I was focused very selfishly upon

10  myself on just about everything, how I was going

11  to get ahead in life, how was I going to become

12  extremely rich and powerful.  I was doing pretty

13  well at it.  I was still in my 30s.  I was a

14  senior VP of a pretty good size bank.  I think

15  one of the psych reports mentioned the fact that

16  I at one point went 18 months without taking a

17  day off, I mean, not a Sunday, not a Christmas,

18  not a birthday.  I was at work behind my desk 18

19  months in a row, and I'm just not that person

20  anymore.  I mean, I've matured a lot.  I've

21  learned that there's a lot more to life than

22  where I was.  That kind of person I don't even

23  think exists in me anymore.  I don't care about

24  making a lot of money.  I don't care about

25  running anybody's life or getting ahead of

26  anybody.  I'm really -- I don't know if it's

27  maturity or old age or what it is, but I just --

Exhibit #2 Page 87

1  the forces that ruled my life and my attitudes

2  and my behavior back in the '80s are just --

3  they're not part of me anymore.  And so from

4  that point -- or from that point of view is why

5  I've changed.

6      PRESIDING COMMISSIONER DAVIS:  All right.

7  Since it's been some time since the

8  transcriptionist will have heard your voices,

9  who are -- are you both going to speak, or one

10  or the other of you going to speak, or how do

11  you want to do this?

12      MR. WILLIAM ENGSTROM:  I'm going to have

13  something to say at the end.

14      PRESIDING COMMISSIONER DAVIS:  All right.

15  So you're going to speak first?

16      MR. SCOTT ENGSTROM:  Yes, sir.

17      PRESIDING COMMISSIONER DAVIS:  Just

18  identify yourself again, please, for the record.

19      MR. SCOTT ENGSTROM:  My name is Scott

20  Engstrom, E-N-G-S-T-R-O-M, brother of Cindy

21  Engstrom.

22      PRESIDING COMMISSIONER DAVIS:  Go ahead,

23  sir.

24      MR. SCOTT ENGSTROM:  Thank you.  First of

25  all, I want to thank you for what seems to be a

26  very thorough hearing.  I'd like to start out by

27  saying that at the beginning Mr. Byrde read a

Exhibit #2 Page 88

1  statement about disabilities that he was given
2  the right to assistance if he cannot walk, if he
3  cannot breathe, if he cannot help himself.  The
4  same individual who read that statement who was
5  given those rights, used tape upon my sister and
6  removed those rights, held her under water, and
7  removed the right to breathe, removed the right
8  to be able to defend herself.  In the statement
9  from Mr. Byrde's sister saying that he's no
10  defense against a ten year-old, in his prime
11  against a 19 year-old he had to use tape to
12  overpower her, not because he was weaker, but
13  because he was a coward.  His disability makes
14  him more dangerous.  More people are willing to
15  help somebody in a wheelchair, which renders
16  them put in danger.  Mr. Byrde has never been in
17  trouble here because he's not capable of it
18  without the cowardice mechanics of having to
19  take his victim's defenses away.  I don't think
20  you'll find anybody in this prison who will
21  allow him to tie them up, and so that is not
22  even a consideration.  Mr. Byrde remembers that
23  it was roughly 10:00 p.m.  He remembers that he
24  had "dated half a dozen prostitutes."  He
25  remembers that his wife was away on a Girl Scout
26  event with his daughters.  He biblically
27  remembers wanting to stand up and close the

Exhibit #2 Page 89

1  windows so his neighbors, who were ten to 12

2  feet away, wouldn't hear, and wanted to run

3  downstairs to close those window and doors to

4  make sure nobody heard, but somehow he can't

5  remember striking my sister.  He says that he is

6  obviously at fault because what else do you say?

7  But he will not admit that he beat, bruised,

8  battered my sister.  Excuse me.  My sister, who

9  is about the same age as my wife, missed out on

10  a chance of watching me get married.  I have a

11  five year-old son now, a four month old daughter

12  that she will never meet.  And somehow in his

13  arguments and discussions and letters from his

14  family, which you got to get those letters, you

15  know, you got to have the support.  Well,

16  somehow it labels Mr. Byrde as a victim.  He

17  spent so much time in here.  Gee, that's

18  something terrible, but he chose to do

19  something.  He chose for that double life.  He

20  chose to take my sister's life.  And he didn't

21  just take her life, he beat her.  My sister knew

22  she was going to die.  And to make himself out

23  to be the victim -- if there's no admitting the

24  crime, there's no healing.  If there's no

25  admittance and taking responsibility other than

26  just lip service, there's no changing.  Mr.

