**EXHIBIT #3**

**2005 LIFE PRISONER HEARING DECISION FACE SHEET**

BOARD OF PRISON TERMS
LIFE PRISONER HEARING DECISION FACE SHEET                STATE OF CALIFORNIA

[ ] PAROLE GRANTED-(YES)
    CDC: Do not release prisoner before
         Governor's review.

[ ] PAROLE DENIED-(NO)

| Records Use Only |
| --- |
| Parole Release Date _____ |
| YR    MO    DAY |
| Attach Prison Calculation Sheet |

[✓] AGREED UNSUITABLE (Attach 1001A Form) FOR:  __One__  YEAR(S)
[ ] HEARING POSTPONED/REASON: _____

## PANEL RECOMMENDATIONS AND REQUESTS

**The Board Recommendations:**

[ ] No more 115's or 128A's            [✓] Stay discipline free        [✓] Earn positive chronos
[ ] Work to reduce custody level       [ ] Learn a trade*              [ ] Get a GED*
[✓] Get self-help*                     [ ] Get therapy*

[ ] Recommend transfer to _____
[✓] Other __Inmate request An updated Psyc Rpt -__
*These programs are recommended if they are offered at your prison and you are eligible/able to participate.
__And A better defined Job plan should be developed.__

Penal Code 3042 Notices    [ X ] Sent    Date: 3-30-05

Commitment Offense(s):____PC 187____                    ____MURDER 2ND____
                          Code(s)                              Crime(s)

                        ____MAR 9635____                    ____01____
                          Case #(s)                            Count #(s)

| Date Inmate Came to CDC 5-23-86 | Date Life Term Began 5-23-86 | Minimum Eligible Parole Date 1-5-95 |
| --- | --- | --- |
| [ ] Initial Hearing    [ X ] Subsequent (Hearing No.)  3 | Date of Last Hearing _____ | |

CDC Representative _____
Attorney for Prisoner _____    Address _____
D.A. Representative _____    County _____
This form and the Board's decision at the end of the heating is only proposed and NOT FINAL.  It will not become
final until it is reviewed.

Chair _____    Date  5/31/05

Panel Member _____    Date

Panel Member _____    Date

| NAME | CDC # | PRISON | CALENDAR | DATE |
| --- | --- | --- | --- | --- |
| BYRD, LESLIE | D-30420 | RJDCF | MAY/JUNE | 5-31-05 |

BPT 1001(REV. 08/03)

Exhibit #3 Page 1

**EXHIBIT #4**

**2002 CALIFORNIA BOARD OF PRISON TERMS DECISION**

54

1        CALIFORNIA BOARD OF PRISON TERMS

2                    D E C I S I O N

3          DEPUTY COMMISSIONER ESTRADA:    We're on

4    record.

5          PRESIDING COMMISSIONER HEPBURN:    All right.

6    All parties have returned to the room.    It's 4:58

7    p.m., and Mr. Byrd, we denied your parole for

8    three years.    Let me read the decision to you.

9    The Panel reviewed all information received from

10   the public and relied on the following

11   circumstances in concluding that the prisoner is

12   not suitable for parole and would pose an

13   unreasonable risk of danger to society or a threat

14   to public safety if released from prison.    Number

15   one was the timing and gravity of the commitment

16   offense itself, which was carried out in a very

17   cruel and callous manner, also in a manner which

18   demonstrates an exceptionally callous disregard

19   for human suffering.    These conclusions are drawn

20   out from the Statement of Facts wherein the

21   prisoner was carrying out one of his sexually

22   violent fantasies against women when he picked up

23   the victim in San Francisco, with an agreement to

24   engage in a sexual act of bondage.    And Mr. Byrd

25   took her back to his residence where he placed her

26   in the bathtub, she struggled, he held her under

27   **LESLIE BYRD    D-30420    DECISION PAGE 1    1/22/02**

*Statement OF FACT*

Exhibit #4 Page 1

1    the water, resulting in her death, and then took

2    her body to another remote location where he

3    disposed of it.  It was found the next day, and

4    then disposed of her clothing and personal items

5    at another location.  And the record reflects a

6    number of an ongoing pattern of behavior by Mr.

7    Byrd, in which he would pick up prostitutes, talk

8    about his sexually violent fantasies regarding

9    women, and carry out his sexual fantasies of tying

10   up women and committing sexual acts with them

11   while they're tied up.  Regarding his previous

12   record, he didn't have a police record, he didn't

13   have a record of convictions.  However, he does

14   have a self-admitted record of previous acts of

15   prostitution with women that he picked up

16   primarily in San Francisco.  We know that he took

17   a number of them back to his residence.  He

18   discussed that here at the hearing, and engaged in

19   activity with them while his family was out of

20   town.  His prison record has been good.  He's been

21   disciplinary free throughout his incarceration.

22   He came in as an outstanding citizen.  He

23   essentially led a double life.  Very few people

24   who knew him would have guessed the dark side of

25   his life.  And as he has programmed in the

26   institution, of course, he's programmed in a

27   **LESLIE BYRD   D-30420   DECISION PAGE 2   1/22/02**

Exhibit #4 Page 2

```
 1    positive manner, consistent with what his behavior
 2    was before he came in the institution.  He came in
 3    with marketable skills and an education.  His work
 4    reports that he's had as a clerk have been
 5    exceptional.  He has participated in self-help
 6    activities, including Hands of Peace, Conflict
 7    Management, Impulse Control, among others.  His
 8    psychological evaluation completed by Dr.
 9    Pesavento on 10-1 of 2001 is not negative.  It's
10    fairly supportive of release.  We are going to ask
11    for a new psychological evaluation to deal with
12    more specifically with some of the issues
13    involving Mr. Byrd's fantasies of sexual violence
14    toward women and specifically as it pertains to
15    this case.  I don't think that they've been dealt
16    with very completely in the psychological
17    evaluation and they need to be addressed.
18    Regarding his parole plans, he appears to have
19    some financial resources and family support.  He
20    certainly has job skills so parole plans aren't a
21    particular issue with the Board.  In response to
22    3042 Notices, we had significant opposition to
23    parole from a number of individuals.  We had a
24    representative from the District Attorney's      —
25    office, who was present at the hearing and voices
26    strong opposition to parole.  We had several
27    LESLIE BYRD    D-30420    DECISION PAGE 3    1/22/02
```

Exhibit #4 Page 3

1   family members here at the hearing who voiced

2   opposition to parole.  We also received quite a

3   few letters in opposition, including a letter from

4   the judge who handled the trial in this

5   particular case, Beverly Savitt, S—A—V—I—T—T.  She

6   had written in her letter that I attempted to make

7   clear at the time of his sentencing that I thought

8   he should never be paroled because he

9   demonstrated a clear hatred for women that was

10  lifelong.  I continue to believe that should Mr.

