

COURT OF APPEAL, FIRST APPELLATE DISTRICT
350 MCALLISTER STREET
SAN FRANCISCO, CA 94102
DIVISION 1

In re LESLIE ARTHUR BYRD on Habeas Corpus.



FILED

MAY 3 0 2007

Court of Appeal - First App. Dist.
DIANA HERBERT

By _____

A117276
Marin County No. SC152472A

BY THE COURT:

The petition for writ of habeas corpus is denied.

The justices participating in this matter were:

Acting Presiding Justice Stein, Justice Swager and Justice Margulies

Date: __MAY 3 0 2007__          __SWAGER, J._____ P.J.

EXHIBIT #17

CALIFORNIA SUPREME COURT DENIAL

S153569

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

In re LESLIE ARTHUR BYRD on Habeas Corpus

The petition for writ of habeas corpus is denied.

SUPREME COURT
## FILED

NOV 2 8 2007

Frederick K. Ohlrich Clerk

Deputy

**GEORGE**

Chief Justice

Exhibit #17    Page 1

**EXHIBIT #18**

In Re CRISCIONE

**F** (ENDORSED) **I L E D**

AUG 3 0 2007

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of Santa Clara Clerk
BRET MORROW
DEPUTY

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

In re                              )      No.: 71614
                                   )
     ARTHUR CRISCIONE,             )      ORDER
                                   )
On Habeas Corpus                   )
                                   )

## INTRODUCTION

Petitioner alleges that he has been denied due process of law because the Board has used standards and criteria which are unconstitutionally vague in order to find him unsuitable for parole. Alternatively, he argues that those standards, even if constitutionally sound, are nonetheless being applied in an arbitrary and meaningless fashion by the Board.  He relies upon evidence that in one hundred percent of 2690 randomly chosen cases, the Board found the commitment offense to be "especially heinous, atrocious or cruel", a factor tending to show unsuitability under Title 15 §2402(c)(1).

## Are the Board Criteria Unconstitutionally Vague?

Our courts have long recognized that both state and federal due process requirements dictate that the Board must apply detailed standards when evaluating whether an individual inmate is unsuitable for parole on public safety grounds.  (See *In re Dannenberg* (2005) 34

1.

Cal.4th 1061 at p. 1096, footnote 16.). Those standards are found in
15 CCR §2402(c) (*Dannenberg, supra,* 34 Cal.4th at p. 1080,) and do
include detailed criteria to be applied by the Board when considering
the commitment offense:

    (c) Circumstances Tending to Show Unsuitability. The following
circumstances each tend to indicate unsuitability for release.
These circumstances are set forth as general guidelines; the
importance attached to any circumstance or combination of
circumstances in a particular case is left to the judgment of
the panel. Circumstances tending to indicate unsuitability
include:

    (1) Commitment Offense. The prisoner committed the offense in an
especially heinous, atrocious or cruel manner. The factors to be
considered include:

    (A) Multiple victims were attacked, injured or killed in
the same or separate incidents.

    (B) The offense was carried out in a dispassionate and
calculated manner, such as an execution-style murder.

    (C) The victim was abused, defiled or mutilated during or
after the offense.

    (D) The offense was carried out in a manner which
demonstrates an exceptionally callous disregard for human
suffering.

    (E) The motive for the crime is inexplicable or very
trivial in relation to the offense.

    In response to Petitioners claim that the regulations are
impermissibly vague, Respondent argues that while "especially
heinous, atrocious or cruel" might be vague in the abstract it is
limited by factors (A)-(E) of §2402(c)(1), and thus provides a
'principled basis' for distinguishing between those cases which are
contemplated in that section and those which are not. An examination
of cases involving vagueness challenges to death penalty statutes is
instructive here and shows that Respondent's position has merit:

    "Our precedents make clear that a State's capital sentencing

2

Exhibit #18 Page 2

1    scheme also must genuinely narrow the class of persons eligible
     for the death penalty.  When the purpose of a statutory
2    aggravating circumstance is to enable the sentencer to
     distinguish those who deserve capital punishment from those who
3    do not, the circumstance must provide a principled basis for
     doing so.  If the sentencer fairly could conclude that an
4    aggravating circumstance applies to every defendant eligible for
     the death penalty, the circumstance is constitutionally infirm."
5    (Arave v. Creech (1993) 507 U.S. 463, 474, citing Maynard v.
     Cartwright (1988) 496 U.S. 356, 364: "invalidating aggravating
6    circumstance that 'an ordinary person could honestly believe'
     described every murder," and, Godfrey v. Georgia (1980) 446 U.S.
7    420, 428-429: "A person of ordinary sensibility could fairly
     characterize almost every murder as 'outrageously or wantonly
8    vile, horrible and inhuman.'")

9
          It cannot fairly be said that 'every murder' could be
10
     categorized as "especially heinous, atrocious or cruel" under the
11
     Board regulations, since the defining factors contained in
12
     subdivisions (A)-(E) clearly narrow the group of cases to which it
13
     applies.  Although Petitioner also argues that the "vague statutory
14
     language is not rendered more precise by defining it in terms or
15
     synonyms of equal or greater uncertainty" (People v. Superior Court
16
     (Engert) (1982) 31 Cal.3d 797, 803, Pryor v. Municipal Court (1979)
17
     25 Cal.3d 238, 249. See also Walton v. Arizona (1990) 497 U.S. 639,
18
     654), the factors in those subdivisions are not themselves vague or
19
     uncertain.  The mere fact that there may be some subjective component
20
     (such as "exceptionally callous" disregard for human suffering) does
21
     not render that factor unconstitutionally vague.   The proper degree
22
     of definition of such factors is not susceptible of mathematical
23
     precision, but will be constitutionally sufficient if it gives
24
     meaningful guidance to the Board.
25
          A law is void for vagueness if it "fails to provide adequate
26   notice to those who must observe its strictures and
     impermissibly delegates basic policy matters to policemen,
27   judges, and juries for resolution on an ad hoc and subjective
     basis, with the attendant dangers of arbitrary and
28

                                    3

Exhibit #18 Page 3

1 discriminatory application." (People v. Rubalcava (2000) 23
Cal.4th 322, 332, quoting People ex rel. Gallo v. Acuna (1997)
2 14 Cal. 4th 1090, 1116, quoting Grayned v. City of Rockford
(1972) 408 U.S. 104, 108-109.)

3 A review of cases expressing approval of definitions to limit the

4 application of otherwise vague terms in death penalty statutes leads

5 inextricably to the conclusion that the limiting factors in §2402(c)

6 easily pass constitutional muster. An Arizona statute was upheld

7 that provided a crime is committed in an 'especially cruel manner'

8 when the perpetrator inflicts mental anguish or physical abuse before

9 the victim's death," and that "mental anguish includes a victim's

10 uncertainty as to his ultimate fate." (Walton v. Arizona (1990) 497

11 U.S. 639, 654.) Similarly, the court in Maynard v. Cartwright, 486

12 U.S. at 364-365, approved a definition that would limit Oklahoma's

13 "especially heinous, atrocious, or cruel" aggravating circumstance to

14 murders involving "some kind of torture or physical abuse. In

15 Florida, the statute authorizing the death penalty if the crime is

16 "especially heinous, atrocious, or cruel," satisfied due process

17 concerns where it was further defined as "the conscienceless or

18 pitiless crime which is unnecessarily torturous to the victim."