27  Byrde removed from me and my family what we

Exhibit #2 Page 90

1   loved dearly, and it was because of narcissistic

2   and careless and selfish behaviors, as he

3   admitted himself.  I think the reason he's doing

4   so well in prison is because it's structured and

5   he has no ability to go out and be a work

6   alcoholic.  He has no ability to go out and try

7   to get ahead in life.  He has no ability to step

8   on anybody, and that's exactly where he belongs,

9   where society is safe and he can continue to

10  thrive in his perfect environment.  Thank you.

11       PRESIDING COMMISSIONER DAVIS:  All right.

12  Thank you.  Did you want to say something, sir?

13       MR. WILLIAM ENGSTROM:  Yes.

14       PRESIDING COMMISSIONER DAVIS:  Okay.

15       MR. WILLIAM ENGSTROM:  William Engstrom,

16  father.

17       PRESIDING COMMISSIONER DAVIS:  If you would

18  like to sit down you may, or if you prefer to

19  stand.  It's up to you.

20       MR. WILLIAM ENGSTROM:  No, I better sit

21  down.

22       PRESIDING COMMISSIONER DAVIS:  All right.

23       MR. WILLIAM ENGSTROM:  Mr. Byrde has always

24  in my mind said that he's responsible, and it

25  changes from time to time, but what doesn't

26  change is he's responsible but.  And as you

27  heard today, he's responsible but had not my

Exhibit #2 Page 91

1  daughter panicked, and then hadn't he panicked,

2  this would of been a different situation.  Well,

3  maybe and maybe not, but if you listen to --

4  again to this tape and the previous tapes, I

5  don't think you'll ever have heard him say I'm

6  sorry.  And without saying I'm sorry, there's

7  something really missing from his character.

8  Thank you.

9       **PRESIDING COMMISSIONER DAVIS:**  All right.

10  Thank you, very much.  We'll now recess for

11  deliberation.

                         **R E C E S S**

12

13                       --oOo--

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Exhibit #2 Page 92

1        **CALIFORNIA BOARD OF PAROLE HEARINGS**

2             **D E C I S I O N**

3      **DEPUTY COMMISSIONER ARMENTA:**  Okay.  We're

4  on record.

5      **PRESIDING COMMISSIONER DAVIS:**  Let the

6  record reflect that everyone previously

7  identified as being in the room have returned,

8  with the exception of the staff from the

9  institution.  This is in the matter of Leslie

10  Byrde, CDC number D-30420.  The Panel reviewed

11  all information received from the public and

12  relied on the following circumstances in

13  concluding that the prisoner is not suitable for

14  parole and would pose an unreasonable risk of

15  danger to society or a threat to public safety

16  if released from prison.  We come to this

17  conclusion first and foremost from the

18  commitment offense itself, in that the offense

19  was carried out in a especially cruel manner.

20  The offense was carried out in a dispassionate

21  manner.  The offense was carried out in a manner

22  which demonstrates an exceptionally callous

23  disregard for human suffering, and the motive

24  for the crime was very trivial in relation to

25  the offense.  These conclusions are drawn from

26  the statement of facts, wherein the prisoner,

27  **LESLIE BYRDE D-30420 DECISION PAGE 1 7/19/06**

Exhibit #2 Page 93

1   for reasons still best known to him, took

2   advantage of a young woman who was not able to

3   defend herself, struck her, and/or held her

4   under water. He did so for his stated reason --

5   for no better reason, at this point that we can

6   determine, of simply protecting his reputation.

7   Regardless of the attempt, you did not seek help

8   for the victim. And although you indicated that

9   you did try and render CPR, there is nothing in

10  the record to quantify that or to verify that.