11  Byrd be released, he will undoubtedly kill again.

12  As I indicated, this is a three—year denial.  In a

13  separate decision, the Hearing Panel finds that

14  the prisoner has been convicted of murder.  It's

15  not reasonable to expect that parole will be

16  granted at a hearing during the next three years.

17  The specific reasons for this finding are as

18  follows.  The timing and gravity of the

19  commitment offense, which was carried out in a

20  very cruel and brutal callous manner.  Also it was

21  carried out in a manner which demonstrates an

22  exceptionally callous disregard for human

23  suffering.  Although Mr. Byrd doesn't have an

24  official police record, he does have a

25  pattern of behavior involving fantasies of

26  violence against women, and of picking up

27  **LESLIE BYRD    D-30420    DECISION PAGE 4    1/22/02**

Exhibit #4 Page 4

1    prostitutes and engaging in prostitution

2    activity, discussing and binding up the women,

3    discussing violence toward women while he was

4    engaged in this sort of activity.  It does cause

5    the Board concern for his future activity, and

6    it's an issue that we think he needs to deal with.

7    We'd like to see some specific self—help programs

8    perhaps and some additional information in the

9    psych report dealing specifically with the issue

10   involving his sexually violent fantasies toward

11   women considering the life offense.  I don't think

12   that that issue has been addressed specifically

13   and certainly not to the extent that it needs to

14   be dealt with.  So the Panel's recommendation is

15   going to be that you remain disciplinary free and

16   there will be a new psychological evaluation prior

17   to the next hearing, participate in self—help and

18   therapy programs that are available, and

19   specifically if one becomes available dealing

20   with his violence toward women.  That will

21   complete the reading of the decision.

22   Commissioner Estrada, do you have any comments you

23   would like to add?

24        **DEPUTY COMMISSIONER ESTRADA:**  None.

25        **PRESIDING COMMISSIONER HEPBURN:**  All right.

26   Mr. Byrd, good luck to you.  That will conclude

27   **LESLIE BYRD    D-30420    DECISION PAGE 5    1/22/02**

Exhibit #4 Page 5

59

1    this hearing at 5:04 p.m.

2                              --o0o--

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    PAROLE DENIED THREE YEARS

26    EFFECTIVE DATE OF THIS DECISION _____
                                        FEB 2 6 2002

27    LESLIE BYRD    D-30420    DECISION PAGE 6    1/22/02

Exhibit #4 Page 6

60

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, VICKI TAYLOR, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 59, and which recording was duly recorded at RICHARD J. DONOVAN CORRECTIONAL FACILITY, at SAN DIEGO, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of LESLIE BYRD, CDC No. D-30420, on JANUARY 22, 2002, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated February 5, 2002, at Sacramento County, California.

_____
Vicki Taylor
Transcriber
**CAPITOL ELECTRONIC REPORTING**

Exhibit #4 Page 7

**EXHIBIT #5**

**1996 CALIFORNIA BOARD OF PRISON TERMS DECISION**

75

1  CALIFORNIA BOARD OF PRISON TERMS

2  D E C I S I O N

3  **PRESIDING COMMISSIONER GUADERRAMA:**    The time

4  now is 15 minutes after 10:00 a.m. and all those that

5  are present before the break are back again.

6  Mr. Byrd, we have a unanimous decision.  The panel

7  reviewed all the information received from the public

8  and relied on the following circumstances in

9  concluding that you're not suitable for parole and

10  that you would pose an unreasonable risk of danger to

11  society and a threat to public safety if you were to

12  be released from prison.  The commitment offense was

13  carried out in a manner which exhibits a callous

14  disregard for the life and suffering of another.  The

15  offense was carried out in a dispassionate manner.

16  The victim was abused and defiled during the offense.

17  These conclusions are drawn from the Statement of

18  Facts where you killed a young lady you had hired for

19  sex and strangled and drowned her as she was bound in

20  the bathtub.  You later dumped the body.  Previous

21  history.  You have escalating pattern of criminal

22  conduct and an unstable social history which includes

23  during that period of time you were hiring

24  prostitutes.  Institutional behavior.  You've

25  programmed in a limited manner while incarcerated.

26  You have not sufficiently participated in beneficial

27  **LESLIE BYRD    D-30420    DECISION PAGE 1    (9/24/96)**

Exhibit #5 Page 1

1. self-help and therapy programming.  The psychiatric

2. factors.  The psychological report dated 5/21/96

3. authored by Dr. J. M. Henry is very superficial and I

4. have to agree with your attorney in saying that if

5. these attorneys [sic] aren't doing a good job, get rid

6. of them and I firmly believe that we ought to.  The

7. panel makes the following findings that the Prisoner

8. needs therapy in order to face, discuss, understand

9. and cope with stress in a non-destructive manner.

10. Until progress is made, you continue to be

11. unpredictable and a threat to others.  Therapy in a

12. controlled setting is needed, but motivation and

13. amenability are questionable.  In view of your

14. assaultive history and lack of adequate program

15. participation, there's no indication that you'd behave

16. differently if paroled.  Nevertheless, you should be

17. commended for being disciplinary free for your entire

18. incarceration and your involvement in some self-help

19. programs.  However, these positive aspects of your

20. behavior do not outweigh the factors of unsuitability.

21. Mr. Byrd, you're being denied parole for five years.

22. The hearing panel finds that it's not reasonable to

23. expect that parole would be granted in a hearing

24. during the following five years.  The specific reason

25. for this finding are as follows.  One, you committed

26. the offense.  Specifically, you beat, bound, strangled

27. **LESLIE BYRD     D-30420     DECISION PAGE 2     (9/24/96)**

Exhibit #5 Page 2

1  and drown a young female victim during a sexual

2  encounter. As a result, a longer period of

3  observation and evaluation are required before the

4  Board should set a parole date. Second reason is that

5  you have -- a longer period of time is required to

6  evaluate your suitability in view of your history of

7  misconduct, including the employment of prostitutes.

8  Third reason, you have not completed necessary

9  programming which is essential to your adjustment and

10  you need additional time to gain such programming.

11  You certainly need a lot more insight into the life

12  offense than what you demonstrated here today and you

13  need a lot of therapy in order to deal with the

14  problems that you have coming into the (inaudible).

15  The panel recommends that you remain disciplinary free

16  and that you participate in self-help and therapy

17  programming, especially that kind of therapy that

18  would deal with sex crimes. That is the official

19  decision. Again, do whatever you can with programs

20  that are available to you. We can't hold the psych

21  evaluation against you because it wasn't one that you

22  made. However, we've really got some problems with

23  the psych evaluation where they don't address these

24  tremendous problems that you had for the longest

25  period of time and they hardly even mention it.

26  You're not ready. You've got a lot of work to do.

27  **LESLIE BYRD    D-30420    DECISION PAGE 3    (9/24/96)**

Exhibit #5 Page 3

78

1    And we are going to ask Ms. Mitchell to submit those

2    photographs in time for the next hearing, if you

3    would, please.