19 State v. Dixon (1973) 283 So. 2d 1 at p. 9.

20 Here, the factors in subdivisions (A)-(E) provide equally clear

21 limiting construction to the term "especially heinous, atrocious, or

22 cruel" in §2402(c).

23 **Has the Board Engaged in a Pattern of Arbitrary Application of the**
24 **Criteria?**

25 As previously noted, 15 CCR §2402 provides detailed criteria for

26 determining whether a crime is "exceptionally heinous, atrocious or

27 cruel" such that it tends to indicate unsuitability for parole. Our

28

4

Exhibit #18 Page 4

1    courts have held that to fit within those criteria and thus serve as

2    a basis for a finding of unsuitability, the circumstances of the

3    crime must be more aggravated or violent than the minimum necessary

4    to sustain a conviction for that offense.  (In re Rosenkrantz (2002)

5    29 Cal.4th 616, 682-683.)  Where that is the case, the nature of the

6    prisoner's offense, alone, can constitute a sufficient basis for

7    denying parole.  (In re Dannenberg, supra, 34 Cal.4th at p. 1095.)

8        Petitioner claims that those criteria, even if constitutionally

9    sound, have been applied by the Board in an arbitrary and capricious

10   manner rendering them devoid of any meaning whatever.  The role of

11   the reviewing court under these circumstances has been addressed

12   previously in the specific context of Parole Board actions:

13       "[Courts have] an obligation, however, to look beyond the facial
         validity of a statute that is subject to possible
14       unconstitutional administration since a law though fair on its
         face and impartial in appearance may be open to serious abuses
15       in administration and courts may be imposed upon if the
         substantial rights of the persons charged are not adequately
16       safeguarded at every stage of the proceedings.  We have
         recognized that this court's obligation to oversee the execution
17       of the penal laws of California extends not only to judicial
         proceedings, but also to the administration of the Indeterminate
18       Sentence Law."  (In re Rodriguez (1975) 14 Cal.3d 639, 648,
         quoting Minnesota v. Probate Court (1940) 309 U.S. 270, 277.)

19

20       Similarly, in In re Minnis (1972) 7 Cal.3d 639, 645, the case

21   closest on point to the present situation, the California Supreme

22   Court stated: "This court has traditionally accepted its

23   responsibility to prevent an authority vested with discretion from

24   implementing a policy which would defeat the legislative motive for

25   enacting a system of laws."   Where, as here, the question is whether

26   determinations are being made in a manner that is arbitrary and

27   capricious, judicial oversight "must be extensive enough to protect

28

-5-

Exhibit #18 Page 5

1   limited right of parole applicants 'to be free from an arbitrary

2   parole decision... and to something more than mere pro-forma

3   consideration.'" (In re Ramirez (2001) 94 Cal.App.4th 549 at p. 564,

4   quoting In re Sturm (1974) 11 Cal.3d 258 at p. 268.)

5       This Court, therefore, now examines Petitioner's "as applied"

6   void for vagueness challenge.

7

8                        The Evidence Presented

9       A similar claim to those raised here, involving allegations of

10  abuse of discretion by the Board in making parole decisions, was

11  presented to the Court of Appeal in In re Ramirez, supra. The court

12  there observed that such a "serious claim of abuse of discretion"

13  must be "adequately supported with evidence" which should be

14  "comprehensive." (Ramirez, supra, 94 Cal.App.4th at p. 564, fn. 5.)

15  The claim was rejected in that case because there was not "a

16  sufficient record to evaluate." (Ibid.) In these cases, however,

17  there is comprehensive evidence offered in support of Petitioner's

18  claims.

19      Discovery orders were issued in five different cases involving

20  life term inmates (Petitioners) who all presented identical claims.[1]

21

22  [1] This Court takes judicial notice of the several other cases currently
    pending (Lewis #68038, Jameison #71194, Bragg #108543, Ngo #127611.) which
23  raise this same issue and in which proof was presented on this same point.
    (Evidence Code § 452(d). See specifically, in the habeas corpus context,
24  In re Vargus (2000) 83 Cal.App.4th 1125, 1134-1136, 1143, in which judicial
    notice was taken of the evidence in four other cases and in which the court
25  noted: "Facts from other cases may assist petitioner in establishing a
    pattern." See generally McKell v. Washington Mutual, Inc. (2006) 142
26  Cal.App.4th 1457, 1491: "trial and appellate courts ... may properly take
    judicial notice of ... established facts from both the same case and other
27  cases." And see AB Group v. Wartin (1997) 59 Cal.App.4th 1022, 1036:
    Judicial notice taken of other cases when matters are "just as relevant to
28  the present [case] as they are to the others.")

                                   6

Exhibit #18 Page 6


1   The purpose of the discovery was to bring before the Court a
2   comprehensive compilation and examination of Board decisions in a
3   statistically significant number of cases.  The Board decisions under
4   examination consisted of final decisions of the Board for life-term
5   inmates convicted of first or second degree murder and presently
6   eligible for parole.  Included were all such decisions issued in
7   certain months, chosen by virtue of their proximity in time to the
8   parole denials challenged in the pending petitions.  All Board
9   decisions in the months of August, September and October of 2002,
10  July, August, September, October, November, and December of 2003,
11  January and February of 2004, February of 2005, and January of 2006
12  were compiled.  This resulted in a review of 2690 cases decided in a
13  total of 13 months.
14      The purpose of the review was to determine how many inmates had
15  actually been denied parole based in whole or in part on the Board's
16  finding that their commitment offense fits the criteria set forth in
17  Title 15 §2402(c)(1) as "especially heinous, atrocious or cruel."  A
18  member of the research team conducting the review, Karen Rega,
19  testified that in its decisions the Board does not actually cite CCR
20  rule §2402(c), but consistently uses the specific words or phrases
21  ("verbiage from code") contained therein, so that it could easily be
22  determined when that criteria was being applied.  (For example,
23  finding "multiple victims" invokes §2402(c)(1)(A); finding the crime
24  "dispassionate" "calculated" or "execution style" invokes
25  §2402(c)(1)(B); that a victim was "abused" "mutilated" or "defiled"
26  invokes §2402(c)(1)(C);  a crime that is "exceptionally callous" or
27  demonstrated a "disregard for human suffering" fits criteria
28

                                7

Exhibit #18 Page 7

1 §2402(c)(1)(D); and finding the motive for the crime "inexplicable"

2 or "trivial" invokes §2402(c)(1)(E).)

3     Petitioners provided charts, summaries, declarations, and the

4 raw data establishing the above in the cases of Lewis #68038,

5 Jameison #71194, Bragg #108543, and Ngo #127611. In this case

6 (Criscione #71614) the evidence was presented somewhat differently.

7 Both to spread the burden of the exhaustive examination, and to

8 provide a check on Petitioners' methods, this Court ordered

9 Respondent to undertake an examination of two randomly chosen months

10 in the same manner as Petitioner had been doing. Respondent complied

11 and provided periodic updates in which they continued to report that

12 at all "the relevant hearings the Board relied on the commitment

13 offense as a basis for denying parole." (See "Respondent's Final

14 Discovery Update" filed April 5, 2007.) At the evidentiary hearing

15 on this matter counsel for Respondents stipulated that "in all of

16 those cases examined [by Respondent pursuant to the Criscione

17 discovery orders] the Board relied on the commitment offense as a

18 basis for denying parole." (See pages 34-35 of the June 1, 2007,

19 evidentiary hearing transcript.)