11  And you chose to dump her nude body in a rural

12  driveway. While there are statements with

13  regard to stress as a result of work and a

14  diagnosis of MS, there is nothing in the record

15  to suggest that this stress contributed directly

16  or significantly to the commitment of this

17  crime. With regard to institutional behavior,

18  we do find that you've had one single 128(a)

19  counseling chrono and no serious 115

20  disciplinary reports, which as Commissioner

21  Armenta indicated, that is an exceptional

22  record, and you are to be congratulated for

23  that. With regard to the psychological report

24  dated July of 2006, by Dr. Fijman, F-I-J-M-A-N,

25  it is this Panel's conclusion that the report

26  itself is inconclusive, in that it does not

27  **LESLIE BYRDE D-30420 DECISION PAGE 2 7/19/06**

Exhibit #2 Page 94

1  address issues that seem to leak from the
2  record, specifically the information in the
3  parole officer's report.  Accordingly, this
4  Panel recommends that prior to the next hearing
5  a new psychological report be completed that
6  will fill in this void and address these areas
7  specifically.  With regard to parole plans, we
8  do find that the parole plans are inadequate,
9  that you do not have verification of a place of
10 residence.  And while we don't doubt that you
11 have a lot of talent, your plan with regard to
12 what you're going to do financially lacks any
13 specificity.  So before you come before a Panel
14 again, you need to lie that out exactly what
15 that looks like.  How are you going to continue
16 to -- how are you going to support yourself?
17 With regard to the 3042 notices, we find that
18 the District Attorney from Marin County is here
19 in person by representative and does oppose
20 parole, as does the Marin County Sheriff's
21 Office by letter, the Marin County Sheriff's
22 Office being the agency responsible for the
23 investigation of this crime, as does the retired
24 Judge Savitt who was the judge who presided over
25 this case from the Superior Court of Marin
26 County.  Nevertheless, we do want to commend you
27 **LESLIE BYRDE D-30420 DECISION PAGE 3 7/19/06**

Exhibit #2 Page 95

1   for your -- several things, your work in the

2   Hands of Peace as a facilitator and a

3   facilitation instructor, your long term work as

4   a clerk with exceptional ratings, your

5   participation in vocational computer

6   programming, and your certificates -- actually,

7   many certificates for Hands of Peace and

8   Conflict Resolution from Friends Outside, as

9   well as your continued participation in Breaking

10  Barriers and Kiros.  However, these positive

11  aspects of behavior do not outweigh the factors

12  for -- I'm sorry, you know, I also left out your

13  laudatory chrono from the chaplain, which was a

14  very nice chrono.  We don't want to leave

15  anything like that out.  However, as I started

16  to say, these positive aspects of behavior do

17  not outweigh the factors for unsuitability, and

18  in a separate decision, this hearing Panel finds

19  that the prisoner has been convicted of murder,

20  and it is not reasonable to expect that parole

21  would be granted during the next three years.

22  We come to this conclusion by first and foremost

23  the commitment offense, in that the offense was

24  carried out in a especially cruel manner.  The

25  offense was carried out in a dispassionate

26  manner.  And that the offense was carried out in

27  **LESLIE BYRDE D-30420 DECISION PAGE 4 7/19/06**

Exhibit #2 Page 96

1   a manner which demonstrates an exceptionally

2   callous disregard for human suffering, and the

3   motive for the crime was very trivial in

4   relation to the offense.  These are conclusions

5   are drawn from the statement of facts, wherein

6   the prisoner, for reasons best known to him,

7   took advantage of a young woman who was not able

8   to defend herself, struck her and/or held her

9   head under water.  You did for the stated

10  reason, your stated reason, of protecting your

11  reputation.  Regardless of the intent, you did

12  not seek help for the victim.  You indicated

13  that you did try and provide CPR; however,

14  there's no independent evidence of that saying.

15  And rather, you took the body from a crime scene

16  and dumped it in a rural area.  While there is -

17  - there are statements with regard to stress as

18  a result of work and a diagnosis of MS, there is

19  nothing in the record to suggest that this

20  stress contributed directly or significantly to

21  the commission of this crime.  With regard to

22  the psychological report of July 2006 by Dr.