4        DEPUTY DISTRICT ATTORNEY MITCHELL:   Yes.

5        COMMISSIONER GIAQUINTO:   Can we also ask for

6    the transcript of the interview?

7        DEPUTY DISTRICT ATTORNEY MITCHELL:   Yes.

8        PRESIDING COMMISSIONER GUADERRAMA:   Thank you

9    very much.

10        DEPUTY DISTRICT ATTORNEY MITCHELL:   Now, my

11    question in that regard is do you want that in advance

12    of the next parole hearing or do you want me to submit

13    that at this time so it will be part of his file?

14        PRESIDING COMMISSIONER GUADERRAMA:   If you

15    have it available, you can submit it to staff here

16    today.

17        DEPUTY DISTRICT ATTORNEY MITCHELL:   I will do

18    that.

19        PRESIDING COMMISSIONER GUADERRAMA:   Thank you

20    very much.  Here's a copy of the decision.  We're

21    going to see you in five years, Mr. Byrd.  We want to

22    wish you well.  That ends the hearing.  It's 20

23    minutes after 10:00 a.m.  Good luck.

24                    --oOo--

25    PAROLE DENIED FIVE YEARS

26    EFFECTIVE DATE OF THIS DECISION _____ JAN 1 5 1997

27    LESLIE BYRD    D-30420    DECISION PAGE 4    (9/24/96)

Exhibit #5 Page 4

**EXHIBIT #6**

**1993 LIFE PRISONER HEARING**
**EXTRAORDINARY ACTION AND DECISION**

BOARD OF PRISON TERMS
**LIFE PRISONER HEARING – EXTRAORDINARY ACTION AND DECISION**

STATE OF CALIFORNIA
BPT 1001A (Rev. 10/89)

| ACTION TYPE (select one) | ☐ Waiver of Appearance | ☐ Request for Postponement | ☒ Waiver of Parole Consideration Hearing-Stipulation of Unsuitability |
|---|---|---|---|

| HEARING TYPE (select one) | ☒ Parole Consideration | ☐ Progress | ☐ Rescission | Hearing Date  12 - |
|---|---|---|---|---|

## WAIVER OF RIGHT TO ATTEND HEARING

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ I do not wish to attend my Board hearing and do not wish to be represented at the hearing. The hearing will be held in my absence.

☐ I do not personally wish to attend my hearing but I do wish to be represented by counsel at the hearing.

    ☐ I will employ counsel to represent me at the hearing.

    ☐ I cannot afford counsel and wish counsel appointed to represent me.

## POSTPONEMENT

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ I hereby request that the hearing indicated above be Postponed to _____.
The reasons for my request for a postponement are stated below.

## WAIVER OF HEARING AND STIPULATION TO UNSUITABILITY

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ I waive my right to a parole consideration hearing and I waive the right to have an attorney represent me at a hearing in my absence. I find that I am unsuitable for parole based on my reasons given on this form and therefore request that you find me unsuitable.

☐ One-year Denial     ☒ Two-year Denial     ☐ Three-year Denial

**PRISONER'S REASON(S) FOR REQUEST:**
(For Example: Psychiatric Evaluation Not Supportive, Programming Inadequate, Cat X Incomplete, etc.)

_Needs to get recommended therapy prior to appearing before the Board of prison terms. Would request transfer to institution where such therapy is available._

| | Date |
|---|---|
| Signature of Prisoner | 12-8-93 |
| Signature of Attorney (if applicable)  Patricia Cassady | 12-8-93 |
| Signature and Title of Witness (CDC)  G. Nye | 12-8-93 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | DATE |
|---|---|---|---|---|

Exhibit #6 Page 1

BOARD OF PRISON TERMS                                      STATE OF CALIFORNIA
LIFE PRISONER HEARING – EXTRAORDINARY ACTION AND DECISION    BPT 1001A (Rev. 10/89)

☐ I certify to the best of my knowledge and information, the foregoing reasons as stated by the prisoner are accurate, and that the prisoner was capable of making a knowledgeable decision regarding his/her hearing.

The following information is submitted for the Board's consideration in making their decision:

_____

_____

_____

| C&PR Signature | Date |
|---|---|

_FOR BOARD OF PRISON TERMS USE ONLY_

## DECISION / ORDER

### WAIVER OF RIGHT TO ATTEND HEARING

1. ☐ Request is denied.
   ☐ Request is granted. Hearing will be conducted in absence of prisoner.

### POSTPONEMENT

2. ☐ Request is denied.
   ☐ Request is granted. Grant based on a finding of good cause. Place on _____ calendar.

### WAIVER OF HEARING AND STIPULATION TO UNSUITABILITY

3. ☐ Request is denied.
   ☒ Request is granted. The Board agrees to enter into the stipulation, on a finding of good cause, offered by the prisoner on the waiver of his/her Life Parole Consideration Hearing and orders a:
      ☐ One-year denial    ☒ Two-year denial*    ☐ Three-year denial**

 *  The Board must find it unreasonable to expect that the prisoner would be eligible for parole during the second, or second and third year, and the Board must state the reasons for its finding.

 ** In addition to the above (*), the prisoner must have been convicted of more than one offense which involves the taking of a life.

(The basis of the finding of good cause for postponement or multiple-year denial must be stated below.)

   ☒ Good cause based on the reasons given by the prisoner.

Other comments (if applicable): Prisoner needs Therapy to address his psych problems recommend Transfer to CMF on P&D if appropriate for C.D.C.

| Signature of BPT Commissioners | |
|---|---|
| 1. _[signature]_ | Date 12-8-23 |
| 2. _[signature]_ | Date 12/8/95 |

BPT Action Taken At: ☐ BPT Headquarters    ☐ Institution

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | DATE |
|---|---|---|---|---|
| BYRD, LESLIE | D-30420 | MULE CREEK | | |

Exhibit #6 Page 2

**EXHIBIT #7**

**2006 PSYCHOLOGICAL ASSESSMENT**

### RICHARD J. DONOVAN CORRECTIONAL FACILITY

### HEALTH CARE SERVICES
### PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
### MENTAL HEALTH EVALUATION

### JULY 2006 Calendar

### (PSYCHOLOGICAL ASSESSMENT)

I.  **IDENTIFYING INFORMATION:**
Mr. Byrd is a married, 61 year old, Caucasian male who was born on
September 8, 1945, to David and Eloise Byrd.  Mr. Byrd subscribes to the
Catholic faith.

This report is based on a review of the Central File, a review of the
medical record and on the results of two, one hour interviews with Mr.
Byrd. The consulting issues to be explored were the inmates'
psychosexual problems and the estimation of the prisoner's potential for
violence in society.