20     The result of the initial examination was that in over 90

21 percent of cases the Board had found the commitment offense to be

22 "especially heinous, atrocious or cruel" as set forth in Title 15

23 §2402(c)(1). In the remaining 10% of cases either parole had been

24 granted, or it was unclear whether §2402(c)(1) was a reason for the

25 parole denial. For all such cases, the decisions in the prior

26 hearing for the inmate were obtained and examined. In every case,

27 the Board had determined at some point in time that every inmates

28

8

1  crime was "especially heinous, atrocious or cruel" under Title 15

2  §2402(c)(1).

3      Thus, it was shown that 100% of commitment offenses reviewed by

4  the Board during the 13 months under examination were found to be

5  "especially heinous, atrocious or cruel" under Title 15 §2402(c)(1).

6      A further statistic of significance in this case is that there

7  are only 9,750 inmates total who are eligible for, and who are

8  currently receiving, parole consideration hearings as life term

9  inmates.  (See "Respondent's Evidentiary Hearing Brief," at p. 4,

10  filed April 16, 2007.)

11

12                  **USE OF STATISTICS**

13      In *International Brotherhood of Teamsters v. United States*

14  (1977) 431 U.S. 324, 338-340, the United States Supreme Court

15  reaffirmed that statistical evidence, of sufficient "proportions,"

16  can be sound and compelling proof.  As noted by the court in *Everett*

17  *v. Superior Court* (2002) 104 Cal.App.4th 388, 393, and the cases cited

18  therein, "courts regularly have employed statistics to support an

19  inference of intentional discrimination."

20      More recently, the United States Supreme Court, in *Miller-El v.*

21  *Cockrell* (2003) 537 U.S. 322, 154 L.Ed.2d 931, when examining a habeas

22  petitioner's allegations that the prosecutor was illegally using his

23  peremptory challenges to exclude African-Americans from the

24  petitioner's jury, noted that "the statistical evidence alone" was

25  compelling.  The high court analyzed the numbers and concluded:

26  "Happenstance is unlikely to produce this disparity."  (See also

27  *People v. Hofsheier* (2004) 117 Cal.App.4th 438 in which "statistical

28

9

Exhibit #18 Page 9

1   evidence" was noted as possibly being dispositive.  And see *People v.*
2   *Flores* (2006) 144 Cal.App.4th 625 in which a statistical survey and
3   analysis, combined into an "actuarial instrument" was substantial
4   proof.)

5      A statistical compilation and examination such as has been
6   presented in these cases is entirely appropriate and sufficient
7   evidence from which to draw sound conclusions about the Board's
8   overall methods and practices.

9

10              ## THE EXPERT'S TESTIMONY

11     Petitioners provided expert testimony from Professor Mohammad
12  Kafai regarding the statistics and the conclusions that necessarily
13  follow from them.  Professor Kafai is the director of the statistics
14  program at San Francisco State University, he personally teaches
15  statistics and probabilities, and it was undisputed that he was
16  qualified to give the expert testimony that he did.  No evidence was
17  presented that conflicts or contradicts the testimony and conclusions
18  of Professor Kafai.  By stipulation of the parties, Professor Kafai's
19  testimony was to be admissible and considered in the cases of all
20  five petitioners.  (See page 35 of the June 1, 2007, evidentiary
21  hearing transcript.)

22     Professor Kafai testified that the samples in each case, which
23  consisted of two or three months of Board decisions, are
24  statistically sufficient to draw conclusions about the entire
25  population of life term inmates currently facing parole eligibility
26  hearings.  Given that every inmate within the statistically
27  significant samples had his or her crime labeled "'particularly

28

                              10

Exhibit #18 Page 10

1   egregious'" or "especially heinous, atrocious or cruel" under Title

2   15 §2402(c)(1), it can be mathematically concluded that the same

3   finding has been made for every inmate in the entire population of

4   9,750.  Although he testified that statisticians never like to state

5   unequivocally that something is proven to a 100% certainty, (because

6   unforeseen anomalies are always theoretically possible,) he did

7   indicate the evidence he had thus far examined came as close to that

8   conclusion as could be allowed.  Not surprisingly, Professor Kafai

9   also testified that "more than 50% can't by definition constitute an

10  exception."

11      Having found the data provided to the expert to be sound this

12  Court also finds the expert's conclusions to be sound.  In each of

13  the five cases before the Court over 400 inmates were randomly chosen

14  for examination.  That number was statistically significant and was

15  enough for the expert to draw conclusions about the entire population

16  of 9,750 parole eligible inmates.  The fact that the approximately

17  2000 inmates examined in the other cases also had their parole denied

18  based entirely or in part on the crime itself (§2402(c)(1)), both

19  corroborates and validates the expert's conclusion in each individual

20  case and also provides an overwhelming and irrefutable sample size

21  from which even a non expert can confidently draw conclusions.

22

23                              **DISCUSSION**

24      Although the evidence establishes that the Board frequently says

25  parole is denied "first," "foremost," "primarily," or "mainly,"

26  because of the commitment offense, this statement of primacy or

27  weight is not relevant to the question now before the Court.

28

                                    11

Exhibit #18 Page 11

1 Petitioners acknowledge that the Board generally also cites other

2 reasons for its decision. The question before this Court, however,

3 is not whether the commitment offense is the primary or sole reason

4 why parole is denied -- the question is whether the commitment

5 offense is labeled "'particularly egregious'" and thus <u>could</u> be used,

6 under *Dannenberg*, primarily or exclusively to deny parole.

7    The evidence proves that in a relevant and statistically

8 significant period where the Board has considered life term offenses

9 in the context of a parole suitability determination, every such

10 offense has been found to be "particularly egregious" or "especially

11 heinous, atrocious or cruel."[2] This evidence conclusively

12 demonstrates that the Board completely disregards the detailed

13 standards and criteria of §2402(c). "Especially" means particularly,

14 or "to a distinctly greater extent or degree than is common."[3] (EC §

15 451(e).) By simple definition the term "especially" as contained in

16 section 2402(C)(1) cannot possibly apply in 100% of cases, yet that

17 is precisely how it has been applied by the Board. As pointed out by

18 the Second District Court of Appeal, not every murder can be found to

19 be "atrocious, heinous, or callous" or the equivalent without "doing

20    [2] In a single case out of the 2690 that were examined Petitioner has conceded that

21 the Board did not invoke §2402(c)(1). This Court finds that concession to be
improvidently made and the result of over caution. When announcing the decision at

22 the initial hearing of S. Fletcher (E-10230) on 4/6/06, the commissioner did begin
by stating "I don't believe this offense is particularly aggravated..." However

23 the commissioner proceeds to describe the crime as a drug deal to which Fletcher
brought a gun so "we could say there was some measure of calculation in that." The

24 commissioner continued by observing that the reason someone would bring a gun to a
drug transaction was to make sure things went according to their plan "so I guess

25 we can say that that represents calculation and perhaps it's aggravated to that
extent." As is the Board's standard practice, by using the word 'calculated' from

26 §2402(c)(1)(b) the Board was invoking that regulation. Certainly if Mr. Fletcher
had brought a habeas petition Respondent's position would be that there is 'some

27 evidence' supporting this. The ambiguity created by the commissioner's initial
statement was cleared up several pages later when he announces that "based upon the

28 crime coupled with ..." parole was denied for four years. (See In re Burns (2006)
136 Cal.App.4th 1318, 1326, holding §2402(c)(1) criteria are necessary for a multi-
year denial.)