23  Fijman, this Board finds -- this Board views

24  that report as being inconclusive, in that it

25  does not address the issue that seems to leak

26  from the record, specifically the information

27  **LESLIE BYRDE D-30420 DECISION PAGE 5 7/19/06**

Exhibit #2 Page 97

1  contained in the probation officer's report.

2  Accordingly, this Panel recommends that prior to

3  the next hearing a new psychological report to

4  be completed to fill in that void.  With regard

5  to parole plans, once again, the parole plans do

6  lack significant specificity and/or

7  documentation, in that they did not provide

8  documentation for a place of residence, although

9  you've indicated that you believe you could

10  obtain that, so we certainly hope that you do

11  that, as well as we previously discussed some

12  specificity as to exactly how you intend to

13  continue to support yourself.  And if your wife

14  .is going to do that, that would be included in

15  that.  And again, a suggestion that if you do

16  want to transfer your confinement to the state

17  of Arizona that you can look into beginning to

18  do that with your counselor.  With regard to the

19  3042 notices, we note that the District Attorney

20  from Marin County is here in person by

21  representative and does oppose parole as does

22  the Marin County Sheriff's Department by letter,

23  the Marin County Sheriff's Department being the

24  agency responsible for the investigation of this

25  crime.  It is also opposed by retired Judge

26  Savitt, S-A-V-I-T-T, who is the judge from the

27  **LESLIE BYRDE D-30420 DECISION PAGE 6 7/19/06**

Exhibit #2 Page 98

1   Superior Court of Marin County who presided over

2   your case.  This Panel also finds, with regard

3   to other areas for suitability, that while Mr.

4   Byrde says that he is responsible for this

5   crime, this Panel is left with the impression

6   from Mr. Byrde's own presentation that this is a

7   weak acceptance and almost a dismissive

8   acceptance, and certainly not reflective of what

9   this Panel would consider to be a real remorse.

10  As I said, this is a three-year denial.  And the

11  Panel recommends that you remain disciplinary

12  free, that you continue to participate in self-

13  help, that you cooperate with clinicians when

14  the time comes for your new evaluation, and that

15  you develop appropriate parole plans and earn

16  positive chronos.  And with that, Mr. Byrde, we

17  want to wish you the best of luck, and we are

18  adjourned.  I'm sorry, Commissioner, did you

19  have anything you wanted to add?

20      **DEPUTY COMMISSIONER ARMENTA:**  Yeah.  Sir,

21  in the hearing you don't -- you don't have to

22  talk about the offense.  You don't have to

23  admit, but if you're saying that you have

24  remorse, we're always hoping to see it, and I

25  really did not see it in you.  You really

26  mitigated a lot of what happened that night, and

27  **LESLIE BYRDE D-30420 DECISION PAGE 7 7/19/06**

Exhibit #2 Page 99

98

1    you almost made it sound like it was her fault.

2        **INMATE BYRDE:**  I didn't intend to.

3        **DEPUTY COMMISSIONER ARMENTA:**  When you get

4    a chance to read the transcripts afterwards,

5    read it.  I would recommend that you read the

6    one from the previous hearings and the report

7    through probation.  That was one concern that I

8    have.  That's all I have to say.

9        **PRESIDING COMMISSIONER DAVIS:**  All right.

10   Thank you, very much for that, Commissioner, and

11   we are adjourned.

12

13

14

15

16

17

18

19

20

21

22

23   **PAROLE DENIED THREE YEARS**

24   **THIS DECISION WILL BE FINAL ON:**___NOV 1 6 2006___

25   **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **LESLIE BYRDE D-30420 DECISION PAGE 8 7/19/06**

Exhibit #2 Page 100

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, STACY WEGNER, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total two in number and

cover a total of pages numbered 1 - 98, and which

recording was duly recorded at R.J. DONOVAN

CORRECTIONAL FACILITY, SAN DIEGO, CALIFORNIA, in the

matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING

OF LESLIE BYRDE, CDC NO. D-30420, ON JULY 19, 2006,

and that the foregoing pages constitute a true,

complete, and accurate transcription of the

aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated October 6, 2006, at Sacramento,

California.


_____
STACY WEGNER
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

Exhibit #2 Page 101