II.  **DEVELOPMENTAL HISTORY:**
According to Mr. Byrd, there were no prenatal or perinatal difficulties in his
mothers' pregnancy. He was a full-term infant who, at birth, weighed 8
lbs., 6 oz. He was unfamiliar with any difficulties in his early childhood
development. He does note that there were no complications during his
delivery. Developmental milestones were reached at the appropriate age.
There is no history of cruelty to animals, childhood bedwetting or juvenile
fire-setting.

There is no significant childhood medical history. Mr. Byrd, during his early
years, was positive for measles, whooping cough, asthma and had a
severe case of mononucleosis. His only hospitalization, at the age of 6,
was for a tonsillectomy.

III.  **EDUCATION:**
Mr. Byrd was enrolled in kindergarten at age 5 and then entered 1st grade
a year later. No particular problems were noted in school in his elementary
and high school years. He graduated from Arcadia High School in Arizona
in 1963. He went on to receive a Bachelor's of Science degree in
Business Administration from the University of Arizona in 1971. During his
college years, he noted that his only difficulty with any subject was
primarily in quadratic equations, for which he later received tutoring. The
subjects that he excelled in during his college years were English, History
and Economics.

Upon graduating from college and accepting and later maintaining
employment in the banking industry, Mr. Byrd went on to receive a
graduate banking degree through the Pacific Coast Banking School in
Seattle, Washington. According to a test administered in CDC, Mr. Byrd's
Grade level equivalent is 13.8

BYRD, LESLIE          D-30420          RJDCF/SD          F1-05-138L          LF/bl

Copy sent to Inmate 5/30/06

Exhibit #7 Page 1

It is not that when Mr. Byrd was in high school, he was a member of the baseball team and was actively involved in chess club. He was later able to obtain national ranking as one of the top ten players in table tennis. Currently, Mr. Byrd's educational interests include U.S. and European history.

IV.    **FAMILY HISTORY:**

Mr. Byrd notes that his parents were both college graduates. His father, age 89, was a career Navy Officer. He is negative for significant medical problems, mental illness, substance abuse, as well as contact with law enforcement. Mr. Byrd relates that his relationship with his father during his earlier years was limited based upon his father being frequently out of the home. It was also noted that as a child, his family moved every two to three years. Mr. Byrd describes his relationship with his father as good. Mr. Byrd's mother is deceased. He describes her as being an alcoholic. He further describes her as being a bright woman who was primarily a housewife and did teach school at a later time while his family was stationed in Hawaii. Mr. Byrd speaks in a stoic and matter-of-fact way of the stressful quality of his and his siblings lives. Growing with an alcoholic mother, who was inebriated daily, starting the drinking in the early afternoons and continuing until passing out and witnessing the raging arguments between his parents made him decide to go to college as far away from home as possible and to make a decision never to return home. Overall, it appears that given his mothers' alcoholism and his fathers' responsibilities, he and his sisters had to take care of themselves. His mother died in 1977, by drowning in the family's swimming pool.

His younger sister, Carol holds a Master's degree in Social work. Mr. Byrd claims to have a good relationship with his sister. She is also noted to be negative for any significant medical problems, mental illness or substance abuse issues. His older sister holds a Bachelor of Science degree. She is negative for mental illness, substance abuse, as well as contact with law enforcement. She is positive, however, for multiple sclerosis.

V.    **PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:**

Mr. Byrd relates that he first became aware of his body changing at approximately 15 to 16 years of age. He first began dating at age 18 and had his first sexual relationship at age 20. Mr. Byrd considers himself as being heterosexual. He has had only one relationship longer than two months duration which has been with his wife with whom he has been with for approximately 38 years. At no time during his adolescence and young adulthood did Mr. Byrd report engaging in any type of activity that would warrant a diagnosis of apparent emotional disorder. The deviant sexual behaviors described during the crime had not been pervasive or extended over time. According to the reports by Mr. Byrd, they started in late 1984, when after 10 years of being diagnosed with multiple sclerosis, he experienced his first debilitating attack. He had difficulties ambulating, experienced weakness of legs and arms and had frightening episodes of diminished visual acuity.

No one in his family with the exception of his wife, knew about his illness for the previous 10 years. Multiple sclerosis is known to be aggravated by any type of stress. Mr. Byrd was (at that time), experiencing a great deal of the stress produced by conflicts at work. His lending decisions were being overruled by his superiors that were questioning his judgment. The combination of his declining health, his conflicts at work and his personal approach to dealing with stress produced some type of emotional disorder.

BYRD, LESLIE        D-30420        RJDCF/SD        F1-05-138L        LF/bl

Exhibit #7 Page 2

(He too    driving for extended periods of ti     after leaving his office to
try to       d before returning home). It was     is time that he became
engaged in soliciting prostitutes. The contacts occurred for approximately
six or seven months. It was a period where several banks merged and he
was part of the designated team in charge of reorganizing the work force.
This involved letting go of a number of people which created innumerable
conflicts and lawsuits. He remembers working seven days a week for a
period of months.

VI.     **MARITAL HISTORY:**
Mr. Byrd married his present wife on December 23, 1967, after a two year
courtship. They have been married for approximately 38 years. Mr. Byrd's
wife is a few years younger than he. She is currently employed as a
school teacher in Tucson, Arizona. From their union, two children were
born. Samantha, who is an architect and Sarah, who is a flight attendant,
stationed in Chicago. Mr. Byrd characterizes his relationships with his
wife and children as being good and very satisfied.

VII.    **MILITARY HISTORY:**
Mr. Byrd has never been a member of the armed forces.

VIII.   **EMPLOYMENT AND INCOME HISTORY:**
Upon leaving college, Mr. Byrd was employed by the Arizona Bank in
Phoenix, Arizona from 1971 through 1983. He worked at the Arizona Bank
as a vice president. Subsequent to this position, he was employed at the
West American Bank in San Rafael. He title was Senior Vice President.
He was in charge of a loan portfolio of more than $700 million dollars.
According to the record, his income at that time was approximately
$72,000 per year, in addition to car allowances and bonuses. His current
interest is primarily in keeping current in his field by reading financial
newspapers and magazines, as well as federal regulations. He would
eventually like to return to banking and or work part time in financial
counseling.

IX.     **SUBTANCE ABUSE HISTORY:**
Mr. Byrd does not claim nor is there any record of any type of abuse or
dependence upon disinhibiting agents. More to the point having witnessed
first hand the ravages of alcoholism and the suffering it produces, it has
been a powerful dissuading factor in his and his sisters' decisions not to
drink nor smoke.