Exhibit #18 Page 12

1   violence" to the requirements of due process.  (*In re Lawrence* (2007)

2   150 Cal.App.4th 1511, 1557.)  This is precisely what has occurred

3   here, where the evidence shows that the determinations of the Board

4   in this regard are made not on the basis of detailed guidelines and

5   individualized consideration, but rather through the use of all

6   encompassing catch phrases gleaned from the regulations.

7

8                           THE BOARD'S METHODS

9       Because it makes no effort to distinguish the applicability of

10  the criteria between one case and another, the Board is able to force

11  every case of murder into one or more of the categories contained in

12  §2402(c).

13      For example, if the inmate's actions result in an instant death

14  the Board finds that it was done in a "dispassionate and calculated

15  manner, such as an execution-style murder."  At the same time the

16  Board finds that a murder not resulting in near instant death shows a

17  "callous disregard for human suffering" without any further analysis

18  or articulation of facts which justify that conclusion.  If a knife

19  or blunt object was used, the victim was "abused, defiled, or

20  mutilated."  If a gun was used the murder was performed in a

21  "dispassionate and calculated manner, such as an execution-style

22  murder."  If bare hands were used to extinguish another human life

23  then the crime is "particularly heinous and atrocious."

24      Similarly, if several acts, spanning some amount of time, were

25  necessary for the murder the Board may deny parole because the inmate

26  had "opportunities to stop" but did not.  However if the murder was

27  _____

    [3] Princeton University World Net Dictionary (2006).

28

13

Exhibit #18 Page 13

1  accomplished quickly parole will be denied because it was done in a
2  dispassionate and calculated manner and the victim never had a chance
3  to defend themselves or flee.  If the crime occurred in public, or
4  with other people in the vicinity, it has been said that the inmate
5  "showed a callous disregard" or "lack of respect" for the
6  "community."  However if the crime occurs when the victim is found
7  alone it could be said that the inmate's actions were aggravated
8  because the victim was isolated and more vulnerable.

9      In this manner, under the Board's cursory approach, every murder
10 has been found to fit within the unsuitability criteria.  What this
11 reduces to is nothing less than a denial of parole for the very
12 reason the inmates are present before the Board – i.e. they committed
13 murder.  It is circular reasoning, or in fact no reasoning at all,
14 for the Board to begin each hearing by stating the inmate is before
15 them for parole consideration, having passed the minimum eligible
16 parole date based on a murder conviction, and for the Board to then
17 conclude that parole will be denied because the inmate committed acts
18 that amount to nothing more than the minimum necessary to convict
19 them of that crime.  As stated quite plainly by the Sixth District:
20 "A conviction for murder does not automatically render one unsuitable
21 for parole."  (Smith, supra, 114 Cal.App.4th at p. 366, citing
22 Rosenkrantz, supra, 29 Cal.4th at p. 683.)

23     In summary, when every single inmate is denied parole because
24 his or her crime qualifies as a §2402(c)(1) exception to the rule
25 that a parole date shall normally be set, then the exception has
26 clearly swallowed the rule and the rule is being illegally
27 interpreted and applied.  When every single life crime that the Board
28

14

Exhibit #18 Page 14

1  examines is "particularly egregious" and "especially heinous,

2  atrocious or cruel" it is obvious that the Board is operating without

3  any limits and with unfettered discretion.

4      Other examples of the failure to 'connect up' the facts of the

5  individual case with the criteria and the ultimate findings abound in

6  the decisions of the reviewing courts.  Some of the state cases to

7  have reversed Parole Board or Governor abuses of discretion in

8  denying parole include *In re Roderick, In re Cooper, In re Lawrence,*

9  *In re Barker, In re Gray, In re Lee, In re Elkins, In re Weider, In*

10  *re Scott, In re Deluna, In re Ernest Smith, In re Mark Smith,* and *In*

11  *re Capistran.*

12      When "the record provides no reasonable grounds to reject, or

13  even challenge, the findings and conclusions of the psychologist and

14  counselor concerning [the inmate's] dangerousness" the Board may not

15  do so.  (*In re Smith* (2003) 114 Cal.App.4th 343, 369.)

16      When an inmate, although only convicted of a second degree

17  murder, has been incarcerated for such time that, with custody

18  credits, he would have reached his MEPD if he had been convicted of a

19  first, the Board must point to evidence that his crime was aggravated

20  or exceptional even for a first degree murder if they are going to

21  use the crime as a basis for denying parole.  (*In re Weider* (2006)

22  145 Cal.App.4th 570, 582-583.)[4]

23

24  [4]    This rule, rooted in Justice Moreno's concurrence in *Rosenkrantz, supra,* is
    particularly applicable in this case.  Petitioner was convicted of second degree,

25  but acquitted of first degree, murder over 25 years ago.  (*People v. Criscione*
    (1981) 125 Cal.App.3d 275.)  With his custody credits he is beyond the matrix even

26  had he been convicted of a first.  In a currently pending habeas petition in which
    he challenges his 2007 parole denial the first reason the Board gave was the crime

27  itself and the presiding commissioner explained: "His actions go well beyond the
    minimum necessary for a conviction of murder in the second degree."  (Decision page
    2 of 4/2/07 transcript.)  For the Board to penalize the Petitioner for the fact
    that he was acquitted of first degree is further proof of their willfulness and

28

1    A "petitioner's young age at the time of the offense" must be

2  considered.  (In re Elkins (2006) 144 Cal.App.4th 475, 500, quoting

3  Rosenkrantz v. Marshall (C.D.Cal. 2006) 444 F. Supp. 2d 1063, 1065,

4  1085: "The reliability of the facts of the crime as a predictor for

5  his dangerousness was diminished further by his young age of 18, just

6  barely an adult. 'The susceptibility of juveniles to immature and

7  irresponsible behavior means their irresponsible conduct is not as

8  morally reprehensible as that of an adult.'")[5]

9    The Board's formulaic practice of stating §2402(c)(1) phrased in

10  a conclusory fashion, and then stating "this is derived from the

11  facts" without ever linking the two together, is insufficient.  (In

12  re Roderick, (2007) ___ Cal.App.4th ___ (A113370): "At minimum, the

13  Board is responsible for articulating the grounds for its findings

14  and for citing to evidence supporting those grounds."  (See also In

15  re Barker (2007) 151 Cal.App.4th 346, 371, disapproving

16  "conclusorily" announced findings.)

17    After two decades, mundane "crimes have little, if any,

18  predictive value for future criminality.  Simply from the passing of

19  time, [an inmate's] crimes almost 20 years ago have lost much of

20  their usefulness in foreseeing the likelihood of future offenses than

21  if he had committed them five or ten years ago."  (In re Lee (2006)

22  143 Cal.App.4th 1400, 1412.)  It should be noted that this rule

23  bias.  The jury had a reasonable doubt that Petitioner committed first degree
24  murder but under the Board's 'reasoning' and 'analysis' this puts him in a worse
   position than if they had not.  Had the jury convicted him of the greater offense
25  Petitioner has served so much time that he would not have been able to use the 'some
   evidence' of first degree behavior against him.  As observed previously, the
26  Board's position in this regard is "so ridiculous that simply to state it is to
   refute it."  (Weider, supra, 145 Cal.App.4th at p. 583.)
27  [5] This point is particularly significant in the case of Mike Ngo.  Mr. Ngo was only
   18 at the time of his crime.  The impetus behind the shooting was youth group or

28

Exhibit #18 Page 16



1  applies with even more force when the Board is relying on any
2  criminality that occurred before the crime.  In that situation, just
3  as with the crime itself, the Board must explain why such old events
4  have any relevance and especially when the inmate has spent a decade
5  as a model prisoner.