X.      **PSYCHIATRIC AND MEDICAL HISTORY:**
Mr. Byrd does not claim nor is there any record of any history of
psychological illness or disabilities. It is noted, however, that he has been
asthmatic since childhood, had a severe case of mononucleosis and that
he contracted multiple sclerosis in 1972. Although he was originally
hospitalized upon having his first attack, it was not immediately diagnosed
as MS. According to the patient's history, Mr. Byrd was diagnosed in 1973
with this illness. He has been hospitalized at various times on occasions,
as well as received outpatient treatment throughout the past 29 years. His
multiple sclerosis relapses and remits by history with past episodes
occurring every two to three years. These episodes have lasted

BYRD, LESLIE        D-30420        RJDCF/SD        F1-05-138L        LF/bl

Exhibit #7 Page 3

approximately two months and result in numbness or weaknesses in his feet, legs, arms and hands. Additional involvement has also included optic neuritis in either side along with decreased vision in the right eye. Mr. Byrd's last attack resulted in left and right leg paralysis, lower trunk paralysis and weaknesses, as well as numbness from his upper abdomen to toes along with urinary urgency. Mr. Byrd is currently on Interferon beta-1A, for this condition. Mr. Byrd is also receiving medications for glaucoma.

## XI.    PLANS IF GRANTED RELEASE:

If Mr. Byrd were to be released, he would move to Tucson, to be with his wife. He further considers his wife, sisters, father and best friend to be in support of him in his attempts to rebuild his life. Although his wife has worked over the years as a school teacher to occupy her time, he states that both of them could live on his pension plan. Job plans, should he be paroled, entail returning to the banking industry or working part time in financial counseling. His primary challenge should he be paroled, would be being paroled to the San Francisco area and being separated from his wife.

## CLINICAL ASSESSMENT

## XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS:

Mr. Byrd was interviewed twice. The first time on April 27th for a period of one hour and the second time on May 1st for 45 minutes.

He is in no apparent, acute distress. He moves about in a wheelchair and he is alert and oriented as to time, place, date and purpose for this interview.

He responded to questions in a polite and appropriate way, is attentive, makes effective eye contact and was spontaneously verbal.

All components of memory are grossly intact as far as I can determine without independent verification of the historical facts.

His thinking seems normal from the perspective of productivity, relevance and coherence.

Speech was relevant, appropriate and without evidence of unusual ideation. It showed good grammatical complexity. There is no obvious preoccupation or obsessions with sexual themes. He distinguishes and is able to identify and control behaviors that may be harmful to self or others and acts on his understanding. He has strong executive functions. Reality testing is intact and he is full self-aware. He is able to comprehend behaviors contrary to social values. Sleep pattern is reported as normal. Mood is euthymic with normal fluctuations and affect is congruent.

**BYRD, LESLIE**      D-30420      **RJDCF/SD**      F1-05-138L      LF/bl

Exhibit #7 Page 4

presented with no obvious weight changes. The use of alcohol or illicit drugs is denied. There are no obsessions, phobias, ideas of reference, hallucinations nor perceptual disturbances.

He is concerned about his health and appropriately so. Level of intelligence is estimated to be above average. Suicidality and homicidality are absent. He has developed an appropriate understanding of the nature of his crime, its consequences and how it has affected his life, his family's life, and the life of the victim's family.

Clinical diagnosis at the time of this interview.

### DIAGNOSES:

**Axis I:**  No diagnosis.

**Axis II:**  No diagnosis.

**Axis III:**  Multiple Sclerosis, Cataracts, Asthma.

**Axis IV:**  Moderate to Severe, consistent of Legal issues.
Incarceration, deterioration of health and separation from family members.

**Axis V:  Current GAF =  Between 75 and 80.**

Mr. Byrd appears to have developed an understanding of the factors that influenced the committing of his crime and the need to develop effective and productive means of communicating and showing his feelings.

**XIII.**  **REVIEW OF LIFE CRIME:**
Upon describing the context of the commitment offense, Mr. Byrd's description and elaboration of the events, both proceeding and during the commission of the offense, did not deviate significantly from that which has already been reported. Mr. Byrd, given the stressors of his work, along with a chronic, debilitating illness, "he was looking for something completely different". As a result he became fascinated with a subset of life which had previously been unknown to him. Overall, however, Mr. Byrd does not excuse nor condone his behavior that eventful night. He reiterates that given the woman's screams and his fear and being discovered that he "panicked" and held the woman underwater for too long a period of time. It does not appear, however, that he had plans or intended the demise of the victim. Although Mr. Byrd appears to be sincerely remorseful for his actions and he also asks, "God, to forgive me", for taking another's life. In his prayers and spiritual search, he is unclear as how he could indeed experience this forgiveness.

As to the causative factors relative to the commitment offense, it would appear from the record that upon the interview with Mr. Byrd, that stress was indeed a factor in his life and his way of resolving it at the time of the commission of the offense, was through sexual release. Since that time, Mr. Byrd has recognized other options related to the reduction of stress in his life.

**BYRD, LESLIE**       **D-30420**       **RJDCF/SD**       **F1-05-138L**       **LF/bl**

Exhibit #7 Page 5

**XIV.    ASSESSMENT OF DANGEROUSNESS:**

Mr. Byrd's violence potential outside a controlled a setting in the past was considered to have been less than average and at the present, it is estimated to be reduced from that level. If released to the community, he would in all probability be likely to continue improvement given his defined set of expectations and goals, along with family support. He further appears to have internal resources necessary, along with the motivation to be productive and contribute to helping others.

**XV.    CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:**

A review of both the medical, as well as Central File and upon interviewing Mr. Byrd, it appears that he has certainly matured throughout his time in CDCR Facilities. It is also apparent that his direction in life is focused upon assisting others. This is noted for example through his work with the Hand of Peace program, his involvement with the Morals and Values class, his participation in Kairos, and his self-initiated force in tutoring others to pass their G.E.D. Overall, Mr. Byrd displays maturity and self-initiative in serving others by taking size of himself. It further appears that although he has high hopes of being reunited with his family, he does not have any expectations of that occurring any time soon. He appears resigned to the fact that there is "nothing I can do to change my circumstances". He expresses and experiences a sense of guilt, regret and remorse for his prior actions. He is aware of his strengths and his abilities as well as his limitations.

It is my personal opinion that the effects of stress and the worsening of his multiple sclerosis symptoms (with the frightening expectation of blindness and paralysis), and his introverted personality, played an important role in his choices for releasing accumulated, negative emotions, some of them originating in childhood and as a consequence of growing up with an alcoholic mother.

LUISA FIJMAN, M.D.
Staff Psychiatrist

D:  05/11/06
T:  05/15/06

BYRD, LESLIE        D-30420        RJDCF/SD        F1-05-138L        LF/bl

Exhibit #7 Page 6

**EXHIBIT #8**

**2001 PSYCHOLOGICAL ASSESSMENT**

# RICHARD J. DONOVAN CORRECTIONAL FACILITY

# HEALTH CARE SERVICES

## PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS

### October 2001 Calendar 

### <u>PSYCHOLOGICAL ASSESSMENT</u>

I.  **IDENTIFYING INFORMATION:**
    Mr. Byrd is a married fifty-six-year old Caucasian male who was born on
    September 8, 1945 to David and Eloise Byrd. Mr. Byrd subscribes to the
    Catholic faith. He does not have any nicknames nor does he have any
    type of physically distinguishing characteristics or tattoos.