6      Murders situationally related to intimate relationships are
7  unfortunately commonplace because emotions are strongest in such
8  domestic settings.  When a murder occurs because of "stress unlikely
9  to be reproduced in the future" this is a factor that affirmatively
10 points towards suitability.  (*In re Lawrence* (2007) 150 Cal.App.4th
11 1511 and cases cited therein.)

12     "The evidence must substantiate the ultimate conclusion that the
13 prisoner's release currently poses an unreasonable risk of danger to
14 the public.  It violates a prisoner's right to due process when the
15 Board or Governor attaches significance to evidence that forewarns no
16 danger to the public."  (*In re Tripp* (2007) 150 Cal.App.4th 306,
17 313.)

18     The Board "cannot rely on the fact that the killing could have
19 been avoided to show the killing was especially brutal."  (*In re
20 Cooper* (2007) 153 Cal.App.4th 1043, 1064.)

21     The Board's focus must be upon how the inmate "actually
22 committed his crimes" not the "incorporeal realm of legal
23 constructs."  (*Lee, supra*, 143 Cal.App.4th at p. 1413.)  This is
24 especially significant when the murder conviction is based on the
25 felony murder rule, provocative act doctrine, or accomplice liability
26 such that the inmate did not intend to kill or may not have even been

27 ─────────────────────────────────────────────────
   gang rivalries, posturing, and threats which mature adults would not have been
28

                              17



1   the actual killer.

2       The Board has ample guidance before it in the decisions of the

3   various reviewing courts to constrain its abuse, but has failed to

4   avail itself of the opportunity to do so.

5

6                SEPARATION OF POWERS DOCTRINE

7       The evidence presented, as discussed above, has established a

8   void for vagueness "as applied" due process violation.  That same

9   evidence also proves a separate but related Constitutional violation

10  -- an as applied separation of powers violation.

11       The separation of powers doctrine provides "that the legislative

12  power is the power to enact statutes, the executive power is the

13  power to execute or enforce statutes, and the judicial power is the

14  power to interpret statutes and to determine their

15  constitutionality."  (*Lockyer v. City and County of San Francisco*

16  (2004) 33 Cal.4th 1055, 1068.)  Because the evidence has proven the

17  Board is not executing/enforcing the legislature's statutes as

18  intended it is this Court's duty to intervene.  The question here is

19  whether the Board is violating the separation of powers doctrine by

20  appropriating to itself absolute power over parole matters and

21  disregarding the limits and guidelines placed by the statute.[6]

22      "Government Code section 11342.2 provides: 'Whenever by the

23

24  caught up in.

[6] "It is settled that Administrative regulations that violate acts of the
25  Legislature are void and no protestations that they are merely an exercise of
administrative discretion can sanctify them.  They must conform to the legislative
will if we are to preserve an orderly system of government.  Nor is the motivation
26  of the agency relevant: It is fundamental that an administrative agency may not
usurp the legislative function, no matter how altruistic its motives are."
27  (*Agricultural Labor Relations Board v. Superior Court of Tulare County* (1976) 16
Cal.3d 392, 419 quoting *Morris v. Williams* (1967) 67 Cal.2d 733, 737, and *City of
San Joaquin v. State Bd. of Equalization* (1970) 9 Cal.App.3d 365, 374.)

28

p.19             Jacob Burland      Sep 07 07 11:35a

Exhibit #18 Page 18

1  express or implied terms of any statute a state agency has authority

2  to adopt regulations to implement, interpret, make specific or

3  otherwise carry out the provisions of the statute, no regulation

4  adopted is valid or effective unless consistent and not in conflict

5  with the statute and reasonably necessary to effectuate the purpose

6  of the statute.'  Administrative regulations that alter or amend the

7  statute or enlarge or impair its scope are void and courts not only

8  may, but it is their obligation to strike down such regulations."

9  (Pulaski v. Occupational Safety & Health Stds. Bd. (1999) 75

10  Cal.App.4th 1315, 1341, citations omitted.)

11      The vice of overbroad and vague regulations such as are at issue

12  here is that they can be manipulated, or 'interpreted,' by executive

13  agencies as a source of unfettered discretion to apply the law

14  without regard to the intend of the people as expressed by the

15  legislature's enabling statutes.  In short, agencies usurp unlimited

16  authority from vague regulations and become super-legislatures that

17  are unaccountable to the people.  As it has sometimes been framed and

18  addressed in the case law, a vague or all encompassing standard runs

19  the risk of "violat[ing] the separation of powers doctrine by

20  'transforming every [executive decisionmaker] into a "mini-

21  legislature" with the power to determine on an ad hoc basis what

22  types of behavior [satisfy their jurisdiction].'"  (People v. Ellison

23  (1998) 68 Cal.App.4th 203, 211, quoting People v. Superior Court

24  (Caswell) (1988) 46 Cal.3d 381, 402.)

25      "It is concern about 'encroachment and aggrandizement,' the

26  [United States Supreme Court] reiterated, that has animated its

27  separation of powers jurisprudence.  'Accordingly, we have not

28

Exhibit #18 Page 19

1   hesitated to strike down provisions of law that either accrete to a
2   single Branch powers more appropriately diffused among separate
3   Branches or that undermine the authority and independence of one or
4   another coordinate Branch.'" (*Kasler v. Lockyer* (2000) 23 Cal.4th
5   472, 493, quoting *Mistretta v. United States* (1989) 488 U.S. 361,
6   382.)  This articulation of the principle speaks directly to the
7   situation at hand.  The Board, by its enactment and interpretation of
8   Title 15, §2402, has appropriated to itself absolute power over
9   'lifer' matters.  Overreaching beyond the letter and spirit of the
10  Penal Code provisions, Title 15, §2402(c)(1) has been interpreted by
11  the Board to supply the power to declare every crime enough to deny
12  parole forever.  The fact that Title 15, §2402, has been invoked in
13  every case, but then sometime later not invoked, tends to show either
14  completely arbitrary and capricious behavior or that unwritten
15  standards are what really determine outcomes.  In either event, all
16  pretenses of taking guidance from, or being limited by, the
17  legislature's statutes have been abandoned.  "[I]t is an elementary
18  proposition that statutes control administrative interpretations."
19  (*Ohio Casualty Ins. Co. v. Garamendi* (2006) 137 Cal.App.4th 64, 78.)
20  Title 15 §2402 as applied, however, has no controls or limitations.
21        The PC § 3041(b) exception to the rule can only be invoked when
22  the "gravity of the current convicted offense or offenses, or the
23  timing and gravity of current or past convicted offense or offenses,
24  is such that consideration of the public safety requires a more
25  lengthy period of incarceration for this individual."  The word
26  "gravity" is a directive for comparison just as "more lengthy"
27  indicates a deviation from the norm.  While *Dannenberg* held there
28

20

Exhibit #18 Page 20

1   does not need to be intra case comparison for the purposes of term

2   uniformity or proportionality, there necessarily has to be some sort

3   of comparison for the purposes of adhering to the legislative mandate

4   that parole is available.  The Board employs no meaningful yardstick

5   in measuring parole suitability.  This is a violation of the

6   separation of powers doctrine.  (*People v. Wright* (1982) 30 Cal.3d

7   705; 712-713.  And see *Terhune v. Superior Court* (1998) 65

8   Cal.App.4th 864, 872-873.  Compare *Whitman v. Am. Trucking Ass'ns*

9   (2001) 531 U.S. 457, 472, describing a delegation challenge as

10  existing when the legislature fails to lay down "an intelligible

11  principle to which the person or body authorized to act is directed

12  to conform.")