II. **DEVELOPMENTAL HISTORY:**
    According to Mr. Byrd there were no prenatal or perinatal difficulties in his
    mother's pregnancy. He was a full term infant who, at birth, weighed eight
    pounds 6 ounces. He was unfamiliar with any difficulties in his early
    childhood development. He does note that there were no complications
    during his delivery. He does not recall if his developmental milestones
    were within normal limits. As far as he can remember there were no
    speech, language or motor delays. He further claimed that there were no
    unusual or peculiar habits and that he interacted well with family members
    as well as with friends of the same sex and age group. During his early
    childhood he was primarily involved in activities outside of school which
    involved children of his own age. There was no history of cruelty to
    animals, childhood bed wetting, or juvenile fire setting.

    There is no significant childhood medical history. Mr. Byrd however,
    during his early years was positive for measles, whooping cough, and
    asthma. His only hospitalization during this time was at age six for a
    tonsillectomy.

III. **EDUCATION:**
    Mr. Byrd was enrolled in kindergarten at age five and then entered first
    grade a year later. No particular problems were noted in school in his
    elementary and high school years. He graduated from Arcadia high
    school in Arizona in 1963. He went on to receive a bachelors of science
    degree in business administration from the University of Arizona in 1971.
    During his college years he noted that his only difficulty with any subject
    was primarily in quadratic equations for which he later received tutoring.
    The subjects that he excelled in during his college years were English,
    History and Economics.

**BYRD, L. LESLIE          D-30420          F1-05-178L    GP/rs**

Exhibit #8 Page 1

**BOARD OF PRISON TERMS REPORT**
**PAGE 2**

Upon graduating from college and accepting and later maintaining employment in the banking industry Mr. Byrd went on to receive a graduate banking degree through the Pacific Coast Banking School in Seattle Washington. In retrospect, Mr. Byrd states that during his college years he was an average student however upon marrying he received A's. According to a test administered in CDC Mr. Byrd's grade level equivalent is 13.8.

It is noted that while Mr. Byrd was in high school was a member of the baseball team and was actively involved in a chess club. He was later able to obtain national ranking as one of the top ten players in table tennis. Currently Mr. Byrd's educational interests include US and European history.

IV.    **FAMILY HISTORY:**

Mr. Byrd notes that his parents were both college graduates. His father, age eighty-three, was a career Navy officer. He is negative for significant medical problems, mental illness, substance abuse as well as contact with law enforcement. Mr. Byrd relates that his relationship with his father during his earlier years was limited based upon his father being frequently out of the home. It was also noted that as a child his family moved every two to three years primarily on the east coast or west coast which later included being stationed in Hawaii. Mr. Byrd however relates that his relationship with his father at this time is described as being good. His mother is deceased. She is negative for mental illness, significant medical problems and contact with law enforcement. Mr. Byrd however describes her as being an alcoholic. He further describes her as being a bright women who was primarily a house wife and did teach school at a later time while his family was stationed in Hawaii. It is noted in the record that his mother had insomnia and frequently got to sleep at approximately five a.m. She would then sleep until noon and start drinking at 5:00 p.m. Overall it appears that given his mother's alcoholism and his father's responsibilities that he and his sisters had to take care of themselves. His mother died in 1977, by drowning in the family swimming pool. Overall, Mr. Byrd's describes his relationship with his mother while growing up as being good.

His younger sister, Carol, age forty-nine, holds a master degree in social work. Mr. Byrd claims to have a good relationship with his sister. She is also noted to be negative for any significant medical problems, mental illness or substance abuse issues. His older sister, age fifty-four, holds a bachelor of science degree. She is negative for mental illness, substance use problems as well as contact with law enforcement. She is positive however, for multiple sclerosis. Overall, Mr. Byrd notes that his relationship with his older sister while growing up was considered as good however now it is considered as being distant.

**BYRD, L. LESLIE**        **D-30420**        **F1-05-178L    GP/rs**

Exhibit #8 Page 2

**BOARD OF PRISON TERMS REPORT**
**PAGE 3**

**V.    PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:**
Mr. Byrd relates that he first became aware of his body changing at
approximately fifteen to sixteen years of age. He first began dating at age
eighteen and had his first sexual relationship at age twenty. Mr. Byrd
considers himself as being heterosexual. He has had only one
relationship longer than two months duration, which has been with his wife
with whom has been with for approximately thirty-six years.

According to the record there is a history of high risk behavior, bondage,
and reports from prostitutes, who testified at his trial, that Mr. Byrd had
fantasies involving homicide and violence toward women.

**VI.    MARITAL HISTORY:**
Mr. Byrd married his present wife on December 23, 1967, after a two-year
courtship. They have been married approximately thirty-four-years. Mr.
Byrd's wife is a few years younger then he is. She is currently employed
as a school teacher in Tucson Arizona. From their union two children
were born. Samantha, age twenty-eight, is currently an architect in San
Francisco. Mr. Byrd's other daughter, Sara, age twenty-six is a flight
attendant stationed in Chicago. Mr. Byrd characterizes his relationships
with his wife and children as being good and very satisfying.

**VII.    MILITARY HISTORY:**
Mr. Byrd has never been a member of the armed forces.

**VIII.    EMPLOYMENT/INCOME HISTORY:**
Upon leaving college Mr. Byrd was employed by The Arizona Bank in
Phoenix Arizona from 1971 through 1983. He worked at the Arizona bank
as a Vice President. Subsequent to this position he was employed at the
West America Bank in San Rafael. His title was Senior Vice President.
He was in charge of a loan portfolio of more than seven hundred million
dollars. According to the record, his income at that time was
approximately seventy-two thousand per year in addition to car
allowances and bonuses. His current interest is primarily in keeping
current in his field by reading financial newspapers and magazines as well
as federal regulations. He would eventually like to return to banking
and/or work part-time in financial counseling.

**IX.    SUBSTANCE ABUSE HISTORY:**
Mr. Byrd does not claim nor is there any record of any type of abuse or
dependence upon disinhibiting agents.

**BYRD, L. LESLIE          D-30420          F1-05-178L    GP/rs**

Exhibit #8 Page 3

**BOARD OF PRISON TERMS REPORT**
**PAGE 4**

He does note however that he did drink some wine beginning at the age of twenty-two. However, he would only drink approximately two to three glasses of wine per week.