13

14                        RESPONDENT'S POSITION

15      The Attorney General has suggested, without pointing to any

16  concrete examples, that it is possible that the Board, when invoking

17  the crime as a reason to deny parole, is not placing it within

18  §2402(c)(1) but instead using is as some sort of 'lesser factor'

19  which, only when combined with other unsuitability criteria, can

20  contribute to a valid parole denial.  The two problems with this

21  position are, first, there is no evidentiary support for this

22  assertion, and second, it would have no impact on the constitutional

23  infirmities outlined and proven above.

24      Even if Respondent had produced evidence that the Board was

25  utilizing the crime as a 'lesser factor' which needs others to fully

26  support a parole denial, the Board would then be admitting it was

27  denying parole, in part, for the very reason that the person is

28

                                21

Exhibit #18 Page 21

1  before the panel and eligible for parole in the first place – the

2  commitment offense. Respondent's argument suggests that a crime that

3  only qualified as the *Dannenberg* "minimum necessary" could still be

4  invoked as a reason for denying parole. Respondent argues that when

5  the crime is invoked 'not in the *Dannenberg* sense,' there must be

6  other reasons for the parole denial and the crime alone would not be

7  enough in this context. This position is inconsistent with the law

8  and fundamental logic.

9      A crime qualifies under *Dannenberg* when it is "particularly

10  egregious," or one where "no circumstances of the offense reasonably

11  could be considered more aggravated or violent than the minimum

12  necessary to sustain a conviction for that offense." (*Dannenberg*,

13  *supra*, 34 Cal.4th at pp. 1094-1095.) These are the only two choices.

14  If a crime consists of only the bare elements then it is not

15  aggravated and it cannot, in and of itself, serve as a basis for

16  parole denials once the inmate becomes eligible for parole. It is

17  the reason an inmate may be incarcerated initially for the equivalent

18  of 15 or 25 years, and then examined to determination rehabilitation

19  efforts when they come before the Board, but a crime that is no more

20  than the bare minimum cannot be factored into the equation pursuant

21  to PC § 3041(b) or any of the case law interpreting it.

22      In oral argument Respondent suggested a second way the

23  commitment offense can be used outside of §2402(c)(1). If for

24  example a crime had its roots in gang allegiances or rivalries and

25  the inmate continued to associate with gangs while incarcerated, then

26  an aspect of the crime, even if the crime otherwise consisted of no

27  more than the minimum elements, could be combined with other behavior

28

22

Exhibit #18 Page 22

1  to support a parole denial.  Similarly, if a crime was rooted in an
2  inmate's then existing drug addiction, and the Board was to point to
3  a recent 115 involving drugs, the evidence that the inmate's drug
4  issues had not been resolved would justify a parole denial even if
5  the crime itself was not aggravated.  A finding that the inmate is
6  not suitable for release under these circumstances, however, is not
7  based on the facts of the commitment offense as tending to show
8  unsuitability.  It is based on the conclusion that can be drawn about
9  Petitioner's lack of rehabilitation or change since the offense, and
10  thus, his present dangerousness.

11      Respondent has not demonstrated any flaws in Petitioner's
12  methodology or analysis, nor provided any actual evidence of the
13  crime being invoked other than pursuant to §2402(c)(1).  Drawing
14  conclusions from the Board's direct statements, or its precise
15  recitations of the §2402(c)(1) language, logically indicates an
16  invocation of §2402(c)(1), and Respondent's suggestion otherwise is
17  insupportable.

18

19                    THE QUESTION OF BIAS

20      Because the issue has been squarely presented, and strenuously
21  argued by Petitioners, this Court is obligated to rule on the charge
22  that the Board's actions prove an overriding bias and deliberate
23  corruption of their lawful duties.

24      In the discrimination and bias case of *USPS Bd. of Governors v.*
25  *Aikens* (1983) 460 U.S. 711, the United States Supreme Court
26  acknowledged "there will seldom be 'eyewitness' testimony as to the
27  [] mental processes" of the allegedly biased decisionmaker.  Instead,

28

23

Exhibit #18 Page 23

1  an examination of other cases for trends or patterns can provide the
2  necessary circumstantial evidence.  (See *Aikens, supra*, at footnote
3  2.)  Reaffirming that such circumstantial evidence will be sufficient
4  the Court stated: "The law often obliges finders of fact to inquire
5  into a person's state of mind.  As Lord Justice Bowen said in
6  treating this problem in an action for misrepresentation nearly a
7  century ago, 'The state of a man's mind is as much a fact as the
8  state of his digestion.  It is true that it is very difficult to
9  prove what the state of a man's mind at a particular time is, but if
10 it can be ascertained it is as much a fact as anything else.'"
11 (*Aikens*, at pp. 716-717, quoting *Edgington v. Fitzmaurice* (1885) 29
12 Ch. Div. 459, 483.)[7]

13       The discovery in these cases was granted in part due to the
14 Petitioners' prima facie showing of bias and the necessity that it be
15 "adequately supported with evidence" if such evidence is available.
16 (*Ramirez, supra*, 94 Cal.App.4th at p. 564, fn. 5.  See also *Nasha v.*
17 *City of Los Angeles* (2004) 125 Cal.App.4th 470, 483: "A party seeking
18 to show bias or prejudice on the part of an administrative decision
19 maker is required to prove the same 'with concrete facts.'"  And see
20 *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674,
21 841: "The challenge to the fairness of the adjudicator must set forth
22 concrete facts demonstrating bias or prejudice."  See also *Hobson v.*

23
24 [7] As occurred in *Aikens, supra*, and as suggested in prior orders of this Court,
   Respondent should have provided direct evidence from the decisionmakers.  While the
25 fact that a *Defendant* does not explain his or her actions cannot be held against
   him, (*Griffin v. California* (1965) 380 U.S. 609, *Doyle v. Ohio* (1976) 426 U.S.
26 610,) it is appropriate to give some weight to the consideration that the Board has
   failed to offer any direct evidence or explanation on its own behalf.  While the
27 case of *Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095 stands for the
   proposition that *Petitioner* may not inquire into the Board members mental
28 processes, Respondent is not precluded from offering such direct evidence if they
   were able to testify as to their good faith and conscientious efforts.

qz:d

Exhibit #18 Page 24

1  *Hansen* (1967) 269 F.Supp. 401, 502, the watershed Washington D.C.

2  school desegregation case in which the court determined from a

3  statistical and factual analysis that racial bias was influencing

4  policy.)