**X.    PSYCHIATRIC AND MEDICAL HISTORY:**
Mr. Byrd does not claim nor is there any record of any history of psychological illnesses or disabilities. It is noted however that he has been asthmatic since childhood and that he contracted multiple sclerosis in 1972. Although he was originally hospitalized upon having his first attack it was not immediately diagnosed as MS. According to the patient's history Mr. Byrd was diagnosed in 1973 with this illness. He has been hospitalized at various times and locations as well as received outpatient treatment throughout the past twenty-nine years. His multiple sclerosis relapses and remits by history with past episodes occurring every two to three years. These episodes have lasted approximately two months and result in numbness or weakness in his feet, legs, arms and hands. Additional involvement has also included optic neuritis in either side along with decreased vision in the right eye. Mr. Byrd's last attack was last May which resulted in left and right leg paralysis, lower trunk paralysis and weakness, as well as numbness from his upper abdomen to toes along with urinary urgency. Mr. Byrd is currently on Interferon beta-1A for this condition. Mr. Byrd is also receiving medication for glaucoma.

**XI.    PLANS IF GRANTED RELEASE:**
If Mr. Byrd were to be released he would move to Tucson to be with his wife. He further considers his wife, sisters, father and best friend to be in support of him in his attempts to rebuild his life. Although his wife has worked over the years as a school teacher to occupy her time he states that both of them could live on his pension plan. Job plans, should he be paroled, entail returning to the banking industry or working part-time in financial counseling. His primary challenge should he be paroled would be being paroled to the San Francisco area and being separated from his wife. He is not aware of any other difficulties or conditions that might be levied should he so paroled. Overall Mr. Byrd's plans appear to be viable in terms of not only having a place to stay but also having the financial means and support necessary to rebuild his life. Overall, there are no specific problems noted at this time.

**BYRD, L. LESLIE        D-30420        F1-05-178L    GP/rs**

Exhibit #8 Page 4

**BOARD OF PRISON TERMS REPORT**
**PAGE 5**

### CLINICAL ASSESSMENT

**XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS:**
In the clinical interview of today, the presentation has been quite similar to the diagnostic picture presented over the past years of which no severe mental disorder is noted. Mr. Byrd was punctual and presented as neatly dressed Caucasian male of medium height and build seated in a wheelchair, which he had navigated to this office. He was cooperative, made good eye contact and exhibited no noticeable aberrant behavior. His affect and mood were slightly upbeat and his speech was clear. Organization of thought processes was clear, sequential and logical. There were no suicidal or homicidal ideations nor did he describe any type of perceptual disturbance. His insight relative to the commitment offense appeared fair and he does have the potential of developing greater self-awareness. Judgment was also noted to be good. His intelligence level, although not formally tested, appeared to be in the above average range.

**CLINICAL DIAGNOSES:**
Axis I:      1.  Sexual sadism (by history).
             2.  Adult antisocial behavior.
Axis II:     No diagnosis.
Axis III:    Multiple sclerosis and asthma.
Axis IV:     Incarceration.
Axis V:      GAF =80.

Overall Mr. Byrd appears to have made more than a satisfactory adjustment to be prison setting. He further appears to be focused upon improving his life and maintaining his contacts and involvement with his family upon parole. His family appears to give him much emotional support. Mr. Byrd does not have a severe mental disorde,r however it may prove useful for him to more fully explore his relationships with women, other than his wife, as well as his method of relating to them sexually.

**XIII.    REVIEW OF LIFE CRIME:**
Upon describing the context of the commitment offense Mr. Byrd's description and elaboration of the events both preceding and during the commission of the offense did not deviate significantly from that which has already been recorded.

**BYRD, L. LESLIE          D-30420          F1-05-178L    GP/rs**

Exhibit #8 Page 5

**BOARD OF PRISON TERMS REPORT**
**PAGE 6**

Mr. Byrd did add that given the stressors of his work along with a chronic debilitating illness he was looking for "something completely different". As a result he became fascinated with a sub-set of life which had previously been unknown to him. Overall however, Mr. Byrd does not excuse nor condone his behavior that eventful night. He reiterates that given the woman's screams and his fear of being discovered that he "panicked" and held the woman underwater for too long a period of time. It does not appear however that he had plans or intended the demise of the victim. Overall, Mr. Byrd appears to be sincerely remorseful for his actions and in this vein he also asked "God to forgive me" for taking another's life. In his prayers and spiritual search he is unclear as to how he could indeed experience this forgiveness. He also recognizes the harm that he has caused both families in this matter.

As to causative factors relative to the commitment offense it would appear from the record and upon the interview with Mr. Byrd that stress was indeed a factor in his life and his way of resolving it at the time of the commission of the offense was through sexual release/control. Since that time Mr. Byrd has recognized other options related to the reduction of stress in his life.

XIV.    **ASSESSMENT OF DANGEROUSNESS:**
Mr. Byrd's violence potential outside a controlled setting in the past was considered to have been less than average and at present it is estimated to be reduced from that level. If released to the community he would in all probability be likely to continue improvement given his defined set of expectations and goals along with family support that he receives. He further appears to have the internal resources necessary along with the motivation to be productive and contribute to helping others.

XV.    **CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:**
In reviewing both the medical as well as central file and upon interviewing Mr. Byrd it appears that he has certainly matured throughout his time in CDC facilities. It is also apparent that his direction in life is focused upon assisting others. This is noted, for example, through his work with the Hand of Peace Program, his involvement with the morals and values class,

**BYRD, L. LESLIE**         **D-30420**         **F1-05-178L    GP/rs**

Exhibit #8 Page 6

**BOARD OF PRISON TERMS REPORT**
**PAGE 7**

his participation in Kairos, and his self-initiated efforts in tutoring others to pass their GED.  Overall Mr. Byrd displays maturity and self-initiative in serving others by taking his eyes off of himself.  It further appears that although he has high hopes of being reunited with his family he does not have any expectations of that occurring anytime soon.  He appears resigned to the fact that there is "nothing I can do to change my circumstance".  He expresses and experiences a sense of guilt, regret and remorse for his prior actions.  He is aware of his strengthens and his abilities as well as his limitations.  He desires however to be of service to others.  In closing Mr. Byrd should be removed from the special calendar because psychopathology is not related to future criminal behavior.  Psychological opinion would not contribute to a release decision.  There are no other recommendations that can be made other than to support the efforts of Mr. Byrd in continuing his service to others and maintaining his connection educationally to his career field.

*Remove +*

**GARY PESAVENTO, Ph.D.**
**Clinical Psychologist**

D: 10-01-01
T: 10-02-01

**BYRD, L. LESLIE          D-30420          F1-05-178L    GP/rs**

Exhibit #8 Page 7

**EXHIBIT #9**

**CATEGORY "T" FINAL REPORT**

# CATEGORY "T"

# FINAL REPORT

BYRD, LESLIE
CDC# D-30420
F1-2-105L
RICHARD J. DONOVAN CORRECTIONAL FACILITY

Exhibit #9 Page 1

# RICHARD J. DONOVAN CORRECTIONAL FACILITY

## HEALTH CARE SERVICES

### CATEGORY "T" FINAL REPORT

**INMATE:**                          Byrd, Leslie
**CDC NUMBER:**                      D-30420
**CATEGORY "T" START DATE:**         February, 1995
**CATEGORY "T" END DATE:**           May, 1996
**CASE MANAGER:**                    Ruth Hansen, MSW
                                     Psychiatric Social Worker
**REPORT WRITER:**                   J.M. Henry, Ph.D.
                                     Senior Psychologist

**INTRODUCTION:**
Mr. Byrd is a fifty year old inmate on a life term for the
crime of second degree murder. He was referred by the BPT
for the Category "J" program at Richard J. Donovan
Correctional Facility/PSU and was entered into the program
by MICC endorsement in January of 1995. He was seen for an
initial evaluation in February of 1995 by his Case Manager
and presented to the Multidisciplinary Treatment Team during
that same month. The Case Manager and this reporter have
frequently discussed the issues related to this report.