5      In the case of *People v. Adams* (2004) 115 Cal.App.4th 243, 255,

6  a similar claim of biased decision making was asserted and it was

7  rejected because, although the defendant clearly articulated it, "he

8  has not demonstrated it. Therefore, he has failed to bear his burden

9  of showing a constitutional violation as a demonstrable reality, not

10  mere speculation." In the present cases Petitioners have provided

11  overwhelming concrete evidence.  It is difficult to believe that the

12  Board's universal application of §2402(c)(1) has been an inadvertent

13  mistake or oversight on their part.  It is hard to credit the Board's

14  position that it does not know its own patterns and practices reveal

15  a complete lack of standards or constraints on their power.

16  Respondent's protestations ring hollow, and it seems a statistical

17  impossibility, that the Board's use of "detailed" criteria in such a

18  fashion that they are rendered meaningless is a result of good faith

19  efforts on their part.  That _every_ murder is "especially heinous,

20  atrocious or cruel," and can therefore be an exception to the rule

21  that a parole date should be set, does not seem to be an accident on

22  their part.

23      Although no court has thus far agreed with the accusation that

24  the Board approaches its duties with a predetermination and a bias,

25  no court has previously been presented the comprehensive evidence

26  outlined herein.  While this Court does not turn a blind eye to the

27  reasonable conclusion that the Board's unconstitutional practices are

28

1  willful, there is another possibility. The pattern of errors
2  demonstrated by the discovery in this case, and the continuously
3  growing body of Court of Appeal opinions finding consistent and
4  persistent abuse of discretion, may instead be caused by the fact
5  that the Board is simply overworked and substantively untrained. The
6  impossibility of the blanket applicability of §2402(c)(1) may be only
7  the result of sloppy preparation and inadvertent carelessness.

8      The Board must first be given an opportunity to comply with the
9  necessary remedy provided by this court before it is possible to
10 enter a finding of conscious bias and illegal sub rosa policy. To do
11 otherwise would ignore the complexities and magnitude of the largely
12 discretionary duties with which that Board is vested.

13

14                          CONCLUSION

15     The conclusive nature of the proof in this case, and the
16 suggestion of institutional bias do not preclude formulation of an
17 remedy which will guarantee adequate restrictions on, and guidance
18 for, the Board's exercise of discretion in making parole suitability
19 determinations. The Board can be made to lawfully perform its duties
20 if given explicit instructions.

21     As noted supra, a reason the proof in this case irrefutably
22 establishes constitutional violations is because the Board does not,
23 in actual fact, operate within the limiting construction of the
24 regulations. The Board's expansive interpretation allows it to
25 operate without any true standards. Although numerous rulings of
26 both state and federal courts of appeal have invalidated the Board's
27 application of the §2402(c) criteria to particular facts, the Board

28

Sep 07 07 11:40a      Jacob Burland

Exhibit #18 Page 26

1  does not take guidance from these binding precedents and ignores them

2  for all other purposes. In the most recent of these cases, *In re*

3  *Roderick*, (2007) ___ Cal.App.4th ___ (A113370) the First District

4  held four of five §2402 factors "found" by the Board to be

5  unsupported by any evidence. At footnote 14 the court took the time

6  to criticize the Board for its repeated use of a "stock phrase"

7  "generically across the state." The court also clarified that "at

8  minimum, the Board is responsible for articulating the grounds for

9  its findings and for citing to evidence supporting those grounds."

10      There is nothing in the evidence presented that would allow any

11  conclusion but that, without intervention of the Courts, the Board

12  will ignore the lessons of these rulings in the future and continue

13  to employ its formulaic approach of citing a criteria from

14  §2402(c)(1), repeating the facts of the crime, but never

15  demonstrating a logical connection between the two. This is the

16  core problem with the Board's methodology -- they provide no

17  explanation or rationale for the findings regarding the crime itself.

18    This practice results in violence to the requirements of due

19  process and individualized consideration which are paramount to the

20  appropriate exercise of its broad discretion.

21      The only solution is one that compels the Board to identify the

22  logical connection between the facts upon which it relies and the

23  specific criteria found to apply in the individual case. For,

24  example, the Board often finds that an inmate's motive is "trivial"

25  without ever suggesting why, on these facts, that motive is not just

26  as trivial as the motive behind any other murder. What motive is not

27  trivial? By any definition "trivial" is a word of comparison and

28

27 .

Exhibit #18 Page 27

1   only has meaning when there can be examples that are not "trivial."

2       Similarly, although the Sixth District made it plain four years

3   ago that "all [] murders by definition involve some callousness," (In

4   re Smith (2003) 114 Cal.App.4th 343, 345,) the Board has continued to

5   deny countless paroles labeling the crime "callous" without ever

6   suggesting what crime would not qualify as "callous" and without

7   consistently explaining why the individual case before it

8   demonstrates "exceptional" callousness.

9       Respondent has consistently refused to suggest what possible

10  instances of murder would not fit the Board's amorphous application

11  of the §2402 criteria.  Citing Dannenberg, Respondent insists such

12  comparative analysis is unnecessary.  Respondent fundamentally

13  misunderstands the Dannenberg holding.

14      The PC § 3041(b) exception to the rule can only be invoked when

15  the "gravity of the current convicted offense or offenses, or the

16  timing and gravity of current or past convicted offense or offenses,

17  is such that consideration of the public safety requires a more

18  lengthy period of incarceration for this individual."  The word

19  "gravity" is a directive for comparison just as "more lengthy"

20  indicates a deviation from the norm.  While Dannenberg held there

21  does not need to be intra case comparison for the purposes of term

22  uniformity or proportionality, there necessarily has to be some sort

23  of comparison for the purposes of adhering to the legislative mandate

24  that parole is available.  This is implicit in §2402 because the

25  qualifier "especially," in "especially heinous atrocious or cruel,"

26  requires that some form of comparison be made.  While the original

27  drafters of §2402 seemed to have recognized this fact, the ongoing

28

                                    28

Exhibit #18 Page 28

1  conduct of the Board has completely ignored it, and this is the

2  essence of the due process violation Petitioners have asserted.

3      As noted in his dissent in the recent case of *In re Roderick*,

4  *supra*, Justice Sepulveda would have deferred to the Board's

5  'exercise' of discretion because "Board members have both training

6  and vast experience in this field.  They conduct literally thousands

7  of parole suitability hearings each year.  The Board therefore has

8  the opportunity to evaluate the egregiousness of the facts of a great

9  number of commitment offenses.  ...  The Board's training and

10 experience in evaluating these circumstances far exceeds that of

11 most, if not all, judges."  The evidence in this case, however,

12 suggests a flaw in granting such deference.  Since the Board

13 continues to place every murder in the category of offenses "tending

14 to show unsuitability," something is certainly wrong.  Since the

15 Board's vast experience is undeniable, the problem must be in the

16 Board's training and understanding of the distinguishing features of

17 the guidelines and criteria.  Although Justice Sepulveda presumes

18 that Board members receive substantive training, there is no evidence

19 before this court to suggest that it does, and substantial

20 circumstantial evidence to suggest that it does not.

21     In the vast numbers of Santa Clara County cases reviewed by this

22 Court, the Board's formulaic decisions regarding the commitment

23 offense do not contain any explanation or thoughtful reasoning.