**OPINIONS:**
I offer the following opinions based on a review of the
Central File, a review of the Medical Record, information
from and discussion with other clinicians and their reports,
knowledge of the inmate through the Process group and an
interview with the inmate.

**VIOLENCE POTENTIAL OUTSIDE A CONTROLLED SETTING:**
Mr. Byrd's violence potential outside of a controlled
setting is considered quite low. The most accurate
predictor of future violence is a history of past violence.
The inmate does not have a history of violence either as a
victim or predator. An assessment in August of 1993 by a
staff psychiatrist indicated that his violence potential was
lower than the average inmate at that time. More recently,
staff psychologist, Dr. Singer further suggested that the
inmate's violence potential is quite low. In discussing
violence with Mr. Byrd, his self report revealed, "My
conception of myself was I was a good person. If there's
any message it's this sort of thing can happen to anybody.
I don't think I represent a threat to anyone today. My
values are so different than what they were."

**BYRD, LESLIE     D-30420     RJDCF/SD     F1-02-105L     JH/rmp**
D: 05/21/96
T: 05/29/96

Exhibit #9 Page 2

CATEGORY "T" FINAL REPORT
PAGE 2

## THE ROLE OF ALCOHOL/DRUGS IN THE COMMITMENT OFFENSE:

Mr. Byrd had no history of illicit drug use. His use of
alcohol was moderate and involved limited social
opportunities. There is sufficient documentation on this
inmate to support the fact that he has never had nor does he
have an alcohol or drug problem. His interest in and
willingness to participate in a Substance Abuse group is
indicative of this inmate's interest in understanding
himself better. It is likely that much of his interest was
further piqued by his mother's involvement with alcohol.
She had experienced frequent alcoholic black outs and was
found dead at age fifty-eight in the swimming pool in their
backyard. Mr. Byrd's interest in the Substance Abuse group
seemed motivated by his desire to understand the effects of
his mother's substance abuse history on his development.

## EXPLORATION OF COMMITMENT FACTORS:

It should be mentioned that Mr. Byrd self-initiated his
participation in the Category "T" process. There is ample
documentation that he requested an opportunity to
participate in this program for the purposes of determining
the factors that led to his crime. He has been consistent
in seeking information to help him understand this tragedy.
Some of the specific factors that he has identified include
a lack of communication with his parents, a history of
repressing emotions and anger, learning to be intolerant
with himself, feelings of inadequacy and limited self worth,
being introverted, the influence of an alcoholic mother and
an absent father. He further realizes that he has had
unrealistic self-expectations and has learned to insulate
himself from his feelings. At this point he has gone from
intellectualizing his feelings to recognizing them and
acting on them more appropriately. Considering the other
successes in his life, prior to this crime, it is not
surprising that he has been appropriately zealous in
exploring the factors that contributed to his early
development and later were influential in the instant
offense.

## REMORSE:

Mr. Byrd's own self report perhaps offers the most eloquent
testimony to his remorse for his crime. He stated, "I think
about it every day, it's the first thing I think of
everyday. The remorse gets worse as my daughters get close
to the age of my victim. My victim was innocent. There's
nothing she did to precipitate my behavior. I thought
several times about writing them but I don't think they want
to hear from me. I think it would just hurt them more."
BYRD, LESLIE    D-30420    RJDCF/SD    F1-02-105L    JH/rmp
D:   05/21/96
T:   05/29/96

Exhibit #9 Page 3

CATEGORY "T" FINAL REPORT
PAGE 3

This writer has known Mr. Byrd for the fourteen months of
his Category "T" participation. He was also a participant
in the writer's Communication group. He has frequently
discussed his remorse on a formal and an informal basis in a
number of settings. He is consistent with his feelings and
emotions. In discussing remorse for this report, he had to
pause a number of times to regain his composure. In this
writer's opinion, Mr. Byrd's remorse is appropriate,
pervasive, and genuine.

NEED FOR FURTHER TREATMENT:
No further individual or group therapy is seen as necessary
to prepare Mr. Byrd to return to the community. The soul
searching and hard work of attempting to answer "why" has
been accomplished. There is little more of a substantive
nature to consider with respect to Mr. Byrd understanding
causes of his behavior or being concerned for his penchant
for violence in the future. As always, should the inmate
choose additional therapy to further develop additional self
awareness, that choice should be his. No additional therapy
is seen as needed to explore any other commitment-related
issues. As stated in Mr. Byrd's Category "T" Clinical
Summary, he has benefited optimally from those services
available to him.

A further consideration is Mr. Byrd's deteriorating physical
health as a result of multiple sclerosis, first diagnosed in
1972. His periods of temporary blindness, paralysis,
psychomotor dysfunction and other symptoms associated with
his MS have clearly tempered his life and his plans for the
future. His twenty-nine year old marriage remains intact as
does his contact with his wife and two daughters. Given the
circumstances in Mr. Byrd's life, his nonviolent lifestyle
with the exception of his commitment offense, the support of
his family, his declining health, his educational
background, his lack of any substance abuse and his day to
day manner of getting the most good out of the rest of his
life. It is highly likely that this inmate represents a
minimal risk to society when he is released.

J.M. HENRY, Ph.D.
Senior Psychologist

BYRD, LESLIE    D-30420    RJDCF/SD    F1-02-105L    JH/rmp
D:  05/21/96
T:  05/29/96

Exhibit #9 Page 4

CATEGORY "T" FINAL REPORT.
PAGE 4

<u>ACKNOWLEDGMENT</u>:
I have read the Category "T" Final Board Report and
understand the information in it.

_____ 6/21/96          _____ 6/21/96
INMATE SIGNATURE/DATE            FINAL REPORT WRITER


<u>INMATE ADDENDUM SECTION</u>:
I disagree with the Category "T" Final Board Report.  I
would like to add the following comments.

----------------------------------------------------------

----------------------------------------------------------

----------------------------------------------------------

----------------------------------------------------------

----------------------------------------------------------


_____          _____
INMATE SIGNATURE/DATE            FINAL REPORT WRITER




BYRD, LESLIE    D-30420    RJDCF/SD    F1-02-105L    JH/rmp
D:  05/21/96
T:  05/29/96

Exhibit #9 Page 5