24 Instead, the Board's conclusionary invocation of words from

25 §2402(c)(1) is linked to a repetition of the facts from the Board

26 report by the stock phrase: "These conclusions are drawn from the

27 statement of facts wherein ...."  Thereafter the inmate files a habeas

28

29

Exhibit #18 Page 29

1    corpus petition and Respondent, after requesting an extension of

2    time, files a boilerplate reply asserting the Board's power is

3    "great" and "almost unlimited" and thus any "modicum" of evidence

4    suffices.  Respondent does not cite or distinguish the expanding body

5    of case law that is often directly on point as to specific findings

6    made.  Thereafter, if the writ is granted, the Board is directed to

7    conduct a new hearing "in compliance with due process" and that order

8    is appealed by Respondent.  On appeal the order is usually upheld

9    with modifications and in the end, after countless hours of attorney

10    and judicial time, the Board conducts a new two hour hearing at which

11    they abuse their discretion and violate due process in some different

12    way.

13        This system is malfunctioning and must be repaired.  The

14    solution must begin with the source of the problem.  The Board must

15    make efforts to comply with due process in the first instance.  The

16    case law published over the last five years provides ample and

17    sufficient guidelines and must be followed.  Although the Board

18    methods suggest it believes this to be optional, it is not.

19

20                   **THE REMEDY**

21        Thus, it is the order of this Court that the Board develop,

22    submit for approval, and then institute a training policy for its

23    members based on the current and expanding body of published state,

24    and federal, case law reviewing parole suitability decisions, and

25    specifically the application of §2402 criteria.  In addition to

26    developing guidelines and further criteria for the substantive

27    application of §2402 the Board must develop rules, policies and

28

Exhibit #18 Page 30

1  procedures to ensure that the substantive guidelines are followed.

2      This Court finds its authority to impose this remedy to flow

3  from the fundamental principles of judicial review announced over two

4  centuries ago in *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137.

5  Citing that landmark case, the California Supreme Court has

6  recognized "Under time-honored principles of the common law, these

7  incidents of the parole applicant's right to 'due consideration'

8  cannot exist in any practical sense unless there also exists a remedy

9  against their abrogation." (*In re Sturm* (1974) 11 Cal.3d 258, 268.)

10     In *Strum* the court directed that the Board modify its rules and

11  procedures so that thereafter "The Authority will be required [,]

12  commencing with the finality of this opinion, to support all its

13  denials of parole with a written, definitive statement of its reasons

14  therefor and to communicate such statement to the inmate concerned."

15  (*Sturm* at p. 273.)

16     Similarly, in the case of *Minnis, supra*, the California Supreme

17  Court held the Board's policy of categorically denying parole to drug

18  dealers was illegal.  Based on its analysis the court there was

19  clearly prepared to order that Board to modify its rules and

20  procedures however such was unnecessary because the Board

21  "voluntarily rescinded" the illegal policy.  While the remedy in this

22  case is of greater scope than that necessary in either *Strum* or

23  *Minnis, supra*, so too has been the showing of a systematic abuse of

24  discretion and distortion of process.

25     The most recent case to address the court's roles and duties in

26  overseeing the parole suitability process has been *In re Rosenkrantz,*

27  *supra*, 29 Cal.4th 616.  In that case the court explained that

28

31

Exhibit #18 Page 31

1  judicial review of a Governor's parole determination comports with,
2  and indeed furthers, separation of powers principles because the
3  courts are not exercising "complete power" over the executive branch
4  and do not "defeat or materially impair" the appropriate exercise or
5  scope of executive duties.  (*Rosenkrantz* at p. 662.)  Citing *Strum*,
6  *supra*, the court reaffirmed that a life term inmate's "due process
7  rights cannot exist in any practical sense without a remedy against
8  its abrogation." (*Rosenkrantz* at p. 664.)

9      The *Rosenkrantz* court also put forth what it believed was an
10 extreme example but which, unfortunately, has been shown to exist in
11 this case.  The court stated: "In the present context, for example,
12 judicial review could prevent a Governor from usurping the
13 legislative power, in the event a Governor failed to observe the
14 constitutionally specified limitations upon the parole review
15 authority imposed by the voters and the Legislature."  This is
16 exactly what the evidence in this case has proven.  As noted above,
17 the Board has arrogated to itself absolute authority, despite
18 legislative limitations and presumptions, through the mechanism of a
19 vague and all inclusive, and thus truly meaningless, application of
20 standards.  The remedy this Court is imposing is narrowly tailored to
21 redress this constitutional violation.

22     The consequence of the Board's actions (of giving § 2402(c)(1)
23 such a broadly all encompassing and universal application) is that
24 they have unwittingly invalidated the basis of the California Supreme
25 Court's holding in *Dannenberg*.  The reason the four justice majority
26 in *Dannenberg* upheld the Board's standard operating procedures in the
27 face of the Court of Appeal and dissent position is because "the
28

32

Exhibit #18 Page 32

1   Board must apply detailed standards when evaluating whether an

2   individual inmate is unsuitable for parole on public safety grounds."

3   (*Dannenberg* at p. 1096, footnote 16.  See also page 1080: "the

4   regulations do set detailed standards and criteria for determining

5   whether a murderer with an indeterminate life sentence is suitable

6   for parole.")  However, Petitioners in these cases have proven that

7   there are no "detailed standards" at all.  Instead the Board has

8   systematically reduced the "detailed standards" to empty words.  The

9   remedy this Court orders, that there truly be "detailed standards,"

10  requires the promulgation of further rules and procedures to

11  constrain and guide the Board's powers.  This remedy differs in

12  specifics, but not in kind, from what courts have previously imposed

13  and have always had the power to impose.

14      The Board must fashion a training program and further rules,

15  standards and regulations based on the opinions and decisions of the

16  state and federal court cases which provide a limiting construction

17  to the criteria which are applied.[9]  The Board must also make

18  provisions for the continuing education of its commissioners as new

19  case law is published and becomes binding authority.  This Court will

20  not, at this point, outline the requirements and lessons to be taken

21  from the above cases.  It is the Board's duty, in the first instance

22  to undertake this task.  The training program, and associated rules

23  and regulations, shall be served and submitted to this Court, in

24  _____
    [9]While the showing and analysis in this case was limited to § 2402(c)(1), the
25  conclusions that the evidence compelled, that the Board has been carelessly
    distorting and misapplying the regulations, is not so limited.  Accordingly, the
26  training program that is necessary for the Board can not reasonably be limited to
    just § 2402(c)(1).  Thus, to the extent case law recognizes, clarifies and
27  establishes remedies for other due process violations they must also be
    incorporated into the necessary rules and training the Board is required to abide
28  by.

                                  33

Exhibit #18 Page 33

1  writing, within 90 days.  Counsel for Petitioners, and any other
2  interested parties, may submit briefs or comments within 30 days
3  thereafter.  After receipt and review of the materials this Court
4  will finalize the training program, and associated rules, and the
5  Petitioners in these cases shall receive a new hearing before a Board
6  that does not operate with the unfettered discretion and caprice
7  demonstrated by the evidence here presented.

8                                ORDER

9      For the above reasons the habeas corpus petition is granted and
10  it is hereby ordered that Petitioner be provide a new hearing which
11  shall comply with due process as outlined above.  Respondent shall
12  provide weekly updates to this Court on the progress of its
13  development of the new rules and regulations outlined above.

14

15

16

17  DATED:  Aug 30, 2007        Linda R. Condron
18                              LINDA R. CONDRON
                                JUDGE OF THE SUPERIOR COURT
19

20  cc:  Petitioner's Attorney (Jacob Burland)
21       Attorney General (Denise Yates, Scott Mather)
22
23
24
25
26
27
28

                              34